# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| CITY OF SOUTHFIELD GENERAL EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | Civil Action No. <br><br> <u>CLASS ACTION</u> |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | |
| NATIONAL VISION HOLDINGS, INC., L. READE FAHS, and PATRICK R. MOORE, | ) ) ) ) | |
| Defendants. | ) ) ) | <u>DEMAND FOR JURY TRIAL</u> |

# COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff City of Southfield General Employees' Retirement System ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of the U.S. Securities and Exchange Commission ("SEC") filings of National Vision Holdings, Inc. ("National Vision" or the "Company"), the Company's press releases, and analyst reports, media reports, and other publicly disclosed reports and information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons who purchased shares of National Vision common stock between May 13, 2021 and May 9, 2022, both dates inclusive (the "Class Period"), seeking to pursue remedies under the Securities Act of 1934 (the "1934 Act") against National Vision and certain of the Company's senior officers and directors.

- 1 -

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act, 15 U.S.C. §78aa.

3.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b), and §27 of the 1934 Act, because National Vison is headquartered in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

4.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

5.      Plaintiff City of Southfield General Employees' Retirement System, as set forth in the certification attached hereto and incorporated by reference herein, purchased National Vision common stock during the Class Period and suffered damages as a result.

6.     Defendant National Vision is headquartered in Duluth, Georgia.  The Company is an optical retailer that provides eye exams, eyeglasses, and contact lenses to value-seeking and lower-income consumers.  National Vision common stock trades on the NASDAQ under the ticker symbol "EYE."

7.     Defendant L. Reade Fahs ("Fahs") was at all relevant times the Chief Executive Officer ("CEO"), President, and a director of National Vision.

8.     Defendant Patrick R. Moore ("Moore") was the Chief Financial Officer ("CFO") and senior vice president of National Vision during the Class Period.  After the Class Period, in August 2022, defendant Moore transitioned to become National Vision's Chief Operating Officer.

9.     The defendants referenced above in ¶¶7-8 are collectively referred to herein as the "Individual Defendants."  The Individual Defendants, together with National Vision, are referred to herein as "defendants."

10.    Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, acquisition plans, and present and future business prospects, as alleged herein.  In addition, the Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and

misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

11.    As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the 1934 Act and trade on the NASDAQ, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, services, markets, competition, acquisition plans, and present and future business prospects.   In addition, the Individual Defendants each had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded common shares would be based upon truthful and accurate information.   Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

12.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases, and other public statements

pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

## BACKGROUND

13.    Based in Duluth, Georgia, National Vision is an optical retailer that provides eye exams, eyeglasses, and contact lenses.  The Company specializes in value-seeking and lower-income consumers.

14.    National Vision operates in two reportable segments: (i) the Owned & Host segment; and (ii) the Legacy segment.  The Owned & Host segment includes National Vision's two owned brands, America's Best Contacts and Eyeglasses ("America's Best") and Eyeglass World, as well as Vista Optical locations in select Fred Meyers stores.  Within this segment, the Company also provides low-cost vision care products and services to American military service members by operating Vista Optical locations on select military bases across the country.  The

Legacy segment consists of National Vision's long-term strategic relationship with Walmart to operate vision centers in select Walmart stores. In addition, the Company's wholly owned subsidiary, FirstSight Vision Services, Inc., which is licensed as a single-service health plan under California law, issues individual vision plans in connection with the Company's America's Best operations in California and arranges for the provision of optometric services at optometric offices next to certain Walmart stores throughout California.

15.   As of the end of fiscal year 2021, National Vision's owned brands consisted of 840 America's Best retail stores and 125 Eyeglass World retail stores. In America's Best stores, vision care services are provided by optometrists employed by National Vision or by independent professional corporations or similar entities. Eyeglass World locations primarily feature eye care services provided by independent optometrists and optometrists employed by independent professional corporations or similar entities and on-site optical laboratories that enable stores to quickly fulfill many customer orders and make repairs on site.

16.   As of the end of fiscal year 2021, National Vision's Host brands consisted of 54 Vista Optical locations on select military bases and 29 Vista Optical locations within select Fred Meyer stores. These brands provide eye exams

primarily by independent optometrists.  This segment also includes sales from America's Best, Eyeglass World, and military omni-channel websites.

17.    As of the end of fiscal year 2021, National Vision's Legacy segment consisted of managing the operations of, and supply inventory and laboratory processing services to, 230 vision centers in Walmart retail locations.  Under the Company's management and services agreement with Walmart, National Vision's responsibilities include ordering and maintaining merchandise inventory, arranging the provision of optometry services, providing managers and staff at each location, and training personnel, among other services.

18.    One of the most important components of the Company's operations and prospects is National Vision's ability to recruit and retain specialized staff and healthcare providers, in particular optometrists.  As the Company has acknowledged in SEC filings, the recruitment and retention of vision care professionals is highly material to National Vision's business.  For example, the Company's 2019 Form 10-K annual report, filed with the SEC on February 26, 2020, stated that "[f]ailure to recruit and retain vision care professionals for our stores could adversely affect our business, financial condition and results of operations" and that the Company's "ability to hire and/or contract with vision care professionals for our stores is critical to our operations as well as our growth strategy."  As CEO, defendant Fahs routinely

told investors that National Vision "can always use more optometrists" and was continuously investing in "optometrist recruitment and retention programs."

19.     In early 2020, National Vision's business was severely disrupted by the start of the COVID-19 pandemic.  In March 2020, National Vision temporarily closed all of its retail locations.  Over the next several weeks, the Company slowly opened back up, but the disruption negatively impacted the Company's first and second fiscal quarters of 2020.[1]  During the first quarter of 2020, National Vision's adjusted comparable store sales ("CSS") – a critical metric that measures the Company's organic sales performance over time – fell 10.3%.  Similarly, during the second quarter of 2020, National Vision's adjusted CSS fell 36.5%.

20.     On June 8, 2020, National Vision issued a press release hailing the Company's successful reopening of Company stores and retail locations following pandemic-induced closures.  In the release, defendant Fahs highlighted the favorable response of National Vision customers to the reopening, which he claimed reflected the Company's "'strong value proposition, as well as pent-up demand and benefits from government stimulus payments.'"

---

[1]     National Vision operates on a retail fiscal calendar that results in a given fiscal year consisting of a 52- or 53-week period ending on the Saturday closest to December 31.

21.     Over the next several quarters, National Vision's financial performance seemed to validate defendant Fahs' rosy characterizations of the Company's business and prospects.  For the next four quarters – from National Vision's third fiscal quarter of 2020 through its second fiscal quarter of 2021 – National Vision experienced double digit adjusted CSS growth, which climbed as high as 76.7% for the second quarter of 2021 as the Company lapped pandemic-impacted 2020 results.  National Vision's quarterly net revenues also more than doubled during this time period, from $260 million for the second quarter of 2020 to $550 million for the second quarter of 2021.

22.     Moreover, National Vision achieved substantially improved margins and operating costs during this time frame, with adjusted operating margins exceeding 10% every quarter from National Vision's third fiscal quarter of 2020 through its third fiscal quarter of 2021.  National Vision's costs applicable to revenue, which include optometrist-related costs, fell to a historically low range of 42.1% to 43.6% as measured as a percent of net revenue during this time frame.  Similarly, the Company's selling, general, and administrative ("SG&A") expenses, which include payroll and optician expenses, dropped to a low of just 39.3% as measured as a percent of net revenue for National Vision's third fiscal quarter of 2020 and remained around 42% as measured as a percent of net revenue through

National Vision's third fiscal quarter of 2021, indicating that the Company was achieving significant operating efficiencies during this period.

23.    During the Class Period, defendants highlighted these favorable financial and operating trends, repeatedly raising the Company's guidance. Furthermore, defendants claimed that National Vision was skillfully navigating the pandemic and had largely avoided the labor disruptions that were then impacting other retailers, claiming that the Company was outperforming the industry in terms of recruitment and retention and implementing ordinary compensation increases.

24.    Unbeknownst to investors, these assurances were materially false and misleading when made.  Behind the scenes, National Vision was struggling to retain and recruit critical healthcare staff sufficient to keep up with surging customer demand.  In mid-2021, National Vision was forced to implement a significant wage investment for both associates and optometrists that would materially impair the Company's earnings.  However, the Company concealed the scope of the investment and structured it so that the enhanced payouts would largely hit the Company's bottom line in the fourth quarter of 2021.  National Vision's efforts ultimately failed to adequately address the Company's retention and recruitment crisis, causing the Company to suffer a pronounced optometrist shortage by the first quarter of 2022, materially negatively impacting the Company's financial and operational results and

prospects.  Defendants' failure to disclose these adverse facts caused the price of National Vision stock to trade at artificially inflated prices, reaching a high of nearly $66 per share during the Class Period.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

25.    The Class Period begins on May 13, 2021.  On that date, National Vision issued a release which announced the Company's financial results for the first quarter of 2021 (the "1Q21 Release").  The release reported, year-over-year, a 13.7% increase in net revenue to $534.2 million, a 35.8% increase in adjusted CSS, a 346% increase in net income to $43.4 million, and a 302% increase in diluted earnings per share ("EPS") to $0.48.  The release also revised National Vision's 2021 outlook upward, increasing, on an annual basis: (i) adjusted CSS from a range of 13% to 16% to a range of 16% to 19%; (ii) net revenue from a range of $1.93 billion to $1.98 billion to a range of $1.975 billion to $2.025 billion; (iii) adjusted operating income from a range of $130 million to $137 million to a range of $155 million to $162 million; and (iv) adjusted diluted EPS from a range of $0.88 to $0.93 to a range of $1.07 to $1.12.  In the release, defendant Fahs stated that it was "'a truly remarkable start to the year, as patients and customers chose us at record levels.'"  Defendant Fahs further stated that, despite the uncertain environment

caused by the COVID-19 pandemic, "we remain well positioned to navigate the rest of the pandemic and beyond."

26.    On the same day, National Vision held an earnings call with analysts and investors to discuss National Vision's first quarter 2021 results hosted by defendants Fahs and Moore.  In his prepared remarks, defendant Fahs attributed the "outstanding quarter" in substantial part to "the great execution of our store teams, who rose to the challenge of serving the increased demand for our low-cost eye exams, glasses and contact lenses."  Defendant Fahs continued, in pertinent part, as follows:

> First, we believe the strong results were likely helped by the interplay of the continued hastening of industry trends that have been helping us for a long time and pent-up consumer demand.
>
> These trends favor larger, better capitalized value retailers like National Vision.  The optical industry remains highly fragmented, and we're confident that we continue to outpace the industry and grow market share.
>
> *                   *                   *
>
> **Optometrists play a key role in our ongoing success, and we have a great network of over 2,200 optometrists associated with the company. Our strong performance this quarter would not have been possible without their tireless hard work and commitment to patient care**.
>
> **As I've said in the past, we can always use more optometrists, and we continue to invest in our top optometrist recruitment and retention programs to keep our high retention rates near record levels**.

- 12 -

> ***With healthy doctor coverage, we're able to meet strong patient demand for eye exams with a safety-first approach****.*

27.    Defendant Fahs also stated that "[o]ur store teams and optometrists are executing well" and "[w]e think there's white space to potentially still double our store count."

28.    During the question-and-answer portion of the call, an analyst questioned whether National Vision had reached capacity regarding booking its optometrist time, which defendant Fahs denied.  To the contrary, defendant Fahs claimed that the Company was outperforming the industry in terms of securing ample workforce capacity, as reflected, in pertinent part, by the following exchange:

**Adrienne Eugenia Yih-Tennant** - Barclays Bank PLC, Research Division – MD, Senior eCommerce & Brand Retailing Analyst

Congratulations on another stellar quarter.  So Reade, my first question is a 35% adjusted comp in '18 reported comp, it would seem that the capacity utilization of maybe the exam aspect, the optometrist time, it seems like they might be being booked pretty close to all the time.

So I guess the question is, how far is it stretching the system?  Are you staffing these longer hours to service demand and can that keep going? . . .

**L. Reade Fahs** - National Vision Holdings, Inc. – CEO & Director

Good.  So thank you for that.  Again, I just want to point out, to sort of achieve these numbers takes really strong execution on a great many fronts.  I mean, just have the labs keeping up, the distribution standard, the store teams.  However, as you mentioned, sort of your – patients were choosing our eye exams in far greater numbers.  ***We do***

***think that there's still capacity there for ongoing growth, and we have – we're always working on different ways to make sure the flow through the store is as efficient as possible so that our doctors can do what they do best***, which is sort of do the good eye exam.

And we have a lot of people sort of helping to get them the data they need to be great optometrists along the way.  But we do think – ***we aren't feeling that there's tremendous capacity constraints for us.  We do think the industry is seeing some capacity constraints.  Many independents, especially, have reduced their store hours.  We have not reduced our store hours.  Many are seeing a lot less exams per hour***.

And we have been focusing very much on a safety-first mindset with cleaning and cleaning and cleaning and social distancing, masks and all of those pieces.  ***But we think we're benefiting from the reduced industry capacity.  We think that's been one of the helps.  But we think we're still well poised to continue at strong high levels, continued growth***.

29.    Similarly, when asked by an analyst whether the Company was experiencing "significant wage pressures either for the optometrists and/or the store associates," defendant Fahs stated that National Vision was "operat[ing] in the same world everyone else does," and simply paying competitively in a tight labor market, stating, in pertinent part, as follows:

***We operate in the same world everyone else does.***  And labor is tighter than it was at this particular moment in time, sort of from the big stimulus checks.  So to us, this COVID thing has been about different chapters and chapters change, and ***we are in a chapter now of tight labor.  And we like to pay competitively and make sure that our folks are well compensated.  So that's something we're watching and managing carefully***.

- 14 -

30.     Also on May 13, 2021, National Vision filed with the SEC a Form 10-Q for the first fiscal quarter ended April 3, 2021, which was signed by the Individual Defendants.  The Form 10-Q contained the financial information regarding National Vision's first quarter 2021 financial results contained in the 1Q21 Release.

31.     On August 12, 2021, National Vision issued a release which announced the Company's financial results for the second quarter of 2021 (the "2Q21 Release").  The release reported, year-over-year, a 111% increase in net revenue to $549.5 million, a 76.7% increase in adjusted CSS, a 186% increase in net income to $37.6 million, and a 176% increase in diluted EPS to $0.42.  The release also revised National Vision's 2021 outlook upward, increasing on an annual basis: (i) adjusted CSS to a range of 19% to 22%; (ii) net revenue to a range of $2.01 billion to $2.06 billion; (iii) adjusted operating income to a range of $180 million to $187 million; and (iv) adjusted diluted EPS to a range of $1.28 to $1.33.  In the release, defendant Fahs hailed National Vision's "'exceptionally strong results for the second quarter'" and stated he was "'excited about our long-term opportunities for expansion and market share growth.'"   Defendant Fahs continued: "'Given our consistent performance since re-opening last year and our safety first approach, we are confident in our ability to navigate the challenging and dynamic environment and remain in a position of strength to drive long-term value for our stakeholders.'"

32.     On the same day, National Vision held an earnings call with analysts and investors to discuss National Vision's second quarter 2021 results hosted by defendants Fahs and Moore.  In his prepared remarks, defendant Fahs stated: "We continue to invest in our optometrist recruitment and retention programs *to keep our high retention rates near record levels*," adding that the Company was "always seeking more optometrists" and "excited to welcome newly graduated optometrists to the National Vision family" and that the Company was considered "one of the top destinations for these new grads."

33.     In his opening remarks, defendant Moore stated that "[o]ur outlook now projects net revenue in the second half to be generally flat with last year" and "we expect generally flattish comps in both the third and fourth quarters, driven by continued positive transaction growth."  Further, defendant Moore stated that "[o]ur outlook continues to project a decline in profitability in the second half as we lap the exceptional margin expansion in 2020 *but would still represent a strong double-digit increase in profitability compared to 2019*."

34.     During the question-and-answer portion of the call, defendant Moore responded to an analyst question about gross margin compression in the second half of the year stating that the Company was experiencing "a little lower growth in optometrist costs" and with "wage inflation, we could see that either remain there or

maybe return closer to normalized levels."  Later, defendant Moore was again asked about potential pressure on the labor front and expected inflationary wage pressures. Defendant Moore responded by minimizing the inflationary pressures and claiming any increases were already captured by the Company's 2021 guidance, stating, in pertinent part, as follows:

> *I don't think there's any surprises inside of the year.  We've seen – if we go to a bigger picture, we've seen some degree of modest wage inflation for our doctors*.  We're happy to pay them competitive rates because they do a lot of work here for us and for the patients.  That has moderated a bit across the last year, and we've been happy to see that moderation.  But we also understand that it's a supply-demand equation in every market.  It's not – *they're not ubiquitous supply demand challenges for optometrists*, but we do that in every market.
>
> So I would expect to see some degree of continued wage inflation there.  In terms of our associates, it really, it's a function of what our states doing with minimum wages – what are we doing relative to market changes.  *We have guided that we are not immune to wage inflation.  We expect to see some of that.  It's absolutely included in our guide.  So really more of the same, we're expecting a little more associate inflation, which is in the guide*.

35.    Similarly, defendant Moore subsequently stated that for the third quarter there would probably only be "a little bit of wage inflation."  He continued, in pertinent part, as follows:

> And then longer term, . . . I think the things that we're doing our best to work around are this wage inflation, which thus far, we've not had to signal huge implications there.  We've managed through that really well.  Not expecting that to continue to change to a large degree. But it will be curious to see kind of how states play out.

- 17 -

36.     When asked by an analyst about optometrist turnover trends, defendant Fahs responded: "We're still near record highs on retention of doctors, and you can't deliver results like we delivered in Q2 if you don't have strong doctor coverage throughout.  So yes, that – there's a good correlation there.  And yes, but we're still near record highs on retention."  Later, when asked to elaborate on labor and wage pressures, defendant Fahs again claimed the Company was experiencing relatively "mild" issues compared to the overall industry, stating, in pertinent part, as follows:

> In terms of staffing challenges, we're not immune to macro trends, **but the impact to us on staffing challenges is mild relative to what we're all sort of hearing about and reading about in much of retail in the service industry**.  And again, I think that relates to the fact that we are an environment of optical professionals who define themselves as optical professionals, who have their – what makes careers in optics and the – given our success, **we're considered a great and very secure place to have your optical career**.  I mean, the nice thing about the growth that we had, it provides lots of opportunity for career development here.
>
> And I think a lot of people see that and say, "wow, I can really build a career here."  The more stores you have built, the more district managers you need, the more regional vice presidents you need.  So the odds of promoting and getting promoted and growing your career here are quite strong.

37.     Also on August 12, 2021, National Vision filed with the SEC a Form 10-Q for the second fiscal quarter ended July 3, 2021, which was signed by the Individual Defendants.   The Form 10-Q contained the financial information

regarding National Vision's second quarter 2021 financial results contained in the 2Q21 Release.

38.     Defendants' statements referenced in ¶¶25-37 above were materially false and misleading when made because they misrepresented and failed to disclose material adverse facts about National Vision's business, operations, and prospects, which were known to defendants or recklessly disregarded by them, as follows:

(a)     that National Vision was experiencing extraordinary wage and labor pressures as a result of intense competition and disruptions in the labor market due to the COVID-19 pandemic;

(b)     that National Vision had made a significant multi-million dollar investment in wage and compensation payments to its vision care professionals in order to prevent mass defections in the middle of 2021;

(c)     that the enhanced payouts were expected to negatively impact the Company's fourth quarter 2021 costs and profit margins to an extent materially greater than what had been disclosed to investors;

(d)     that, as a result of (a)-(c) above, the Company's profitability metrics were expected to deteriorate below not only favorable 2020 results, but also pre-pandemic levels; and

(e)    that the Company's recruitment and retention efforts had not been successful and there was a substantial undisclosed risk that National Vision would experience staff and optometrist shortages and capacity constraints.

39.    Then, on November 10, 2021, National Vision issued a release which announced the Company's financial results for the third quarter of 2021 (the "3Q21 Release").  The release reported, year-over-year, a 19.9% increase in net revenue to $518.0 million, a 13.3% increase in adjusted CSS, a 16.2% increase in net income to $41.0 million, and a 6.7% increase in diluted EPS to $0.45.  The release also tightened the Company's sales and revenue outlook towards the upper end of the previously issued 2021 guidance, but did not change the Company's earnings outlook, indicating that National Vision was suffering from a substantial deterioration in profit margins during the fourth quarter of 2021.

40.    On the same day, National Vision held an earnings call with analysts and investors to discuss National Vision's third quarter 2021 results and fourth quarter trends hosted by defendants Fahs and Moore.  In his opening remarks, defendant Moore admitted that the "lower Q4 profitability" was not due to unforeseen circumstances, but rather in substantial part "due to the impact of the wage investments *implemented earlier this year*."  Later, when asked by an analyst how one could "marry those higher sales with perhaps lower profitability,"

defendant Moore responded that the Company had "made surgical wage investments *around midyear* in our stores, associates and lab associates where we saw immediate returns in hiring and retention rates" and "also made investments in doctor compensations."

41.    As a result of this news, the price of National Vision common stock dropped from $63.52 per share when the market closed on November 9, 2021 to $55.22 per share when the market closed on November 10, 2021, a 13% decline, on abnormally heavy volume of over 1.7 million shares traded.

42.    However, because defendants failed to disclose the full truth, the price of National Vision common stock remained artificially inflated.   In addition, defendants continued to make materially false and misleading statements regarding the labor environment facing the Company.

43.    For example, during the November 10, 2021 quarterly conference call, defendant Fahs stated that "our business has demonstrated a track record for consistency over the past 2 decades with 72 quarters of positive comparable store sales growth prior to our COVID closing followed by strong comp performance since reopening last year."  Defendant Fahs also commented on positive trends in the industry that he claimed would "continue and to favor larger, better-capitalized value retailers like National Vision."

44.     In his opening remarks, defendant Moore stated that National Vision's "third quarter performance further highlights the consistency and resiliency of our business model," and the Company is "well positioned to effectively navigate this evolving environment and [is] pursuing the right strategies to drive continued market share gains and sustainable growth."  Later, in response to an analyst question about whether National Vision had experienced any sort of demand "pull forward" which would negatively impact future quarters, defendant Moore responded that National Vision was "not going to suffer from a lot of cycle pull forward," and that, other than lapping the stimulus-fueled growth that had occurred during the first half of 2021, National Vision was "back into normal seasonality, normal kind of comp growth expectations."

45.     Also on November 10, 2021, National Vision filed with the SEC a Form 10-Q for the third fiscal quarter ended October 2, 2021, which was signed by the Individual Defendants.   The Form 10-Q contained the financial information regarding National Vision's third quarter 2021 financial results contained in the 3Q21 Release.

46.     On December 1, 2021, defendants Fahs and Moore participated in the Morgan Stanley Global Consumer & Retail Conference.   At that conference, defendant Fahs stated that "***[w]e are pleased with our ability to staff our stores amid***

*this more difficult labor environment*," and "*we are staffing our stores well and appropriately now*."  When asked about expectations for 2022, defendant Moore stated that he felt "good about" "just the business continuing to grow and attract and retain customers."  He continued: "I do think there will be a little bit of a grow over here and there.  But in general, I think a lot of things will be more of the same."

47.    On February 28, 2022, National Vision issued a release which announced the Company's financial results for the fourth quarter and full year 2021 (the "FY21 Release").  For the fourth quarter, the release reported, in line with the muted updated guidance previously provided, year-over-year, a 3.8% increase in net revenue to $477.9 million, a 1.2% increase in adjusted CSS, an 82.3% decrease in net income to $6.3 million, and an 82.2% decrease in diluted EPS to $0.07.  The release also provided National Vision's 2022 outlook, stating that the Company expected, on an annual basis: (i) adjusted CSS within a range of (1%) to 1.5%; (ii) net revenue within a range of $2.12 billion to $2.17 billion; (iii) adjusted operating income within a range of $140 million to $150 million; and (iv) adjusted diluted EPS within a range of $1.03 to $1.10.  In the release, defendant Fahs represented: "'Going forward, while the macro environment remains dynamic, *I remain confident in our ability to deliver the consistent sustainable growth we have experienced for the past few decades*.'"

48.     On the same day, National Vision held an earnings call with analysts and investors to discuss National Vision's fourth quarter and full year 2021 results and 2022 trends hosted by defendants Fahs and Moore.  In his opening remarks, defendant Fahs stated that there have been "macro headwinds [that] have affected store operations and customer traffic thus far in 2022."  This included the Omicron variant which "impacted [their] ability to staff stores based on optometrist and associate illness" and severe winter weather, but defendant Fahs nonetheless represented that "*we believe our foundation is solid and are confident in the health of our business model*."  Defendant Fahs also stated that "*our business performance has been consistent across strong and weak economic periods*."  He further stated that the Company's "*performance is aided by ongoing positive trends*" and that "*[we] expect these trends, combined with other macro environmental factors to continue to favor our value positioning to help us to drive market share gains*."

49.     Specifically with respect to optometrist retention and labor pressures, defendant Fahs stated that National Vision "maintain[ed] high retention rates" and that the compensation and recruiting initiatives launched in the prior year had been successful, stating in pertinent part as follows:

> On these calls, you've repeatedly heard me say that we are always seeking more optometrists.  Optometrists play a key role in our company's ongoing success because the optical customer journey typically begins with an eye exam.  That's why we've always been so

focused on making sure we are offering great places for optometrists to practice, and thereby increase exam accessibility for our patients. ***This means continuing to invest in programs that attract optometrists and maintain high retention rates. In 2021, new initiatives related to optometrist compensation and recruiting were implemented. And thus far, we've been encouraged with the early results of these initiatives. These initiatives will continue to be a focus area in 2022***.

50.     In his opening remarks, defendant Moore stated in regard to the 2022 outlook that, despite the uncertainty caused by the macro environment, "our consistent performance over time gives us sustained confidence in our business." Defendant Moore also stated that "our fourth quarter performance further highlights the consistency and underlying strength of our business model," and that "despite the short-term macro headwinds, we are excited about the strategies and initiatives that we've shared today and that give us confidence that we are well positioned to deliver improving performance as we move through 2022."

51.     During the question-and-answer session, defendant Fahs was asked to "discuss your retention rates for your employees over the last few months versus historically, given the wage investments that you've made and will continue to make this year." In response, defendant Fahs stated that National Vision enjoyed strong retention rates and low employee attrition because it enjoyed numerous competitive advantages, stating in pertinent part as follows:

[T]o your question about retention rates, we don't share the specific numbers on that. ***I will tell you, our stores are well staffed now that***

*we're in good shape on that*. And a vagary of this category that's different from others that you might look at is, a lot of our associates regard themselves as an optical professional and that they're career optician or they're career optical person.

There are very nice aspects to working in this field. You're in healthcare. There's a fashion component. There's a nice sense of fulfillment that you're helping people. There are some beautiful moments when a child sees for the first time. So there's a lot of fulfillment in that, and there's a – so *there's not a, oh, should I go work at the restaurant down the street. They're competitive. Their labor frame is other optical firms. And we've had such nice success for so long that there's a feeling like they are with a winning team, which is always good*.

Also, one of the things that we're real pleased about is sort of our career tracking. And I'll just give you a rough sense that around 40% of our store managers started in an entry-level role with us without optical experience and grew from within and those people are really dedicated to National Vision and that we've given them great, great career growth. And they're well aware that a company that's opening, formerly 75, now 80 stores – at least 80 stores a year is a great place to grow a career because a growing company has lots of opportunity. *And if you feel like you're learning and growing and respected and getting promotions and you like optical, you tend to stick around. So I think relative to a lot of companies you might follow, it's a little better situation than you might expect if you didn't understand optics as deeply*.

52. Also on February 28, 2022, National Vision filed with the SEC a Form 10-K for the fiscal year ended January 1, 2022, which was signed by the Individual Defendants. The Form 10-K contained the financial information regarding National Vision's fourth quarter and full year 2021 financial results contained in the FY21 Release.

53.    On March 10, 2022, defendants Fahs and Moore participated in the UBS Global Consumer & Retail Conference.  During the conference, which took place more than two-thirds through the first quarter of 2022, defendant Fahs emphasized "*that for the 72 quarters prior to the closing of the pandemic, we had – we never had a negative comp quarter*."  Defendant Fahs continued in pertinent part as follows:

> *We averaged 5% comp for that period of time and we were told by people like yourselves that there's no other retailer in that period of time from 2002 to 2020 that had consistent comp quarters*.
>
> *We've never had a negative comp quarter*.  In fact, because of the 2 COVID quarters, we get to have a negative comp quarter.  *But it's been very, very consistent, good times and bad, high gas prices, low gas prices, and of course, the recession of '08 and '09.  The recession of '08 and '09 was very good to us*.

54.    When asked about optometrist recruitment and retention and labor market pressures, defendant Fahs responded by stating that the Company had "high retention rates" and a "strong ability to recruit" and that, while the Company was "always" looking for more optometrists, this regular outreach was consistent with National Vision's ordinary operating environment and something that the Company was constantly improving, stating in pertinent part as follows:

> So as we went public just about 5 years ago, and what we said at the time was we – our process starts with an eye exam, eye exams are given by optometrists.  And although we have the largest network of employed optometrists in America that's between 6% and 7% of all

optometrist practicing in America are practicing with us. ***We have high retention rates and we have strong ability to recruit***. We have never said we have enough optometrists. ***We are always looking for more optometrists, and we do not anticipate we will ever from any stage, say, "Great news. We now have all the optometrists we want." That's just not the business we're in***.

Having said that***, there are a variety of things we are doing to improve retention, to improve recruitment, and we feel we're getting ever better at of that***, and we think the employment model, which is our most common model, is ever more the model of choice for optometrists going forward.

55.   Defendant Fahs also highlighted the Company's remote medicine options, which he represented "provides great flexibility during different phases of life, and a lot of doctors who were doing it with us now are very much enjoying it. It has a lot of different benefits, ***including recruitment and retention***." Defendant Fahs added that "***we see this as a mode of practice that will help us to attract and retain doctors going forward***."

56.   Defendants' statements referenced in ¶¶43-55 above were materially false and misleading when made because they misrepresented and failed to disclose material adverse facts about National Vision's business, operations, and prospects, which were known to defendants or recklessly disregarded by them, as follows:

(a)   that National Vision was experiencing extraordinary wage and labor pressures as a result of intense competition and disruptions in the labor market due to the COVID-19 pandemic;

(b)     that National Vision had suffered a severe optometrist shortage in the first quarter of 2022;

(c)     that the lack of sufficient optometrists to meet customer demand had created an acute exam capacity constraint;

(d)     that, as a result of (a)-(c) above, the Company was suffering from a decline in net revenue and CSS during the first quarter of 2022; and

(e)     that, as a result of (a)-(d) above, the Company's 2022 financial outlook was materially false and misleading and lacked a reasonable factual basis.

57.     Furthermore, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item 303"), required defendants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and required each risk factor to "adequately describe[] the risk." The failure of the Company's periodic SEC filings to disclose that the extraordinary labor market pressures being suffered by the Company, and the effect of these pressures on the Company's margins, sales,

retention and recruitment efforts, and exam capacity, violated Item 303, because these undisclosed facts were known to defendants and would (and did) have an unfavorable impact on the Company's sales, revenues, and income from continuing operations.  This failure also violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant factors that made an investment in National Vision securities speculative or risky.   Indeed, the boilerplate discussions of potential risks provided by defendants during the Class Period were themselves materially misleading, because they discussed potential future contingencies regarding how a failure to recruit and retain vision care professionals "could" adversely affect National Vision's business, financial condition, and results of operations, but failed to disclose that the Company was *already* suffering from extraordinary labor market pressures, optometrist shortages, and constraints on exam capacity due to problems attracting and/or retaining optometrists, which had materially adversely impacted National Vision's financial results and business prospects.

58.    Then, on May 10, 2022, National Vision issued deeply disappointing financial and operational results for its first fiscal quarter of 2022.  The release stated that during the quarter, on a year-over-year basis, the Company's net revenues had decreased 1.2% to $527.7 million, its adjusted CSS had fallen 6.8%, net income had

decreased 30.6% to $30.1 million, and its diluted EPS had decreased 28.2% to $0.34. The release also slashed the Company's 2022 outlook, lowering adjusted CSS to a range of negative 7% to negative 4%, net revenue to a range of $2.01 billion to $2.07 billion, adjusted operating income to a range of $85 million to $105 million, and adjusted diluted EPS to a range of $0.65 to $0.80.  Notably, the revised projections indicated that the Company was actually performing *worse* in terms of profits and earnings than before the pandemic.  The release blamed "'emerging constraints to exam capacity'" as a major reason for the shortfall, a fact that the Individual Defendants confirmed on the Company's subsequent earnings call related to a lack of sufficient optometrists.

59.    As a result of this news, the price of National Vision common stock dropped from $33.57 per share when the market closed on May 9, 2022 to $24.93 per share when the market closed on May 10, 2022, a nearly 26% decline, on extraordinarily high volume of over 7.1 million shares traded.

60.    As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of National Vision common stock, plaintiff and other Class members have suffered significant losses and damages.

## CLASS ACTION ALLEGATIONS

61.    Plaintiff brings this action as a class action on behalf of a class consisting of all persons who purchased National Vision common stock during the Class Period (the "Class").   Excluded from the Class are defendants and their families, the officers, directors, and affiliates of defendants, at all relevant times, and members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

62.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, National Vision common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by National Vision or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

63.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

64.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

65.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether defendants' statements during the Class Period were materially false and misleading;

(b)     whether defendants acted with scienter in issuing materially false and misleading statements during the Class Period; and

(c)     the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

66.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it

impossible for members of the Class to individually redress the wrongs done to them.

There will be no difficulty in the management of this action as a class action.

## ADDITIONAL SCIENTER ALLEGATIONS

67.   As alleged herein, defendants acted with scienter in that defendants

knew, or recklessly disregarded, that the public documents and statements they

issued and disseminated during the Class Period to the investing public in the name

of the Company, or in their own name, were materially false and misleading.

Defendants knowingly and substantially participated or acquiesced in the issuance

or dissemination of such statements and documents as primary violations of the

federal securities laws.   Defendants, by virtue of their receipt of information

reflecting the true facts regarding National Vision, and their control over and/or

receipt and/or modification of National Vision's allegedly materially misleading

misstatements, were active and culpable participants in the fraudulent scheme

alleged herein.

68.   Defendants knew and/or recklessly disregarded the false and

misleading nature of the information they caused to be disseminated to the investing

public.   The fraudulent scheme described herein could not have been perpetrated

during the Class Period without the knowledge and complicity of, or at least the

reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

69.   The Individual Defendants, because of their positions with National Vision, controlled the contents of National Vision's public statements during the Class Period.  The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected.  Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.  As a result, each of the defendants is responsible for the accuracy of National Vision's corporate statements and is, therefore, responsible, and liable for the representations contained therein.

70.   The scienter of defendants is further underscored by the Sarbanes-Oxley mandated certifications of defendants Fahs and Moore filed during the Class Period, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about National Vision was

made known to them and that the Company's disclosure-related controls were operating effectively.

71.    In addition, defendants Fahs and Moore, along with other National Vision insiders, sold nearly $36 million worth of National Vision stock during the Class Period.  These sales were highly suspicious in both timing and amount.  For example, defendant Fahs sold $30.6 million worth of National Vision shares in May and August 2021, when the stock was trading near all-time highs and shortly before the revelation of bad news caused the price of National Vision stock to plummet. The number of shares sold by defendant Fahs in this short time frame was also greater than his entire share sales in the 42-and-a-half month period prior to the Class Period.  Further bolstering an inference of scienter, National Vision launched a significant share buyback during the Class Period shortly after the Individual Defendants had completed their own insider selling spree in an attempt to maintain the artificial price inflation in the stock.

## LOSS CAUSATION

72.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of National Vision common stock and operated as a fraud or deceit on Class Period purchasers of National Vision stock by failing to disclose and

misrepresenting the adverse facts detailed herein.   When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of National Vision common stock declined significantly as the prior artificial inflation came out of the stock's price.

73.     As a result of their purchases of National Vision common stock during the Class Period, plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.   Defendants' false and misleading statements had the intended effect and caused National Vision common stock to trade at artificially inflated levels throughout the Class Period, trading as high as $65.92 per share on November 5, 2021.

74.     By concealing from investors the adverse facts detailed herein, defendants presented a misleading picture of National Vision's business, risks, and future financial prospects.   When the truth about the Company was revealed to the market, the price of National Vision common stock fell significantly, dropping to below $25 per share by May 10, 2022, removing the inflation therefrom and causing economic loss to investors who had purchased National Vision common stock during the Class Period.

75.     The decline in the price of National Vision common stock after the corrective disclosures came to light was a direct result of the nature and extent of

defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price decline in National Vision common stock negates any inference that the losses suffered by plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct.

76.     The economic loss, *i.e.*, damages, suffered by plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the price of National Vision common stock and the subsequent significant declines in the value of National Vision common stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

77.     At all relevant times, the market for National Vision common stock was an efficient market for the following reasons, among others:

(a)     National Vision common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient, national stock market;

(b)     as a regulated issuer, National Vision filed periodic public reports with the SEC;

(c)    National Vision regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    National Vision was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

78.    As a result of the foregoing, the market for National Vision common stock promptly digested current information regarding National Vision from all publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of National Vision common stock during the Class Period suffered similar injury through their purchases of National Vision common stock at artificially inflated prices and a presumption of reliance applies.

79.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on defendants' material misstatements and/or omissions.  Because this action involves

defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

80. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pled herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking

statement was authorized and/or approved by an executive officer of National Vision who knew that those statements were false when made.

## COUNT I

### For Violation of §10(b) of the 1934 Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

81.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

82.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

83.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)   engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of National Vision common stock during the Class Period.

84.   Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for National Vision common stock.  Plaintiff and the Class would not have purchased National Vision common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

85.   As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of National Vision common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

86.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

87.   The Individual Defendants acted as controlling persons of National Vision within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of National Vision stock, the Individual Defendants had the power and authority to cause National Vision to engage in the

wrongful conduct complained of herein.  National Vision controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.    Designating plaintiff as Lead Plaintiff and declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including permitting any putative Class members to exclude themselves by requesting exclusion through noticed procedures.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  January 27, 2023              **JOHNSON FISTEL, LLP**

_s/ Michael I. Fistel, Jr._
Michael I. Fistel, Jr.
michaelf@johnsonfistel.com
Georgia Bar No. 262062
Mary Ellen Conner
maryellenc@johnsonfistel.com
Georgia Bar No. 195077
40 Powder Springs Street
Marietta, GA  30064
Telephone:  470/632-6000
770/200-3101 (fax)

**ROBBINS GELLER RUDMAN
  & DOWD LLP**
Samuel H. Rudman
srudman@rgrdlaw.com
Vicki Multer Diamond
vdiamond@rgrdlaw.com
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

**ROBBINS GELLER RUDMAN
  & DOWD LLP**
Brian E. Cochran
bcochran@rgrdlaw.com
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

**VANOVERBEKE, MICHAUD &
  TIMMONY, P.C.**
Thomas C. Michaud
tmichaud@vmtlaw.com
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

*Attorneys for Plaintiff*