UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| CITY OF SOUTHFIELD GENERAL EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | Civil Action No. 1:23-cv-00425-VMC |
| | ) | <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| NATIONAL VISION HOLDINGS, INC., L. READE FAHS, and PATRICK R. MOORE, | ) ) ) ) | |
| Defendants. | ) ) | |
| | ) | <u>DEMAND FOR JURY TRIAL</u> |

**AMENDED COMPLAINT FOR VIOLATIONS OF**
**<u>THE FEDERAL SECURITIES LAWS</u>**

# TABLE OF CONTENTS

**Page**

I.  NATURE OF THE ACTION ........................................................2

II.  JURISDICTION AND VENUE ...................................................8

III.  PARTIES ...................................................................................9

IV.  SUBSTANTIVE ALLEGATIONS ............................................13

    A.  National Vision's Background and the Optical Industry ...................13

    B.  National Vision's Business and Growth Depend on the Company Performing as Many In-Person Eye Exams as Possible ..........................................................................17

    C.  Leading Up to the Class Period, National Vision Suffered from Labor Shortages and Mounting Frustrations Due to Scheduling and Staffing Pressures ..........................19

    D.  The COVID-19 Pandemic Exacerbates National Vision's Staffing Problems and the Company Fails to Timely Adjust to Meet Increasing Consumer Demand for Its Services and Optometrist Demand for Flexibility ....................24

        1.  National Vision Doubles Down on Its Churn and Burn Mentality ....................................................25

        2.  National Vision Dedicates Minimal Effort to Its Remote Medicine Initiatives ....................................27

    E.  Defendants Were Aware of, but Failed to Disclose that Labor Shortages Were Impacting Eye Exam Capacity and Making It Impossible to Meet Growing Demand .................31

    F.  National Vision Begins Overdue and Costly Recruitment, Retention, and Remote Medicine Initiatives to Mask Optometrist Labor Shortages, Exam Capacity Constraints, and National Vision's Inability to Meet Growing Demand ....................36

**Page**

G.    Defendants Revealed the Truth Through a Series of Partial
      Disclosures ...........................................................................40

V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING
      STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ......49

      A.    First Quarter 2021 Financial Results...................................................49

      B.    Second Quarter 2021 Financial Results ............................................57

VI.   EVEN AS THE TRUTH BEGAN TO EMERGE, DEFENDANTS
      CONTINUED TO MISLEAD THE MARKET ...........................................65

      A.    Third Quarter 2021 Financial Results: the Disclosure of Wage
            Investments Negatively Impacting Profitability in the Fourth
            Quarter 2021 ......................................................................66

      B.    Fourth Quarter and Full Year 2021 Financial Results .......................76

      C.    First Quarter 2022 Financial Results: the Disclosure of
            Emerging Constraints on Exam Capacity ...........................................87

      D.    Second Quarter 2022 Financial Results ...........................................100

      E.    Third Quarter 2022 Financial Results...............................................111

      F.    Fourth Quarter and Full Year 2022 Financial Results: the
            Disclosure of Still Prevalent Exam Capacity Constraints, and
            Significant Investments in Optometrist Recruiting, Retention,
            and Remote Medicine Initiatives, Leading to Disappointing
            Fourth Quarter 2022 Results and 2023 Outlook ...............................118

VII.  POST-CLASS PERIOD REVELATIONS..................................................125

VIII. BY FAILING TO DISCLOSE THE TRUE IMPACT OF THE
      OPTOMETRIST LABOR SHORTAGE ON THE COMPANY'S

**Page**

    ABILITY TO MEET INCREASING DEMAND, DEFENDANTS
    VIOLATED SEC DISCLOSURE RULES ................................................127

IX.   ADDITIONAL SCIENTER ALLEGATIONS ..........................................134

    A.   Optometrists Are Critical to the Company's Operations.................134

    B.   The Individual Defendants' Substantial Experience and Control
        Over the Statements Made to the Market..........................................136

    C.   The Individual Defendants' Significant Access to Data, and
        Active Involvement in and Monitoring of the Company's
        Business...............................................................................................139

    D.   Defendants' Admissions and Belated Disclosures Support a
        Strong Inference of Scienter.............................................................144

    E.   The Magnitude of the Fraud, the Timing of Defendants'
        Statements, and Subsequent Revelations of the Truth Are
        Indicative of Scienter........................................................................146

    F.   The Individual Defendants Were Motivated to Artificially
        Inflate the Price of National Vision Stock .......................................148

X.    LOSS CAUSATION ...............................................................................153

    A.   November 10, 2021 Corrective Disclosure.......................................155

    B.   May 10, 2022 Corrective Disclosure ...............................................157

    C.   March 1, 2023 Corrective Disclosure ..............................................158

XI.   APPLICABILITY OF THE PRESUMPTION OF RELIANCE:
    FRAUD ON THE MARKET ..................................................................162

XII.  NO SAFE HARBOR ..............................................................................164

**Page**

XIII. CLASS ACTION ALLEGATIONS ............................................................. 166

COUNT I ............................................................................................. 169

For Violations of §10(b) of the Exchange Act and Rule 10b-5
    Promulgated Thereunder Against All Defendants ........................... 169

COUNT II ............................................................................................ 170

For Violations of §20(a) of the Exchange Act Against the Individual
    Defendants ...................................................................................... 170

COUNT III ........................................................................................... 172

For Violations of §20A of the Exchange Act Against Fahs ........................ 172

By and through its undersigned counsel, Lead Plaintiffs City of Southfield General Employees' Retirement System ("Southfield") and International Union of Operating Engineers, Local No. 793, Members Pension Benefit Trust of Ontario (collectively, "Lead Plaintiffs" or "Plaintiffs"), allege the following against defendants National Vision Holdings, Inc. ("National Vision" or the "Company"), L. Reade Fahs ("Fahs"), and Patrick R. Moore ("Moore") (collectively, "Defendants") upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by National Vision with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain defendants and other related non-parties; (c) review of news articles, securities analyst reports, and shareholder communications; (d) review of other publicly available information concerning the Defendants; (e) investigation of factual sources; and (f) information readily obtainable on the Internet. Many of the facts supporting the allegations contained herein are known only to Defendants named herein or are exclusively within their custody and control. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    Plaintiffs bring this federal securities class action on behalf of themselves and all other similarly situated persons or entities ("Class") who purchased or otherwise acquired the publicly traded common stock of National Vision between May 13, 2021 and February 28, 2023, inclusive ("Class Period"), seeking to pursue remedies for violations of §§0(b), 20(a), and 20A of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b), 78t(a), and 78t-1, and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

2.    This case arises because Defendants misled investors about National Vision's ability to recruit and retain its critical vision care professionals, especially its optometrists, to meet increasing demand for eye exams post-COVID pandemic.

3.    National Vision, an optical retailer, historically experienced significant growth by catering to value-seeking, lower-income consumers. Consumers valued the Company's bundled offers that provided "free" eye exams along with the purchase of two pairs of glasses at low prices.  National Vision's customer's purchases were, therefore, directly tied to the volume of eye exams its optometrists performed, making optometrist availability paramount to the Company's growth.

4.    Unbeknownst to investors, however, prior to the Class Period and leading up to the COVID-pandemic, growth in the Company's high volume, thin

margin business stemmed from a churn and burn business model, in which consumers needing eye exams were seen as quickly as possible. To maintain this pace, National Vision required its optometrists to work an inflexible and demanding schedule, while requiring them to see a high volume of patients per hour, despite having inadequate staffing support, resulting in high attrition rates and ongoing frustration. In addition, the Company's below market pay to its non-optometrist staff resulted in significant staff turnover and often left its retail stores dispensing glasses and contact lenses through non-licensed employees in violation of state optical board rules.

5.      When the pandemic hit, National Vision, along with businesses worldwide, was severely disrupted. But by the time the Company's stores fully re-opened, an industry shift was underway. As a result of the economic strain of the pandemic and government stimulus checks, both lower-income and higher-income consumers flocked to National Vision's "free" eye exams and value-centered products. Competition for the Company's vision care professionals, especially skilled optometrists, dramatically increased, while in-demand optometrists sought a better work-life balance and pushed back against the Company's rigid and inflexible work requirements. National Vision, however, refused to abandon its archaic churn and burn business model and failed to timely adjust, leaving it unable to meet

growing consumer demand for its services or optometrists' demand for better working conditions.  For example, the Company's remote medicine initiatives, which were supposed to allow optometrists to see patients from the comforts of the doctor's home – and help National Vision combat exam capacity issues resulting from a lack of optometrists, were sparse, costly, and riddled with problems.  Given these increased demands and pressures, optometrist burnout and attrition continued to rise, and optometrists retired at unprecedented levels or left the Company in search of an improved work-life balance.

6.      By the start of the Class Period, on May 13, 2021, the Company's staffing and optometrist labor shortage problems were immense.  It was eminently clear within the Company that National Vision could not continue to meet surging demand for eye exams.  Starting in mid-2021, and throughout the Class Period, National Vision implemented belated and costly recruitment and retention initiatives in an attempt to address, but not fully disclose, the Company's struggles.  Unbeknownst to investors, however, National Vision's initiatives were too little and too late, and incapable of counteracting the Company's labor crisis without having a material negative impact on National Vision's financial performance and outlook.

7.      Despite the widespread and internal problems detailed herein, which were known or disregarded with severe recklessness by Defendants, throughout the

Class Period, Defendants repeatedly made false and misleading statements and omissions assuring the market that National Vision was skillfully navigating the post-pandemic business environment and had largely avoided the labor disruptions that were then impacting other retailers, including the Company's competitors. Defendants claimed that the Company was outperforming the industry in terms of recruitment and retention, implementing mere ordinary compensation increases, and developing a robust remote medicine program that would drive the Company's continued profitability and growth.

8.     As a result of Defendants' false statements and material misrepresentations and omissions, National Vision common stock traded at artificially inflated prices, reaching as high as $64.95 per share during the Class Period.  The Individual Defendants (defined herein) personally benefitted from National Vision's artificially inflated stock price, and collectively sold more than *$34 million* of their personally-held Company shares in transactions that were suspiciously timed over a three-month period while the stock traded at artificially inflated prices.  While Defendants were cashing in, investors were in the dark about the true extent of the Company's problems, and were ultimately damaged as a result.

9.     As the truth was exposed through three partial disclosures, National Vision's stock price dropped, causing significant investor losses as the artificial

inflation was removed.  *First*, on November 10, 2021, National Vision reported its third quarter 2021 ("3Q21") financial results and shocked investors by announcing that the Company expected "lower Q4 profitability" due to previously undisclosed and vague "wage investments" "implemented earlier" that year.  Defendants further adjusted National Vision's 2021 guidance, signaling the Company would suffer from gross margin compression and earnings pressures.  In response to these disclosures, the price of National Vision stock fell *24%* from a closing price of $63.52 on November 9, 2021, to a closing of $48.24 on November 16, 2021.

10.    *Second*, on May 10, 2022, Defendants reported disappointing first quarter 2022 ("1Q22") financial results, and significantly slashed National Vision's 2022 outlook due, in part, to "emerging constraints to exam capacity."  Defendants acknowledged that eye exam capacity constraints stemmed from "not having enough doctors for the demand we have."  The lowered 2022 outlook demonstrated that National Vision was actually performing *worse,* in terms of profits and earnings, than before the pandemic.  The market was stunned and the price of National Vision stock fell over *31%* from a closing price of $33.57 per share on May 9, 2022, to a closing price of $23.00 on May 11, 2022.

11.    Throughout this entire period, and up until the final revelation of truth on March 1, 2023, Defendants continued to downplay the Company's labor

shortages, highlight the Company's growth initiatives, and assure the market that any exam capacity constraints were temporary.

12.    *Third*, on March 1, 2023, and despite Defendants' ongoing assurances, investors were shocked once more when Defendants reported disappointing fourth quarter 2022 ("4Q22") financial results and issued lower than expected 2023 guidance because of significant exam capacity constraints that were ***still*** negatively impacting the Company's financial performance and outlook.   Defendants confirmed that despite their affirmations throughout the Class Period, National Vision's labor situation was indistinguishable from the labor shortages of its competitors, and its problems with "optometrist availability" had been ongoing since "the pandemic" – which began ***three years prior***.  Defendants further disclosed the need for "***significant enhancements*** to Optometrist recruiting and retention initiatives, including increased scheduling options" that would "weigh on profitability," and that the Company needed to implement "new techniques and training to minimize" previously undisclosed "productivity loss" in the Company's remote medicine initiatives.  Once more, the market and investors were shocked by Defendants' disclosures, and National Vision's stock price fell ***39%***, from a closing price of $37.36 per share on February 28, 2023 to a closing of $22.76 per share on March 1, 2022 (the next trading day).

13.    In response to Defendants' March 1, 2023 disclosures, analysts highlighted "ongoing vulnerability in [the Company's business] model related to availability of optometrists" and voiced their "deep set frustration [with] a lack of clear messaging around [National Vision's] access to optometrists."

14.    The price of National Vision common stock has yet to recover from its Class Period high of $64.95 per share on November 5, 2021.

## II.    JURISDICTION AND VENUE

15.    The claims asserted herein arise under and pursuant to §§10(b), 20(a), and 20A of the Exchange Act, 15 U.S.C. §§78j(b), 78t(a), and 78t-1, and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act, 15 U.S.C. §78aa.

16.    Venue is proper in this District pursuant to 28 U.S.C. §1391 and §27 of the Exchange Act.  National Vision maintains its principal executive offices in this District, and many of the acts and practices complained of herein, including the dissemination of materially false and misleading information to the investing public, occurred in substantial part in this District.

17.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including, but not limited to, the U.S. mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

18.    Lead Plaintiffs City of Southfield General Employees' Retirement System and International Union of Operating Engineers, Local No. 793, Members Pension Benefit Trust of Ontario, as set forth in the certifications on file [ECF 24-4], incorporated by reference herein, purchased National Vision common stock at artificially inflated prices during the Class Period and were damaged when the truth was revealed, as detailed herein. *See also*, ECF 24-5.

19.    Defendant National Vision is a Delaware corporation with its headquarters located at 2435 Commerce Ave., Building 2200, Duluth, Georgia 30096. The Company is one of the largest optical retail companies in the U.S., with over 1,300 stores in 44 states plus the District of Columbia and Puerto Rico. The Company provides eye exams, eyeglasses, and contact lenses to value-seeking and lower-income consumers. National Vision common stock trades on the NASDAQ under the ticker symbol "EYE." References to "National Vision" or the "Company" also include its predecessors, National Vision, Inc. and Nautilus Parent, Inc.

20.    Defendant L. Reade Fahs has served as the Chief Executive Officer ("CEO") and President of National Vision since January 2003, and has served as a

director on the Company's Board of Directors ("Board") since 2014. Fahs originally joined the Company in April 2002 as its President and Chief Operations Officer ("COO"). During the Class Period Fahs garnered insider proceeds of over $30.6 million through his sales of Company stock.

21.    Defendant Patrick R. Moore has served as the Company's COO since August 2022, after serving as National Vision's Chief Financial Officer ("CFO") and Senior Vice President since 2014. As COO, Moore oversees and leads National Vision's following functions: Retail Operations, Clinical Services, Real Estate, Labs, Manufacturing and Distribution, and Strategy. According to the Company, "as a member of the Executive Leadership Team, [Moore] is instrumental in key strategic decisions to ensure the company's ongoing success." During the Class Period Moore garnered insider proceeds of over $3.4 million through his sales of Company stock.

22.    Defendants Fahs and Moore are collectively referred to herein as the "Individual Defendants."

23.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of National Vision, were privy to confidential and proprietary information concerning National Vision's financials and the Company's labor shortages, recruitment, retention, and remote medicine initiatives, and exam

capacity constraints.  Because of their positions with National Vision, the Individual Defendants had access to non-public information about the Company's business and growth prospects through access to internal corporate documents, such as the "OD Retention Report" and the "Lost OD Days" reports, the Company's intranet, weekly and monthly meetings, annual "Kick Off" and "Back to School" internal meetings, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or with severe recklessness disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

24.    The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of National Vision's business.

- 11 -

25.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of National Vision's quarterly reports; press releases; and presentations to securities analysts, money and portfolio managers and institutional investors, and, through them, the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material, non-public information, the Individual Defendants knew or were severely reckless in disregarding that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants had the opportunity to commit the fraudulent acts alleged herein and are liable for the false and misleading statements pleaded herein.

26.    As senior executive officers and/or directors and as controlling persons of a publicly traded company whose stock was registered with the SEC, traded on the NASDAQ, and governed by the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful

information with respect to the Company's business, including the negative financial impact that would result from the Company's labor shortages, recruitment, retention, and remote medicine initiatives, as well as National Vision's exam capacity constraints and its future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of National Vision stock would be based upon truthful and accurate information. The Individual Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     National Vision's Background and the Optical Industry

27.     Commencing operations in 1990, National Vision is currently one of the largest optical retailers in the United States.  The Company specializes in providing eye exams, eyeglasses, and contact lenses to value-seeking, lower-income customers.  National Vision routinely highlights its "history of profitable growth," "founded on a commitment to providing exceptional value and convenience to customers, enabled by [the Company's] low-cost operating platform."  As of December 31, 2022, National Vision operated through 1,354 retail stores across five brands and 16 consumer websites, employed 13,975 full-time and part-time

employees, and contracted with professional corporations or similar entities that employed 1,841 optometrists.

28.   National Vision has two reportable segments: (a) Owned & Host and (b) Legacy.   Relevant here, the Owned & Host segment includes the brands America's Best Contacts & Eyeglasses ("America's Best") and Eyeglass World, as well as Vista Optical locations in select Fred Meyers stores and on select military bases across the country.   America's Best is priced significantly lower than its competitors and provides customers with a wide selection of frame choices at a low cost entry point.   At America's Best, vision care services are provided by optometrists (eye doctors who examine, diagnose, and treat patients' eyes) who are employed either by the Company or by independent professional corporations or similar entities.  Eyeglass World is a value-centered eyeglass superstore with a broad selection of designer brands and price points, and designed to have a highly personalized level of service.  Eyeglass World locations offer eye exams primarily from independent optometrists and optometrists employed by independent professional corporations or similar entities, and have on-site laboratories.

29.   As of December 31, 2022, the Company had 905 America's Best retail stores, 136 Eyeglass World retail stores, 54 Vista Optical locations on select military bases, and 29 Vista Optical locations within select Fred Meyer stores.  At all relevant

times, the Owned & Host segment was far and away the Company's largest reporting segment, accounting for 80.9% and 80.6% of the Company's 2021 and 2022 annual revenues, respectively. Within Owned & Host, America's Best represented 84.5% and 84.4% of the Company's revenues for 2021 and 2022, respectively. The Company refers to both America's Best and Eyeglass World as its "growth brands" responsible for its "top line growth."

30.     The optical retail industry in which National Vision operates is highly competitive. Competition is generally based upon brand name recognition, price, convenience, selection, service, and product quality. In the value segment of the U.S. optical industry, the Company competes with mass merchants, warehouse club stores, specialty retail chains, independent eye care practitioners and opticians, large national retailers (such as LensCrafters, Pearle Vision, and Visionworks), and online sellers of lenses and eyewear.

31.     National Vision, and the broader optical industry, benefit from a recurring revenue stream because eye care purchases are a medical necessity and considered non-discretionary. For many customers, eye exams occur annually, and optical consumers typically replace their eyeglasses every two to three years, and contact lens customers order new lenses every six to twelve months.

32.    The Company considers National Vision's "recurring revenue" and its "differentiated and defensible value proposition," both of which are driven by low prices, convenient locations, and a broad assortment of branded and private label merchandise and high levels of in-store service, as foundations of its business model.

33.    Despite the recurring nature of its revenue, National Vision experiences seasonality due to the nature of its customer base.  National Vision's customers purchase more during the first half of the year, due to the timing of customers' income tax refunds and annual health insurance program start and reset periods, and less in the fourth quarter of the year, because vision products are usually not included in holiday budgets.  As such, the Company states "it expects a higher portion of annual net revenue, operating income, and cash flows from operations in the first half of the fiscal year, and a lower portion in the fourth fiscal quarter."

34.    Given the importance of eye exams on consumers' health, National Vision is subject to various state licensing regulations.  For example, at least 18 states require that any person who fits eyeglasses, contact lenses, and other vision-correcting devices must by a licensed optician.  National Vision, as an optical provider, is required to ensure – but often failed to ensure – that all of its employees complied with appropriate state regulations.

### B. National Vision's Business and Growth Depend on the Company Performing as Many In-Person Eye Exams as Possible

35.     National Vision provides eye exams to value-seeking and lower-income consumers who often have limited access to healthcare and prioritize value and convenience.  As such, the purchasing cycle of National Vision's eye care products "is closely tied to the frequency with which consumers obtain eye exams." In short, the Company's growth is rooted in eye exam volume, not price.  The more eye exams performed, the more eyeglass and contact lens purchases consumers are likely to make.  Many of the Company's customers do not have vision insurance, which would ordinarily cover eye exams, so free eye exam offers are key to get them in the door.  It is, therefore, no surprise that National Vision is known for its value-driven "bundled offers," including its popular package deal that offers a "free" eye exam that comes with two pairs of eyeglasses for $79.95 at America's Best.[1]

36.     All of National Vision's eye exams to check overall eye health and issue prescriptions must be performed by optometrists.  While National Vision's optometrists focus on performing eye exams and writing prescriptions, they are

---

[1]    Prior to and during the Class Period, America's Best charged $69.95 for an eye exam and two pairs of glasses.  Beginning in 2022, National Vision increased the price for this deal to $79.95.

traditionally supported by a team of optical support staff.  At National Vision this staff includes, among others, retail store managers, administrative staff to answer phones and schedule appointments, optical technicians to do preliminary testing and patient intake and, where required by law, licensed opticians to fit and dispense glasses and contacts.

37.    Because National Vision's consumers' purchases are directly tied to receiving an eye exam, National Vision's ability to recruit and retain optometrists, opticians, and supporting personnel to perform eye exams and sell eyewear is paramount to all aspects of the Company's performance and outlook.  For example, the Company's 2021 annual report, filed with the SEC on Form 10-K ("2021 10-K"), states that the Company's "ability to hire and/or contract with vision care professionals" for National Vision's stores "is ***critical*** to our operations as well as our growth strategy."  The Company also states that "the availability of optometrists and other vision care professionals" directly "affect[s] comparable store sales" ("CSS") – a critical metric that measures the Company's organic sales performance over time – a "***key*** driver" of National Vision's business.

38.    National Vision's optometrists perform millions of eye exams per year, and the Company touts the thoroughness of its exams designed to address its unique consumer base.  For example, the Company's optometrists are trained to provide eye

sight correcting prescriptions, but also to diagnose ocular diseases and related health care oriented issues.  For many of the Company's lower income customers without insurance, their annual eye exams with National Vision optometrists will be the only interaction with a doctor they have that year.

### C. Leading Up to the Class Period, National Vision Suffered from Labor Shortages and Mounting Frustrations Due to Scheduling and Staffing Pressures

39.    National Vision's advertised low prices derived from razor-thin margins.  In order to be profitable, National Vision needed to serve as many customers as possible.  However, unbeknownst to investors, in order to do so, the Company overworked its vision care professionals, including optometrists and staff, in order to meet the demand.

40.    To start, National Vision's historical optometrist recruitment model focused on the niche market of recent optometrist graduates who were saddled with student loans and lacked the business experience to open their own practice. National Vision offered these recent graduates a guaranteed, higher base pay than its competitors.  As such, new optometry school graduates would often accept positions to pay off their student loans, but, as detailed below, would quickly realize that National Vision was not where they wanted to work long-term because of its demanding, stressful, and inflexible conditions of employment.  In contrast, National

Vision's competitors and private practices offered a more favorable work-life balance, as well as a sub-lease environment in which the fee to rent available space in a store was based on a percentage of the profits collected from patients, which was often more profitable to the optometrists in the long-run.

41.    Starting in at least 2019, and prior to the pandemic, National Vision faced optometrist attrition, stemming from the Company's demanding and inflexible work schedules and a lack of sufficient optical team support.  National Vision *required* its optometrists to not only see between four and six patients every hour, regardless of patient needs, but also to work every Saturday, without exception. Because National Vision's customers were lower-income, the Company did not focus on upselling or offering non-essential products.  Instead, the focus from the highest levels of the Company was on optometrists meeting the number of patient-per-hour requirements in order to boost and maximize revenue.

42.    The Company's churn and burn business model led to optometrists having minimal exam time with each patient, leaving them unable to perform the more comprehensive exams often needed.  National Vision also experienced high cancellation rates, and so it would overbook appointments, causing an even higher volume of examinations for the Company's optometrists.  In contrast, non-National

Vision optometrists typically see 1-3 patients per hour and often do not work on weekends.

43.     One-third of America's Best's volume was seen on Saturdays, because the Company's lower-income customers worked Monday through Friday.  As such, having the proper optometrist and staff coverage to conduct the highly-touted, free eye exams was paramount.  Because of the nature of National Vision's business, any adjustments to its optometrists' schedules, such as an extended lunch or an early leave request, was frowned upon and needed to be approved by a District Manager and National Vision's corporate office.  Because of this, even though National Vision falsely touted its high retention rates to the market, in reality, Defendants knew of massive, labor shortages and that the Company optometrists would only stay for an average of two years due to burnout and poor pay.  In fact, while the Company regularly lauded its 80%-90% retention rates, leading up to the pandemic, the real number was closer to 40% to 60%, as the vast majority of optometrists lasted at America's Best for only two years.  This two-year life cycle was well-known within the Company, and, as later disclosed by the Company at the end of the Class Period, National Vision's rigid inflexibility was the main reason it suffered from material recruitment and retention problems during the Class Period.

44.     To help ensure that National Vision's customers were diagnosed by optometrists in a churn and burn environment, the Company relied heavily on technicians to conduct all of the pre-testing procedures before any eye exam.  Due to lower salaries and time-consuming paperwork, National Vision suffered from an extremely high turnover rate from its technicians, which caused both patient and optometrist frustration.

45.     In addition, National Vision historically offered below-market pay to its store staff, and as a result, its stores frequently experienced staffing shortages, which extended to licensed opticians.  This significant turnover of National Vision's licensed opticians resulted in non-licensed employees in the Company's stores frequently practicing opticianry, in violation of state optical board rules.  An optician is similar to a pharmacist because they are responsible for filling prescriptions and ensuring that prescriptions for glasses are correct.  In states that require an on-site licensed optician, a National Vision store operating without a licensed optician present on location would only be allowed to answer phones and make appointments, not to see patients or dispense eyeglasses and contact lenses.  Within National Vision, operating a store without an optician was referred to as "show mode."  To that end, optical retailers traditionally have pre-made signs that they put

in the window notifying potential customers of their limited capabilities on days they lack a licensed optician.

46.    But instead of operating in "show mode," as was often required, National Vision's stores conducted business as usual, frequently in violation of applicable state optical board laws.  For example, Commonwealth of Virginia Board for Hearing Aid Specialists and Opticians ("Virginia Board") Regulation §54.1-1507 states that "[n]o person shall practice or offer to practice as an optician in the Commonwealth unless he holds a license issued under this chapter."  Yet leading up to and continuing into the Class Period, there were at least five stores in Virginia operating with non-licensed employees practicing opticianry by dispensing and fitting eyeglasses and contact lenses in violation of state rules and regulations that permitted only licensed opticians to do so.  When a district manager expressed concern and frustration to his/her regional vice president regarding the improper practices surrounding licensed opticians, the district manager was told that the Company would rather take a fine from the state's board for not having licensed optician coverage than be completely shut down (and operate in show mode) because the store could not have a licensed optician to dispense glasses or contact.

47.    As such, National Vision's optometrists and staff were overworked, and routinely suffered from burnout.  Optometrists complained they were unable to

conduct adequate, comprehensive exams within the narrow time period allocated to them by National Vision for diagnosing patients.  Despite these ongoing labor problems that existed before the pandemic, National Vision did not update its business model and stuck to its stringent churn and burn atmosphere, threating the sustainability of the Company's growth and profitability.

### D. The COVID-19 Pandemic Exacerbates National Vision's Staffing Problems and the Company Fails to Timely Adjust to Meet Increasing Consumer Demand for Its Services and Optometrist Demand for Flexibility

48.    In early 2020, National Vision's business – along with businesses worldwide – was severely disrupted by the COVID-19 pandemic.  In March 2020, National Vision temporarily closed its retail locations and then slowly reopened, calling back its workforce around May 2020, and reopening all stores in June 2020 (the "Post-Pandemic Reopening").  Understandably, the disruption negatively affected the Company's first and second fiscal quarters of 2020.[2]  For example, during the first quarter of 2020 ("1Q20"), National Vision's adjusted CSS fell 10.3% and its revenue increased by a mere 1.8%.  By the second quarter of 2020 ("2Q20"), adjusted CSS fell by 36.5% and revenue fell 39.5%.

_____

[2]    National Vision operates on a retail fiscal calendar that results in a given fiscal year consisting of a 52- or 53-week period ending on the Saturday closest to December 31.

### 1. National Vision Doubles Down on Its Churn and Burn Mentality

49.     On June 8, 2020, National Vision issued a press release announcing the Company's successful Post-Pandemic Reopening following pandemic-induced closures.  In the release, Fahs highlighted the favorable response of National Vision customers to the reopening, which he stated reflected the Company's "strong value proposition, as well as pent-up demand and benefits from government stimulus payments."  As a result of the pandemic, the government provided stimulus checks to supplement income during a time of extreme need.  This resulted in National Vision's lower-income consumers receiving a short-term influx of cash and flocking to stores to purchase their medically necessary contacts and eyeglasses.

50.     In addition to demand from National Vision's traditional customers, the economic pressures of the pandemic brought a host of new, higher-income consumers to National Vision who now sought a more value-centered vision center. The trade-down of these new customers caused even more pressure on the Company's optometrists to meet growing demand.

51.     At the beginning of the Company's reopening, National Vision's optometrists were only required to see one to two patients an hour, but the benchmark numbers quickly escalated to three to four patients per hour, and then increased to five to six patients an hour.  Given increased demands and scheduling

pressures, National Vision's optometrists were retiring at unprecedented levels or giving notice, seeking an improved work-life balance from competitors following the pandemic. Optometrists were in high demand and competitors offered more flexibility and less stressful conditions. The combination of these factors resulted in exam capacity reaching its breaking point. National Vision's stores were backlogged, with patients waiting as long as a month to see a doctor because National Vision simply did not have enough optometrists on staff.

52. Given this massive attrition, in the Post-Pandemic Reopening time frame, it was common for new optometrist recruits to receive signing bonuses with a two-year commitment. In the third and fourth quarters of 2020 ("3Q20" and "4Q20"), National Vision hired seven doctor recruiters, one for each region of the country, whose job responsibilities centered on searching for doctors and then passing their contact information on to district managers. The recruiter positions paid approximately $150,000 annually. The Company also created a Regional Clinical Director position around the first quarter 2021 ("1Q21"), with seven Regional Clinical Directors serving as liaisons between doctors and the Company's professional services office for the purpose of maximizing optometrist recruiting and retention. Each Regional Clinical Director was paid approximately $200,000 per year.

53.     But, as was known within the Company, none of these efforts combatted the Company's burgeoning labor shortages because the Company refused to abandon its historical churn and burn model and adapt to patients' and vision care professionals' needs in the post-pandemic environment.  For example, National Vision reprimanded a district manager during an annual review after the Post-Pandemic Reopening for accommodating employees with higher wages and allowing certain optometrists to work every other weekend (as opposed to every Saturday) in order to retain them.

54.     As alleged below (*see* §IV.E, *infra*), such labor shortages and exam capacity constraints were meticulously tracked by the Company generally, and the Individual Defendants specifically, via various reports, and were discussed internally at Company-wide events.  It was not until March 1, 2023, at the end of the Class Period, however, that Defendants finally acquiesced and agreed to offer more flexible scheduling and took significant steps to change National Vision's historical practices in order to combat the lack of optometrist availability and exam capacity constraints that began three years earlier with the start of the pandemic.

## 2.     National Vision Dedicates Minimal Effort to Its Remote Medicine Initiatives

55.     Further contributing to optometrist attrition, National Vision failed to react timely to optometrists' heightened demand for a remote work environment

following the Post-Pandemic Reopening.  Leading up to and throughout the Class Period, Defendants dedicated minimal attention and effort to remote medicine initiatives, leading such efforts to be inefficient and sparsely implemented and of no benefit to the Company's recruitment and retention initiatives, or the Company's financial performance.

56.    Beginning in 2019, the Company began a remote optometrist pilot with DigitalOptometrics, a tele-optometry provider that allows optometrists to remotely perform eye exams.  It quickly became clear, however, that DigitalOptometrics could not provide National Vision the relief it needed.

57.    *First*, the remote medicine program was costly to implement.  National Vision was required to have – and pay for – two technicians to physically operate the remote medicine program and assist customers in-store, instead of the previously-required one technician needed for an in-person eye exam. DigitalOptometrics also required National Vision to change its store design and incur equipment cost, which far outweighed any initial savings.  For example, to get the remote medicine pilot program up and running in a store, the Company had to install new technology and build out exam rooms, which the Company referred to as "lanes."  Specific electronic equipment was required to both conduct remote eye exams and securely transmit records through the internet, which National Vision was

not previously able to do.  The cost of equipping National Vision's stores with these specific lanes was double that of a non-remote space, requiring each equipped store to bring in an additional $300,000 to break even from the cost of the remote services in its first year of use.

58.    *Second*, DigitalOptometrics equipment required a large amount of internet bandwidth, which significantly slowed down the Company's technology systems on the retail floor.  Due to frequent connectivity issues, it could take between 15 and 40 minutes for a remote optometrist to simply connect with a National Vision store, and the patient, via a remote camera.  These technical delays exacerbated National Vision's exam capacity restraints and slowed the remote medicine initiative's rollout.  Moreover, for patients with significant vision issues, like glaucoma or cataracts, National Vision could not properly see them via a remote optometrist.

59.    *Third*, National Vision used only minimal efforts to pilot the DigitalOptometrics initiative.  For example, the pilot that launched around 2019 was limited to a few remote locations mainly on the east coast where access to care was minimal due to lack of optometrists in the area.

60.    Leading up to the start of the Class Period, approximately early 2021, the Company abandoned DitigalOptometrics and started rolling out RDX

Technology ("RDX") in America's Best stores. As Fahs explained during the Company's February 28, 2022 earnings call, the goal of remote medicine was for a doctor to sit remotely, yet still engage in a "synchronous exam" with the patient "on a video screen, talking to the customer as if they were there."

61.    In truth, however, the Company's RDX remote medicine system was inefficient and flawed, because there were not enough doctors to operate the remote platform and the technology often failed. For example, the hand-held sit-lamps – specialized lamps used to shine a light in a patient's eye when the patient was sitting for an eye exam, which allowed the optometrist to see the patient's eye remotely – quickly lost their charge and took hours to fully re-charge, which prevented National Vision's stores from conducting remote exams in the meantime. Furthermore, National Vision's goal was to have doctors work remotely from home and examine patients in multiple states where there were shortages of optometrists at the stores. But, due to extremely high demand, combined with significant technical issues, this never occurred.

62.    Despite remote medicine's problems being evident via, among other things, years of monitoring remote pilots (*see* §IX.C), National Vision never took the steps necessary to seriously implement a remote option until it was far too late. By March 1, 2023, remote offerings were only available in one-third of America's

Best locations, and Defendants admitted remote medicine needed significantly more resources to "minimize" previously undisclosed "productivity loss."

### E.    Defendants Were Aware of, but Failed to Disclose that Labor Shortages Were Impacting Eye Exam Capacity and Making It Impossible to Meet Growing Demand

63.    Defendants did not disclose that National Vision's ballooning labor crisis was negatively impacting its eye exam capacity and, therefore, its ability to meet growing demand and sustain its financial performance.  Instead, leading up to the start of and throughout the Class Period, Defendants touted that the Company's financial performance was seemingly benefitting from soaring demand, which served to validate Fahs' rosy characterizations of the Company's financial health and business prospects.  For instance, on November 5, 2020, in the Company's 3Q20 earnings press release Fahs boasted that the "National Vision team delivered an exceptionally strong Q3 – establishing a new record for quarterly profit for our three years as a public company" and further noted that "Q3 comps were clearly the best I've witnessed since joining National Vision 18 years ago."  Then, on February 17, 2021, National Vision issued its 4Q20 and full year 2020 ("FY20") financial results and in the Company's press release, Fahs highlighted that "we once again posted double digit comps.  Our low cost eye care and eyewear offerings seem to be even more in demand during this pandemic economy."  Indeed, for 3Q20 and 4Q20,

- 31 -

National Vision reported adjusted CSS growth of 12.4% and 10.6%, respectively, and revenue growth of 12.4% and 23.6%, respectively.

64.    Any gains in financial performance due to increased demand would be short lived, however, because National Vision was, in truth, simply not equipped to continue meeting increased consumer demand in the Post-Pandemic Reopening world.  National Vision's outdated churn and burn model, rooted in rigid schedules which overworked employees in order to drive the Company's growth on its razor-thin margins, was no longer sustainable, resulting in labor shortages.  And the minimal recruitment, retention and remote medicine initiatives National Vision implemented thus far were simply inadequate.  The increased demand for National Vision's products and magnified competition for attracting and retaining critical staff, especially optometrists, left National Vision's business model at a breaking point.  It was clear within the Company at the start of the Class Period that National Vision needed to dramatically increase compensation and flexibility for its critically necessary vision professionals and staff, and immediately and fully implement remote medicine offerings, to maintain its workforce, profitability and growth – all while operating as a "low cost" optical retailer.  But Defendants resisted such dramatic disruptions to National Vision's business, which would have significantly

disrupted the Company's near term financial performance.  Once Defendants acted,

however, it was too little too late.

65.    At all relevant times, Defendants were keenly aware of the problems

facing the Company.  Given the importance of optometrists to the Company's

financial performance, Defendants regularly monitored the Company's staffing and

optometrists shortages leading up to and throughout the Class Period.  For example,

soon after the pandemic shutdown, the Company scheduled multiple calls a week

with each of the Company's brands to discuss doctor capacity and retention.  These

calls were referred to as the "playbook."

66.    The Company also held weekly conference calls every Monday with,

among others, district managers to discuss current sales numbers and plans for the

Company's reopening.  The weekly calls were routinely attended by Fahs, National

Vision's Senior Vice President, Head of Stores Sharon Petitt ("Petitt"), and National

Vision's Chief People Officer Bill Clark.  After Company stores reopened, the

weekly calls were reduced to monthly calls that were attended by every district

manager and every regional vice president.  During these internal monthly calls, the

Company discussed all the stores' sales numbers and employee-related issues,

including staffing shortages and pay issues.

67.    National Vision's Professional Services Division also prepared and circulated a regular OD Retention Report that included key optometrist retention metrics.  The OD Retention Report provided detailed statistics on optometrist employment levels within the Company, including, but not limited to, unfilled positions down to the store level in real-time.  The OD Retention Report also identified the stores with the highest and lowest retention rates.  The OD Retention Report was distributed via email to employees at the district manager level or higher, including regional directors and regional vice presidents.  The OD Retention Report received high-level visibility and anyone with interest had access to it, including Petitt, who reported directly to Fahs.

68.    Moreover, the America's Best regional directors and regional vice presidents prepared a quarterly report entitled "Lost OD Days" that listed every store location, the number of lanes, the weekly optometrist budget, and actual working optometrist days.  If a store was budgeted for five working optometrist days but had a day without an optometrist available, the Lost OD Days report referred to that day as a "dark day."  Any dark day required detailed notes in the Lost OD Days report as to why there was not an optometrist available, how long there had been an opening, and what was needed to fill the position.  The Lost OD Days report was submitted to Petitt who reported directly to Fahs.  If the Lost OD Days reports

included negative information, it would be discussed during bi-weekly calls amongst the regional directors and vice presidents to determine the best way to handle. Often, members of Professional Services were included on the call to discuss optometrist retention rates and the number of dark days to assist in trying to find recent graduates and offer compensation options to aid in recruitment.

69.    On top of this, each region had to send reports every week to the Company's recruitment office, including a list of every job opening at every store, including for optometrists. The recruitment office would then set up hiring events to try and fill the positions and those recruitment office employees were on the weekly, Company-wide calls that included all district managers and regional vice presidents.

70.    The topic of optometrist and optician retention was always a hot topic of conversation at the Company's bi-annual, internal "Kick Off" meeting, which occurred during the first quarter of each year, as well as during the "Back to School" meetings held during the third quarter of each year. Fahs and Petitt regularly attended both the Kick Off and Back to School meetings. At these meetings, store managers were told to do whatever it took to make the optometrists happy, and to not let them leave the Company. Similarly, Fahs would attend and speak at the annual continuing education sessions that all Company optometrists attended in

various locations such as Texas or Florida.  Retention was a key focus and metric that was always the main topic of conversation during breakout sessions.

**F.   National Vision Begins Overdue and Costly Recruitment, Retention, and Remote Medicine Initiatives to Mask Optometrist Labor Shortages, Exam Capacity Constraints, and National Vision's Inability to Meet Growing Demand**

71.    The Class Period begins on May 13, 2021, when the Company's stores had been reopened for almost a year, increased demand for vision services and products was still going strong, and National Vision's market share was increasing. Unbeknownst to investors, however, the Company was in dire straits.

72.    By the start of the Class Period, the Company's labor shortage crisis was reaching its peak.  Without a sufficient number of critical optometrists and staff available, the Company was unable to meet the growing demand for eye exams that surged after the Post-Pandemic Reopening.  In fact, as of mid-2021, many of National Vision's stores were operating as usual, despite the fact that they did not have licensed opticians on-site, in violation of state regulations.  Specifically, National Vision stores located in multiple cities in Virginia, including Fairfax, Stearling, and Woodbridge, were dispensing eye glasses and contact lenses, without a licensed optician, in violation of the rules and regulations of the Virginia Board. Stores needing licensed opticians, were always topics of conversation at the Kick

Off and Back to School meetings which Fahs attended, and were readily seen in the Company's reporting.

73.     As such, in mid-2021 (and throughout the Class Period), after sticking its head in the sand since the start of the pandemic – and at the time of making its Class Period statements – National Vision implemented belated and undisclosed costly recruitment and retention initiatives to attempt to address the Company's struggles.  As Defendants later admitted, in mid-2021, National Vision made several multi-million wage investments which would impact its fourth quarter 2021 ("4Q21") profitability and signal that industry headwinds would impact the Company's financials and outlook.

74.     Such recruitment and retention initiatives, however, were too little and too late, and, as later disclosed through partial revelations of the truth, the Company's belated and costly endeavors were incapable of combatting ongoing, massive optometrist frustration and attrition to meet demand, without having a material negative impact on the Company's performance.

75.     On May 13, 2021, when National Vision announced its quarterly results for 1Q21, Defendants highlighted purportedly favorable financial and operating trends, even increasing 2021 outlook, thus actively concealing the Company's labor and demand-meeting problems from the market.  Instead, Defendants emphasized

increasing demand and National Vision's ability to meet it.  Defendants further falsely stated that National Vision was skillfully navigating the Post-Pandemic Reopening world and had largely avoided the labor disruptions that were then impacting other retailers.

76.   Similarly, on the Company's May 13, 2021 earnings call, Fahs highlighted that that the Company was "well poised to continue at strong high levels, continued growth"; that National Vision "remain[ed] well positioned to effectively navigate this challenge and emerge as an even stronger business"; and "with healthy doctor coverage, we're able to meet strong patient demand for eye exams."  When asked specifically about optometrist capacity, Fahs falsely stated that the Company was not experiencing "tremendous capacity constraints for us."  Defendants further claimed that the Company was outperforming the industry in terms of recruitment and retention and implementing ordinary compensation increases.

77.   Analysts were pleased, with William Blair noting the "company continues to outperform with its best-in-class value offering driving increased market share amid a highly fragmented competitive field."

78.   Just days after the Company announced its positive 1Q21 financial results, on May 19, 2021, Fahs sold over 160,000 shares of National Vision common stock for insider proceeds of over $7.75 million.  As detailed below, §IX.F, this

began the Individual Defendants' $34 million three-month insider trading selling spree. From July 30, 2021 through August 2, 2021, Moore sold over 64,000 shares of stock for insider proceeds of $3.4 million. Between August 11 and 18, 2021, Fahs sold 423,602 shares, for insider proceeds over of over $22.8 million.

79. Despite underlying, foundational workforce problems, Defendants continued to issue positive statements, concealing National Vision's then-apparent labor issues. On August 12, 2021, the Company reported positive financial results for the second quarter 2021 ("2Q21"). During the 2Q21 earnings call, Defendants were asked numerous times about National Vision's crucially-important ability to retain its optometrists. In response, Fahs misleadingly told the market that, unlike its competitors, National Vision was "still near record highs on retention of doctors" and falsely stated that to the extent National Vision had "staffing challenges," they were only "mild." In a similar vein, Moore falsely stated that the Company was seeing mere "modest wage inflation" for optometrists. Defendants further gave the market the false impression that the Company was dedicating sufficient resources to transitioning to a remote medicine environment. Defendants commented on the "progress" of the "number of pilot programs" that the Company hailed as "expanding capacity over time" and "helping with flexible scheduling."

80. Analysts, again, were thrilled, and believed Defendants' false assurances. For example, Jefferies issued a report stating, National Vision's "[b]iz [a]dvancement" was "[u]ndeniable," that "[o]ptometrist retention remains at record levels and associate staffing is strong across stores" and that National Vision "is not seeing the attrition levels being cited across other consumer healthcare services models."

81. Such excitement was short-lived. The truth about National Vision's labor shortages and resulting eye exam capacity constraints and the negative impact on the Company's financial performance began to emerge, resulting in a dramatic, negative impact on the price of National Vision stock through three partial disclosures that removed the artificial inflation created by Defendants' materially false statements and omissions.

**G.    Defendants Revealed the Truth Through a Series of Partial Disclosures**

82. Defendants could no longer conceal the truth from investors. As detailed below, the truth about National Vision's optometrist shortages and eye exam capacity constraints, and the failure of the Company's overdue and costly recruitment, retention, and remote medicine initiatives created to combat exam capacity constraints and meet consumer demand were revealed to the market through

three partial disclosures.  These disclosures caused the Company's stock price to sharply decline as the artificial inflation was removed.  *See* §X, below.

83.  *First*, on November 10, 2021, National Vision reported its 3Q21 financial results and shocked investors by announcing that the Company expected "lower Q4 profitability" due to previously undisclosed and vague "wage investments" "implemented earlier this year."  To that end, Defendants only tightened the Company's 2021 sales and revenue outlook towards the upper end of the previously issued guidance (showing top-line growth), but because of the wage investments they did not change other aspects of the Company's outlook, signaling gross margin compression and earnings pressures for 4Q21.  At the same time, however, Defendants mitigated the negative news and assured the market of their continued monitoring of the Company's initiatives.  Defendants issued false and misleading statements that: (a) the Company's efforts fostered "maintaining high retention rates and expanding exam capacity"; (b) the pilot remote medicine initiatives were poised to be effective and "advance efforts to expand capacity to see patients"; (c) National Vision was "well positioned to effectively navigate this [post-pandemic] evolving environment"; and (d) that the Company was "pursuing the right strategies to drive continued market share gains and sustainable growth."

84.    The announcements took the market by surprise, despite Defendants'
assurances.  The price of National Vision stock fell *24%* from a closing price of
$63.52 on November 9, 2021, to $48.24 on November 16, 2021.  But for Defendants'
reassurances, the price of National Vision stock would have dropped further.
Analysts quickly reacted, with Jefferies stating, "[s]entiment took a step down as
messaging was somewhat less confirmatory re: labor costs," but that "conviction in
multi-year, predictable growth" remained.

85.    Nonetheless, Defendants continued to mislead the market.  Defendants
made numerous false statements and material misstatements and omissions about
National Vision's ability to meet growing demand, deliver "consistent sustainable
growth," and succeed in its recruitment, retention, and remote medicine initiatives.
For example, on December 1, 2021, Fahs highlighted Defendants' "attention" to
staffing issues, while touting the Company's competitive advantage in "staff[ing]
our stores amid this more difficult labor environment."

86.    Similarly, on February 28, 2022, with two out of three months of
financial data on 1Q22 demonstrating severe optometrist shortages, exam capacity
constraints and an inability to meet growing demand, Defendants with severe
recklessness issued what they labeled as "conservative" 2022 full year guidance
("FY22").  Fahs misleadingly touted National Vision's investments in programs to

"attract optometrists and maintain high retention rates" and the success of the "optometrist compensation and recruiting" initiatives. Fahs noted the Company was moving from the "pilot phase" of its remote medicine initiatives "into a broader expansion phase" and continued to give the false impression that remote medicine was meeting patient's demand for "increased exam availability," and optometrists' need for "flexibility."

87.    Throughout the February 28, 2022 earnings call, Fahs and Moore both (and collectively four times) falsely blamed "macro headwinds" from the Omicron variant and severe winter weather for issues "affect[ing] store operations and customer traffic *thus far* in 2022," due to the inability "to staff stores based on optometrist and associate illness." Moore assured the market of "increased eye exam capacity with profitability" for the second half of 2022, while Fahs stated "[a]s we enter the third year of the pandemic, we've grown our business and market share, advanced key initiatives and further strengthened our foundation for sustainable growth." In addition, the Company's 2021 10-K, filed with the SEC on February 28, 2022, which was signed by both Fahs and Moore, falsely touted that the Company's "tailor[ed]" operations were in compliance with applicable state laws governing the "practice of medicine/optometry" even though the Company's stores were dispensing eyeglasses and contact lenses without licensed opticians.

88.    But, as the Class Period went on, Defendants could only keep their ruse going for so long.  Defendants made a second partial revelation of truth to the market on May 10, 2022, and disclosed that National Vision was, indeed, facing extreme optometrist labor shortages and exam capacity issues.  On that day, Defendants issued negative financial results for 1Q22 and significantly slashed 2022 guidance due to, in part, "emerging constraints to our exam capacity."  Defendants acknowledged that eye exam capacity constraints "affected customer traffic" and that the issue stemmed from "not having enough doctors for the demand we have." Notably, the revised 2022 outlook showed the Company was actually performing *worse* in terms of profits and earnings than before the pandemic.

89.    When asked to quantify the impact of the capacity constraints on the Company's disappointing quarter, Defendants falsely stated the Company's challenges were "balanced" between "economic factors and the [optometrist] capacity factors."  Defendants repeatedly tempered market concerns by stating that exam capacity challenges were only "short-term" and "temporary," and continued to praise the Company as being "well-positioned to deliver sustainable growth" and the strength of the Company's recruitment and retention initiatives.  Defendants noted they were "happy with the initial economics" of the remote medicine initiative, and, in fact, accelerated its timing.

90.    As a result of this disclosure, National Vision stock fell ***26%*** from a closing price of $33.57 per share on May 9, 2022, to $24.93 per share on May 10, 2022, and another 7.7% on May 11, 2022, to close at $23.00.  The total stock price decline over this two-day period was 31.5%.  But for Defendants' reassurances, it would have declined further.

91.    Analysts reacted negatively to the news as well, but continued to be misled by Defendants' assurances.  For example, on May 11, 2022, Guggenheim reduced its price target due to the "inability to fulfill exam demand due to the lack of available optometrists" but maintained its "buy" rating, because "[t]he company affirmed that the early signs of these initiatives are encouraging."

92.    By the next quarter, on August 11, 2022, Defendants began a full court press to assuage investors' exam capacity concerns, as a means to put off revealing the truth to the market as long as they could.  For example, Fahs misleadingly reported that National Vision was "seeing incremental progress in exam capacity with every month," and that exam capacity would "gradually improve by year-end." Moore confirmed that the "current challenges" were only "transitory" and he had "every confidence in the underlying health" of National Vision's "business and our value proposition."

93.    Defendants also announced that going forward Moore would begin wearing two hats, serving as the first COO in over three years, while continuing to serve also as the Company's CFO through January 1, 2023.

94.    Over the following six months Defendants continued their campaign of downplaying the problems negatively impacting the Company, by making false statements and material misstatements and omissions highlighting National Vision's "growth initiatives," including "incremental improvements" in recruitment and retention, and remote medicine initiatives that were "adding incremental exam capacity," and that the Company was "going to be very well positioned to take . . . demand recovery," affirming again that "capacity" would "improve into 2023 and throughout next year." Defendants repeatedly gave the market the false impression that remote medicine initiatives were going to be the savior to the Company's exam capacity constraints, and falsely assured the market that remote medicine would bring the Company to profitability in 2023.

95.    Given these positive and qualifying statements, investors were shocked by Defendants' *third* partial disclosure on March 1, 2023. On that date, National Vision reported disappointing 4Q22 financial results, and issued lower than expected 2023 guidance due to the Company *still* suffering from significant exam capacity constraints, which rendered National Vision incapable of meeting growing demand.

Defendants admitted the Company needed to make "*significant enhancements* to Optometrist recruiting and retention initiatives, including increased scheduling options" that would "weigh on profitability." And, despite Defendants' assurances throughout the Class Period that National Vision was distinguishable from the labor shortages of its competitors, Fahs now confirmed that National Vision's problems with "optometrist availability" had been ongoing since "the pandemic" – which began *three years prior.* Indeed, remote medicine offerings were still only available in less than a third of the Company's America's Best locations, and the Company needed to "implement[] new techniques and training to minimize" previously undisclosed "productivity loss." Fahs finally admitted to what optometrists had been complaining of for years, that the 5-day, every Saturday in-store work week "was a turnoff to our recruitment efforts and also a factor in why people left us."

96.   On this news, National Vision common stock price tumbled, falling *39%*, from a closing price of $37.36 per share on February 28 2023, to $22.76 per share on March 1, 2022, the next trading day, on abnormally heavy trading volume.

97.   Analysts were stunned.   William Blair highlighted "ongoing vulnerability in [the Company's business] model related to availability of optometrists" and voiced "deep set frustration [with] a lack of clear messaging around the access to optometrists."  Barclays reduced its price target and attributed

the Company's 39% stock decline to "no clear time horizon as to when the capacity constraints will be relieved or when EYE will capture sufficient market share to offset the structurally higher cost of doing business."

98.    In total, National Vision investors suffered significant damages when the truth was revealed through the above disclosures, causing the artificial inflation to come out of the stock price.

99.    Notably, after the Class Period, during a March 15, 2023 conference, Fahs confirmed that "the biggest reason" optometrists "were leaving us was because of our lack of flexibility and because they had to work every Saturday."  In short, "in a world of scarce doctors amidst the great rethink of post-COVID values, *that wasn't going to work anymore*."

100.   All told, the Company's ongoing labor struggles, severe exam capacity constraints and belated and costly recruitment, retention and remote medicine initiatives, contributed to the Company's declining financial performance throughout the Class Period, resulting in consistent and year over year, declines in revenue and gross margin, and increases in selling, general and administrative expenses ("SG&A") and overall operating expenses, and as demonstrated below:

| National Vision's Financial Results | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Start of Class Period | | | | | | | | | End of Class Period | |
| | 1Q21 | 2Q21 | 3Q21 | 4Q21 | FY21 | 1Q22 | 2Q22 | 3Q22 | 4Q22 | FY22 | 1Q23 |
| Revenue Y/Y Change | 13.7% | 111.3% | 6.7% | -3.8% | 21.5% | -1.2% | -7.3% | -3.6% | -1.9% | -3.6% | 6.6% |
| Gross Margin % | 57.9% | 57.1% | 56.3% | 54.4% | 56.5% | 55.3% | 54.0% | 53.4% | 52.6% | 53.8% | 54.8% |
| Y/Y Change | 4.47% | 11.21% | -0.28% | -1.97% | 2.45% | -2.67% | -3.09% | -2.92% | -1.83% | -2.65% | -0.45% |
| SG&A as % of revenue | 41.9% | 42.6% | 42.1% | 47.0% | 43.3% | 43.3% | 44.7% | 45.1% | 49.9% | 45.6% | 44.4% |
| Y/Y Change | 0.61% | -9.90% | 2.87% | 6.82% | 1.22% | 1.45% | 2.08% | 2.95% | 2.85% | 2.33% | 1.13% |
| Op. Ex. as % of revenue | 46.4% | 47.1% | 46.5% | 52.8% | 48.1% | 48.2% | 50.4% | 50.3% | 54.7% | 50.8% | 48.9% |
| Y/Y Change | -3.43% | -14.77% | 1.22% | 7.82% | -0.88% | 1.76% | 3.28% | 3.80% | 1.92% | 2.71% | 0.70% |
| Source: SEC Filings | | | | | | | | | | | |

# V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

## A.     First Quarter 2021 Financial Results

101.     The Class Period begins on May 13, 2021.  On that date, National Vision issued a press release, filed with the SEC on Form 8-K, announcing positive financial results for 1Q21 ("1Q21 Release"), including across-the-board increases in net revenue, adjusted CSS growth, adjusted operating income and adjusted diluted earnings per share ("EPS") when compared to 1Q20.  In the 1Q21 Release, Fahs highlighted increased demand for National Vision's services and products and stated that it was "a truly remarkable start to the year, as patients and customers chose us at record levels."  Fahs further attributed the Company's success during the uncertain environment caused by the pandemic to "the entire National Vision team and optometrist network for their continued commitment and extraordinary efforts to serve patients and customers in this complicated and ever evolving retail landscape" assuring the market that "*we remain well positioned to navigate the rest of the*

*pandemic and beyond*." Defendants further extolled the Company's ability to outperform in the Post-Pandemic Reopening atmosphere by increasing the Company's previously-issued financial outlook for 2021.

102. Also on May 13, 2021, National Vision hosted an earnings call with analysts and investors to discuss the Company's 1Q21 results, with Fahs and Moore speaking on behalf of the Company. During his prepared remarks, Fahs attributed the "outstanding quarter," in substantial part, to "*the great execution of our store teams*, who rose to the challenge of *serving the increased demand* for our low-cost eye exams, glasses and contact lenses."

103. Fahs further explained how the pandemic environment favored value-retailers like National Vision over its competitors, stating, "we believe the strong results were likely helped by the interplay of the continued hastening of industry trends that have been helping us for a long time and pent-up consumer demand," and that "[t]hese trends favor larger, better capitalized value retailers like National Vision." Assuring investors of National Vision's continued viability and the sustainability of its long-standing business model, Fahs stated, "[t]he optical industry remains highly fragmented, and *we're confident that we continue to outpace the industry and grow market share*."

104.    As the call continued, Fahs also falsely and misleadingly touted the Company's record "***high retention rates***" of key optometrists and that the Company was successfully meeting "strong patient demand for eye exams," stating, in pertinent part:

> . . . ***we continue to invest in our top optometrist recruitment and retention programs to keep our high retention rates near record levels.***

> ***With healthy doctor coverage, we're able to meet strong patient demand for eye exams with a safety-first approach.***

105.    During the question-and-answer portion of the May 13, 2021 earnings call, Defendants were asked about National Vision's ability to maintain adequate staffing, including of optometrists, and to meet growing eye exam demand.   In response, Fahs falsely stated that National Vision was ***not*** seeing any "***capacity constraints***," and stated National Vision was, in fact, poised to continue its growth and outperform the industry in terms of securing ample workforce capacity, stating, in relevant part:

> ***We do think that there's still capacity there for ongoing growth, and we have – we're always working on different ways to make sure the flow through the store is as efficient as possible so that our doctors can do what they do best***, which is sort of do the good eye exam.

> And we have a lot of people sort of helping to get them the data they need to be great optometrists along the way.  But we do think – ***we aren't feeling that there's tremendous capacity constraints for us.  We do think the industry is seeing some capacity constraints*** . . .

- 51 -

*. . . **But we think we're benefiting from the reduced industry capacity. We think that's been one of the helps. But we think we're still well poised to continue at strong high levels, continued growth**.*

106.    Similarly, when asked during the May 13, 2021 earnings call whether the Company was experiencing "significant wage pressures either for the optometrists and/or the store associates," Fahs deflected, and stated that National Vision was "operat[ing] in the same world everyone else does." Fahs acknowledged that National Vision was "in a chapter now of tight labor," but assured investors that the Company simply "***like[s] to pay competitively and make sure that our folks are well compensated***," which "***we're watching and managing carefully***."

107.    Also on May 13, 2021, National Vision filed with the SEC its quarterly report on Form 10-Q for 1Q21 ("1Q21 10-Q"). The 1Q21 10-Q was signed by Fahs and Moore and included Sarbanes-Oxley Act of 2002 ("SOX") certifications signed by Fahs and Moore, which falsely stated that the 1Q21 10-Q did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" ("SOX Certifications").

108. The 1Q21 10-Q reiterated the same financial information regarding National Vision's 1Q21 financial results contained in the 1Q21 Release and included misrepresentations and omissions regarding the Company's business and operations.

109. As a result of Defendants' materially false or misleading statements and omissions, analysts and investors were under the false impression that the Company was successfully and sustainably growing market share and meeting increased demand for its products, and unlike its competitors, not experiencing any workforce shortages or exam capacity constraints during a time of industrial turmoil.

110. For instance, on May 13, 2021, Guggenheim issued a report commenting that National Vision stock was a "Blue Light Special" and had the "health and safety protocols in place and the financial resources to weather the pandemic." Reflecting on Defendants' misrepresentations, Guggenheim was "encouraged by National Vision's continual optometrist retention rate improvement and expect[ed] higher-than-average levels to continue, considering 1) the company kept paying its optometrists during the pandemic, 2) disruption in the industry, and 3) equity from paying a $250 appreciation bonus to all front line employees." As such, Guggenheim reaffirmed its "buy" rating and maintained its $58 price target.

111. Also on May 13, 2021, William Blair issued a report stating, the "company continues to outperform with its best-in-class value offering driving

increased market share amid a highly fragmented competitive field." William Blair added that National Vision "management is guiding prudently in a low-visibility environment, and we continue to encourage investors to focus on the decades-plus growth opportunity."

112.   On May 24, 2021, Jefferies issued a report maintaining National Vision's "buy" rating and $58 price target. The report was issued after Jefferies' meeting with management and noted a key takeaway was that "[o]ptometrist productivity (patients/day) has jumped meaningfully over the past year and the company is not experiencing any capacity constraints (due to COVID)." The report further stated that despite the fact that "[o]ptometrist availability hasn't improved dramatically over the past year . . . [National Vision] continues to focus on retention, which is still trending at all-time highs."

113.   Defendants' statements on May 13, 2021, as set forth in ¶¶101-108, above, were materially false and misleading and omitted material facts for the following reasons:

(a)   National Vision was experiencing extraordinary wage and labor pressures related to the retention and recruitment of its vision care professionals and staff, especially regarding the Company's optometrists, and resulting eye exam capacity constraints, due to industry changes since the start of the pandemic, which

resulted in increased competition for the Company's vision care professionals and increased demand for National Vision's services and products;

(b)     National Vision's low-cost operating platform stemmed, in truth, from overworking the Company's vision care professionals and staff, especially its coveted optometrists who were saddled with stringent exam requirements that required seeing many patients each hour, completely inflexible schedules, and inadequate staffing support, resulting in National Vision's inability to retain and recruit a sufficient number of optometrists to meet demand, which resulted in a substantial undisclosed risk that National Vision's Post-Pandemic Reopening financial results were unsustainable because the Company was extremely vulnerable to staff and optometrist shortages exacerbating exam capacity constraints;

(c)     Defendants knew or were severely reckless in disregarding that National Vision was failing to timely and effectively react to its extraordinary wage and labor pressures, especially regarding the Company's optometrists, as set forth in (b) above, and that the Company's belated and costly recruitment and retention initiatives (including wage investments and other enhanced compensation efforts) and remote medicine initiatives during the Class Period, were primed to negatively impact the Company's financial results and, in turn, the Company's profitability;

(d)    National Vision made an undisclosed material investment in wage and compensation payments to its vision care professionals in the middle of 2021, which Defendants knew or were severely reckless in disregarding that it would negatively impact the Company's 4Q21 costs and profit margins to an extent materially greater than what had been disclosed to investors;

(e)    Leading up to and throughout the Class Period, the Company dedicated minimal attention and effort to its remote medicine initiatives, and the Company's belated efforts during the Class Period were incapable of counteracting the Company's ongoing labor pressures and exam capacity constraints;

(f)    as a result of (a)-(e) above, Defendants knew or with severe recklessness disregarded that the Company's profitability was unsustainable and as a result key financial metrics were expected to deteriorate starting in 4Q21 and in the long-term, below previously reported 2020 results and pre-pandemic levels;

(g)    National Vision's extraordinary wage and labor pressures, which left the Company scrambling to retain and recruit enough licensed opticians resulted in National Vision stores regularly operating with non-licensed employees practicing opticianry – the dispensing and fitting of eyeglasses and contact lenses - in violation of state rules and regulations that permitted only licensed opticians to do so; and

(h)    Defendants' SOX Certifications, certified by Fahs and Moore, were false and misleading because they represented that the Company's quarterly and annual filings with the SEC disclosed all material information to investors and did not contain any materially false or misleading statement, when in fact and as set forth above they did.

## B.    Second Quarter 2021 Financial Results

114.    On August 12, 2021, National Vision issued a press release, filed with the SEC on Form 8-K, which announced the Company's "strong" financial results for 2Q21 ("2Q21 Release"). The 2Q21 Release again reported, year-over-year growth demonstrated by increases in net revenue, adjusted CSS growth, net income, adjusted operating income and adjusted diluted EPS, when compared to the second quarter of 2019.[3]

115.    In the 2Q21 Release, Fahs noted that the Company was "pleased by the positive trend in customer transactions throughout the quarter, especially in June when we lapped record re-opening results last year," that he was "***excited about our***

---

[3]    Starting with the 2Q21 Release and continuing through 4Q21/FY21, each earnings release included a "comparison of fiscal 2021 results to fiscal 2019 pre-COVID results" because in 2Q21, for example, there was a "lack of comparability to the second quarter of fiscal 2020 when the Company temporarily closed all of its retail locations to the public through early June due to COVID-19." The Company did include a complete comparison to 2020 results in its quarterly Forms 10-Q.

*long-term opportunities for expansion and market share growth*," and that "[g]iven our consistent performance since re-opening last year and our safety first approach, *we are confident in our ability to navigate the challenging and dynamic environment and remain in a position of strength to drive long-term value for our stakeholders*."  The 2Q21 Release also raised National Vision's 2021 financial outlook, for the second quarter in a row, further reiterating that the Company was poised for sustainable growth.

116.   Also on August 12, 2021, National Vision hosted an earnings call with analysts and investors to discuss National Vision's 2Q21 results and outlook, with Fahs and Moore speaking on behalf of the Company.  In his opening remarks, Moore discussed the Company's updated outlook in detail, explaining that the raised fiscal outlook already took into account expectations that "net revenue in the second half [will] be *generally flat with last year*" and "*generally flattish comps in both the third and fourth quarters, driven by continued positive transaction growth*."  Moore stated "[o]ur outlook continues to project a decline in profitability in the second half as we lap the exceptional margin expansion in 2020 *but would still represent a strong double-digit increase in profitability compared to 2019*."

117.   Despite continued margin pressure, Fahs touted the Company's high retention rates of its critical optometrists, stating, "*We continue to invest in our*

***optometrist recruitment and retention programs to keep our high retention rates near record levels***."

118.   When questioned about optometrist turnover trends, Fahs once again emphasized the Company's retention, stating, "***We're still near record highs on retention of doctors, and you can't deliver results like we delivered in Q2 if you don't have strong doctor coverage throughout.   So yes, that – there's a good correlation there.   And yes, but we're still near record highs on retention***."   Later in the August 12, 2021 call, when asked to elaborate on labor and wage pressures, Fahs again claimed the Company was experiencing relatively "***mild***" pressures compared to the overall industry, and misleadingly boasted about long-term employees, stating, in pertinent part:

> In terms of staffing challenges, we're not immune to macro trends, ***but the impact to us on staffing challenges is mild relative to what we're all sort of hearing about and reading about in much of retail in the service industry***.   And again, I think that relates to the fact that we are an environment of optical professionals who define themselves as optical professionals, who have their – what makes careers in optics and the – given our success, ***we're considered a great and very secure place to have your optical career***.   I mean, ***the nice thing about the growth that we had, it provides lots of opportunity for career development here***.

119.   Later in the August 12, 2021 call, Moore was pressed on labor and expected inflationary wage pressures.   Moore responded by minimizing any wage

- 59 -

inflation pressures and claimed that any increases were already considered and

captured by the Company's 2021 guidance, stating, in pertinent part, as follows:

> *I don't think there's any surprises inside of the year. We've seen – if we go to a bigger picture, we've seen some degree of modest wage inflation for our doctors*. We're happy to pay them competitive rates because they do a lot of work here for us and for the patients. *That has moderated a bit across the last year, and we've been happy to see that moderation*. But we also understand that it's a supply-demand equation in every market. It's not – *they're not ubiquitous supply demand challenges for optometrists*, but we do that in every market.
>
> So I would expect to see *some* degree of continued wage inflation there. In terms of our associates, it really, it's a function of what our states doing with minimum wages – what are we doing relative to market changes. *We have guided that we are not immune to wage inflation. We expect to see some of that. It's absolutely included in our guide. So really more of the same, we're expecting a little more associate inflation, which is in the guide*.

120. Similarly, Moore subsequently minimized any "implications from

minimal wage implications, stating in pertinent part, as follows:

> And then longer term, . . . I think the things that *we're doing our best to work around are this wage inflation, which thus far, we've not had to signal huge implications there. We've managed through that really well. Not expecting that to continue to change to a large degree*.

121. During the August 12, 2021 call, Fahs touted the Company's "digital

and omnichannel initiatives" regarding remote medicine, but failed to disclose the

Company was, in truth, dedicating minimal attention and effort to remote medicine,

which was riddled with technical issues and extremely costly to implement. Specifically, Fahs stated:

> **[W]e continue to advance efforts to expand capacity** to see patients as well as opportunities to improve engagement throughout the customer journey. Our efforts in remote medicine are continuing, and **we're pleased with the progress and the additional flexibility that remote exams provide**.

122.   As the August 12, 2021 call continued, Fahs responded to a question regarding National Vision's remote medicine initiatives and "utilization in exam scheduling," as well as a request for an update on "down or better. . . optometrist costs" by falsely assuring the market that the Company's remote medicine pilots demonstrated that the remote offerings were efficiently and productively prepared to help expand National Vision's capacity, stating, in relevant part:

> **We believe that, that [remote medicine] should be able to be helpful to us in expanding capacity over time and making our stores overall more productive, helping with flexible scheduling and maybe fun [sic] Sundays and hard-to-fill locations and that sort of thing**.

123.   Also on August 12, 2021, National Vision filed with the SEC its quarterly report on Form 10-Q for the second fiscal quarter ended April 3, 2021 ("2Q21 10-Q"). The 2Q21 10-Q was signed by Fahs and Moore and included SOX Certifications also signed by Fahs and Moore. The 2Q21 10-Q repeated the financial information regarding National Vision's second quarter 2021 financial results

contained in the 2Q21 Release and included misrepresentations and omissions regarding the Company's business and operations.

124.   Analysts reacted positively to Defendants' statements, commenting on the sustainability of the Company's ongoing growth and lack of attrition concerns. For instance, on August 12, 2021, Jefferies gave National Vision a buy rating, issued a report stating that National Vision's "[b]iz [a]dvancement" was "[u]ndeniable," and increased its price target for the stock from $58.00 to $63.00.  The report noted that "[o]ptometrist retention remains at record levels and associate staffing is strong across stores" and that National Vision was "not seeing the attrition levels being cited across other consumer healthcare services models."  Furthermore, Jefferies believed that "[m]omentum appears to be sustainable and absent material changes in macro dynamics, we see potential for upside to EYE's conservative forecast."

125.   Also on August 12, 2021, William Blair issued a report noting "opportunity for near-term upside" in National Vision's stock price "given management's conservative second-half guidance."  Similarly, BMO Capital Markets issued a report commenting that National Vision "posted a strong and broad-based beat with materially better top-line growth flowing through at healthier-than-expected margins."

126. Defendants' statements on August 10, 2021, as set forth in ¶¶115-123, above, were materially false and misleading and omitted material facts for the following reasons:

(a)    National Vision was experiencing extraordinary wage and labor pressures related to the retention and recruitment of its vision care professionals and staff, especially regarding the Company's optometrists, and resulting eye exam capacity constraints, due to industry changes since the start of the pandemic, which resulted in increased competition for the Company's vision care professionals and increased demand for National Vision's services and products;

(b)    National Vision's low-cost operating platform stemmed, in truth, from overworking the Company's vision care professionals and staff, especially its coveted optometrists who were saddled with stringent exam requirements that required seeing many patients each hour, completely inflexible schedules, and inadequate staffing support, resulting in National Vision's inability to retain and recruit a sufficient number of optometrists to meet demand, which resulted in a substantial undisclosed risk that National Vision's Post-Pandemic Reopening financial results were unsustainable because the Company was extremely vulnerable to staff and optometrist shortages exacerbating exam capacity constraints;

(c)     Defendants knew or were severely reckless in disregarding that National Vision was failing to timely and effectively react to its extraordinary wage and labor pressures, especially regarding the Company's optometrists, as set forth in (b) above, and that the Company's belated and costly recruitment and retention initiatives (including wage investments and other enhanced compensation efforts) and remote medicine initiatives during the Class Period, were primed to negatively impact the Company's financial results and in turn the Company's profitability;

(d)     National Vision made an undisclosed material investment in wage and compensation payments to its vision care professionals in the middle of 2021, which Defendants knew or were severely reckless in disregarding that it would negatively impact the Company's 4Q21 costs and profit margins to an extent materially greater than what had been disclosed to investors;

(e)     Leading up to and throughout the Class Period, the Company dedicated minimal attention and effort to its remote medicine initiatives, and the Company's belated efforts during the Class Period were incapable of counteracting the Company's ongoing labor pressures and exam capacity constraints;

(f)     as a result of (a)-(e) above, Defendants knew or were severely reckless in disregarding that the Company's profitability was unsustainable and as a

result key financial metrics were expected to deteriorate starting in 4Q21 and in the long-term, below previously reported 2020 results and pre-pandemic levels;

(g)     National Vision's extraordinary wage and labor pressures, which left the Company scrambling to retain and recruit enough licensed opticians resulted in National Vision stores regularly operating with non-licensed employees practicing opticianry – the dispensing and fitting of eyeglasses and contact lenses - in violation of state rules and regulations that permitted only licensed opticians to do so; and

(h)     Defendants' SOX Certifications, certified by Fahs and Moore, were false and misleading because they represented that the Company's quarterly and annual filings with the SEC disclosed all material information to investors and did not contain any materially false or misleading statement, when in fact and as set forth above they did.

## VI.    EVEN AS THE TRUTH BEGAN TO EMERGE, DEFENDANTS CONTINUED TO MISLEAD THE MARKET

127.   As undisclosed, extraordinary wage and labor pressures and resulting eye exam capacity constraints negatively impacted National Vision, Defendants could only conceal the truth for so long.  The truth was ultimately revealed in a series of partial disclosures causing significant declines in the price of National Vision stock.  The declines would have been sooner, swifter, and steeper, but Defendants

frequently downplayed the negative news and continued to mislead the market with material misrepresentations and omissions regarding problems related to optometrist retention and attrition, increasing eye exam capacity constraints, the Company's belated and costly recruitment, retention and remote medicine initiatives, and, ultimately, the Company's financial position and business outlook.  By continuing to mislead the market, Defendants kept the Company's stock price artificially inflated throughout the remainder of the Class Period.  The allegations below detail not only the three partial revelations of truth regarding Defendants' fraud and the resulting National Vision stock price declines, but also Defendants' continued material misrepresentations and omissions that continued to artificially inflate National Vision's stock price even as the truth began to leak out.

**A.     Third Quarter 2021 Financial Results: the Disclosure of
        Wage Investments Negatively Impacting Profitability in the
        Fourth Quarter 2021**

128.    Before the market opened on November 10, 2021, National Vision reported the Company's 3Q21 financial results, and surprised the market by revealing that the Company expected lower 4Q21 profitability, due to the impact of undisclosed wage investments implemented earlier that year.  The Company's 3Q21 press release, filed with the SEC on Form 8-K, announced the Company's financial results for 3Q21 ("3Q21 Release") and reported year-over-year increases in net

revenue, adjusted CSS growth, and net income, but decreases in adjusted operating income and adjusted diluted EPS.

129.   In the 3Q21 Release, Fahs highlighted the Company's strong quarter of continuous growth and demand, stating "[w]e are pleased with our third quarter results, as sales remained healthy."  Fahs stated "[a]ll credit goes to *the dedicated patient and customer care of the 2,000-plus optometrists* and over 13,000 associates at National Vision *who continue to successfully navigate* the many challenges this environment throws our way."  Fahs further assured the market of the Company's "*sustainable growth*," stating, "[l]ooking ahead, as sales trends and customer demand continue to normalize from record levels during the COVID-19 pandemic, we believe *we remain in a position of strength to continue to deliver sustainable growth*."

130.   The 3Q21 Release tightened the Company's 2021 sales and revenue outlook towards the upper end of the previously-issued 2021 guidance, demonstrating top-line growth, but because of the previously undisclosed consequences of wage investments, did not change other aspects of the Company's outlook, indicating gross margin compression and earnings pressures for 4Q21.

131.  Before the market opened on November 10, 2021, National Vision hosted an earnings call with analysts and investors to discuss National Vision's 3Q21

results and expected 4Q21 trends, with Fahs and Moore speaking on behalf of the Company.  Moore admitted that "***lower Q4 profitability***" was expected "due to the impact of wage investments *implemented earlier this year*."

132.   As the November 10, 2021 call continued, Defendants were asked how an investor could "marry those higher sales with perhaps lower profitability," and Moore responded that the Company had "*made surgical wage investments around midyear*" in its stores, specifically in "associates and lab associates where [National Vision] saw immediate returns in hiring and retention rates" and "also made investments in doctor compensations."

133.   Moore further explained the Company's wage investments and the resulting impact on the Company's financials, admitting there had been three wage "adjustments" and indicating that any impacts were "mid-single-digit millions" and that the Company would return to "normal seasonality" in 2022," with fewer challenges in 3Q22 and 4Q22, stating:

> So I would say in terms of the wage, Michael, I was trying to give guidance that says *mid-single-digit millions impact of 3 wage adjustments*, and that's an annualized figure.  So you can kind of do the math on how much of that affected the second -- the third and fourth quarters . . .
>
> I would say in general, thinking about looking ahead, there's still a lot of uncertainty in the environment.  We're not providing specific 22 metrics at this time, but I will offer a few things that may help.  I do think, as I said, ***we're going to see more normal seasonality in 2022***.  I

*think we'll have kind of challenging growers in the first* half ***and much easier in the second half***.

*. . . And then those surgical wage investments that we made will lap those in the summer and midyear of next year*.

134.   As the November 10, 2021 call continued, Moore again touted the sustainability of National Vision's business model, stating its "***third quarter performance further highlights the consistency and resiliency of our business model***," and the Company was "***well positioned to effectively navigate this evolving environment and [is] pursuing the right strategies to drive continued market share gains and sustainable growth***."

135.   Later in the November 10, 2021 call, in response to a question regarding whether National Vision had experienced any sort of demand "pull forward" that would negatively impact future quarters, Moore misleadingly responded that National Vision was "***not going to suffer from a lot of cycle pull forward***," and repeated that, other than stimulus-fueled growth during the first half of 2021, National Vision was "***back into normal seasonality, normal kind of comp growth expectations***."

136.   During the November 10, 2021 call, Fahs also boasted about positive demand trends that would "***continue and . . . favor larger, better-capitalized value retailers like National Vision***."  Indeed, Fahs acknowledged, "Optometrists play a

key role in our company's ongoing success, ***a fact even more evident since our reopening last year***," and stated "***[o]ur consistent performance would not have been possible without the admirable hard work and commitment to patient care of our network of optometrists***."  Fahs misleadingly stated, "***[w]e strive to be the place of choice where optometrists want to practice and stay for their entire career . . . .***"  Fahs assuaged any investor concerns regarding optometrist retention or capacity, stating that National Vision "***continue[d] to invest in optometrist-related programs toward maintaining high retention rates and expanding exam capacity***."  Fahs also continued to give the market the false impression that National Vision was advancing towards viable remote medicine initiatives, stating:

> ***We continue to advance efforts to expand capacity to see patients*** as well as opportunities to improve engagement throughout the customer journey.  Our pilots in remote medicine are continuing, and ***we are thus far pleased with the pilots***.

137.   Also, on November 10, 2021, National Vision filed with the SEC its quarterly report on Form 10-Q for the third fiscal quarter ended July 3, 2021 ("3Q21 10-Q").  The 3Q21 10-Q was signed by Fahs and Moore and included SOX Certifications also signed by Fahs and Moore.  The 3Q21 10-Q contained the financial information regarding National Vision's third quarter 2021 financial results contained in the 3Q21 Release and included misrepresentations and omissions regarding the Company's business and operations.

- 70 -

138.   On news that National Vision's mid-year wage investments to recruit and retain the Company's optometrists and associates had a negative impact on the Company's 4Q21 profitability, the price of National Vision common stock dropped 13%, or $8.30 per share, from a close of $63.52 on November 9, 2021, to a close of $55.22 per share on November 10, 2021, on elevated trading volume.  As the market continued to digest and respond to the negative news and its resulting impact on the Company, the stock continued to drop in the following days, closing at $48.24 on November 16, 2021, representing a more than 24% decline from the November 9, 2021 close.

139.   Despite these drops, and because Defendants failed to disclose the full truth, analysts reacted to the November 10, 2021 disclosure of "wage investments" and the resulting tightened 4Q21 outlook, but maintained confidence in the Company's profitability and growth in the long run.  For example, on November 10, 2021, Jefferies expressed surprise, stating, "[s]entiment took a step down as messaging was somewhat less confirmatory re: labor costs," but also noted that "conviction in multi-year, predictable growth" remained undeterred.  Jefferies cited "evidence of ongoing strength in the business" and gave National Vision credit for consistency, citing high "optometrist/associate retention levels at a time when

turnover is commonly plaguing performance" because "wages [were] being proactively adjusted where necessary."

140. Also on November 10, 2021, Guggenheim increased its National Vision price target from $60.00 to $68.00, and noted that despite expected higher SG&A expenses due to "higher levels of wage inflation" it "remain[ed] confident that the company [was] . . . pursuing the necessary strategies to drive continued market share gains and sustainable growth[.]"

141. On November 17, 2021, Barclays issued a report stating that it "continue[d] to believe in EYE's long-term strategy" and that "[d]espite pressure on the stock after the 3Q21 earnings due to the lower-than-expected 4Q21 guidance on the back of COVID, supply chain, and tough demand comparisons, we believe EYE remains strongly positioned to take market share given its value positioning."

142. On December 1, 2021, Fahs and Moore presented on behalf of the Company at the Morgan Stanley Global Consumer & Retail Conference. During the question-and-answer portion of the December 1, 2021 conference, an analyst noted that the market was "somehow fearing that this near- term noise" regarding wage investments, staffing, or capacity issues "should be extrapolated on the future prospects of the business." Moore responded by tempering any long-term concerns of extreme compensation investments going forward and assured investors of the

Company's ability to meet ongoing demand, stating in pertinent part, "***we've made some wage investments with our doctors and with our associates***" but minimized it by stating "***we have a little bit of that***."  Moore further assured the market that National Vision was taking a positive stance and "***still fe[lt] good about the customer-driven demand growth aspects of the business***."

143.   Next, when asked specifically about the Company's labor retention "now versus historically," Fahs again minimized any concerns of labor shortages, and falsely reiterating his previous comments: "***we are pleased with our ability to staff our stores amid this more difficult labor environment.  Sure, we're paying attention to it, but it's not something we're talking about every day in our meetings. It's not a key focus of our discussion.  We are staffing our stores well and appropriately now***."

144.   Defendants' statements on November 10, 2021 and December 1, 2021, as set forth in ¶¶129-137, 142-143, above, were materially false and misleading and omitted material facts for the following reasons:

(a)    National Vision was experiencing extraordinary wage and labor pressures related to the retention and recruitment of its vision care professionals and staff, especially regarding the Company's optometrists, and resulting eye exam capacity constraints, due to industry changes since the start of the pandemic, which

resulted in increased competition for the Company's vision care professionals and increased demand for National Vision's services and products;

(b)     National Vision's low-cost operating platform stemmed, in truth, from overworking the Company's vision care professionals and staff, especially its coveted optometrists who were saddled with stringent exam requirements that required seeing many patients each hour, completely inflexible schedules, and inadequate staffing support, resulting in National Vision's inability to retain and recruit a sufficient number of optometrists to meet demand, which resulted in a substantial undisclosed risk that National Vision's Post-Pandemic Reopening financial results were unsustainable because the Company was extremely vulnerable to staff and optometrist shortages exacerbating exam capacity constraints;

(c)     Defendants knew or were severely reckless in disregarding that National Vision was failing to timely and effectively react to its extraordinary wage and labor pressures, especially regarding the Company's optometrists, as set forth in (b) above, and that the Company's belated and costly recruitment and retention initiatives (including wage investments and other enhanced compensation efforts) and remote medicine initiatives during the Class Period, were primed to negatively impact the Company's financial results and in turn the Company's profitability;

(d)    Leading up to and throughout the Class Period, the Company dedicated minimal attention and effort to its remote medicine initiatives, and the Company's belated efforts during the Class Period were incapable of counteracting the Company's ongoing labor pressures and exam capacity constraints;

(e)    as a result of (a)-(d) above, Defendants knew or were severely reckless in disregarding that the Company's profitability was unsustainable and, as a result, key financial metrics were expected to continue to deteriorate in the long-term, below previously reported 2020 results and pre-pandemic levels;

(f)    National Vision's extraordinary wage and labor pressures, which left the Company scrambling to retain and recruit enough licensed opticians resulted in National Vision stores regularly operating with non-licensed employees practicing opticianry – the dispensing and fitting of eyeglasses and contact lenses - in violation of state rules and regulations that permitted only licensed opticians to do so; and

(g)    Defendants' SOX Certifications, certified by Fahs and Moore, were false and misleading because they represented that the Company's quarterly and annual filings with the SEC disclosed all material information to investors and did not contain any materially false or misleading statement, when in fact and as set forth above they did.

**B.      Fourth Quarter and Full Year 2021 Financial Results**

145.    On February 28, 2022, National Vision issued a press release, filed with the SEC on Form 8-K, announcing the Company's financial results for 4Q21 and full year 2021 ("FY21") ("FY21 Release").  For 4Q21, the release reported financial results in line with the muted guidance previously provided, when compared year-over-year to 4Q20, including decreases in net revenue, net income, adjusted operating income, adjusted diluted EPS, and a minimal increase in adjusted CSS growth.  In the FY21 Release, Fahs touted "*confiden[ce]*" in National Vision's "*ability to deliver the consistent sustainable growth we have experienced for the past few decades*."

146.    After highlighting the Company's 4Q21 and FY21 financial performance, the FY21 Release gave unrealistic and unattainable guidance for 2022, stating the Company expected, on an annual basis: *(a) adjusted CSS within a range of negative 1% to negative 1.5%; (b) net revenue within a range of $2.12 billion to $2.17 billion; (c) adjusted operating income within a range of $140 million to $150 million; and (d) adjusted diluted EPS within a range of $1.03 to $1.10*.

147.    Also on February 28, 2022, National Vision hosted an earnings call with analysts and investors to discuss National Vision's 4Q21 and FY21 results and 2022 trends, with Fahs and Moore speaking on behalf of the Company.  In his

opening remarks, Fahs falsely blamed "macro headwinds" including the Omicron variant and winter weather for affect[ing] store operations and customer traffic thus far in 2022," which "impacted [National Vision's] ability to staff stores based on optometrist and associate illness."  Nonetheless, Fahs stated that "*we believe our foundation is solid and are confident in the health of our business model*" and "*[o]ur investments in people and processes have paid off with the strong momentum experienced throughout the pandemic*."  He further emphasized that the Company's "*performance is aided by ongoing positive trends*" and that "*[we] expect these trends, combined with other macro environmental factors to continue to favor our value positioning and help us to drive market share gains*."

148.  In his opening remarks during the February 28, 2022 call, Moore reiterated that despite the uncertainty caused by the macro environment, National Vision's "*consistent performance over time gives us sustained confidence in our business*."  Moore also touted the "*consistency and underlying strength of [National Vision's] business model*," and stated that despite "*short-term macro headwinds*," Defendants were "*excited about the strategies and initiatives that we've shared today and that give us confidence that we are well positioned to deliver improving performance as we move through 2022*."

149.    Moore further touted the Company's financial performance to assuage investors' concerns, stating, "[w]e're pleased with our fourth quarter results as the business performed ahead of our expectations" and that "*[o]ur performance was driven by continued positive traffic trends and excellent store level execution*." When discussing the Company's "share repurchases to date," Moore tied them to the Company's outlook and the "*confidence of management and the Board in our business model and our ability to continue to generate strong cash flows and deliver sustainable growth*."

150.    As the February 28, 2022 call continued, Fahs spoke about optometrist retention and labor pressures, but touted that National Vision "*maintain[ed] high retention rates*" and that the compensation and recruiting initiatives launched in the prior year were successful, and would continue, stating, in pertinent part:

> *This means continuing to invest in programs that attract optometrists and maintain high retention rates. In 2021, new initiatives related to optometrist compensation and recruiting were implemented. And thus far, we've been encouraged with the early results of these initiatives. These initiatives will continue to be a focus area in 2022*.

151.    During the question-and-answer session on the February 28, 2022 call, Fahs was asked to discuss "retention rates" for National Vision employees "over the last few months versus historically" in light of the Company's past and upcoming

wage investments.  In response, Fahs stated that National Vision enjoyed strong

retention rates and low employee attrition, stating, in pertinent part:

> *I will tell you, our stores are well staffed now that we're in good shape on that*.  And a vagary of this category that's different from others that you might look at is, a lot of our associates regard themselves as an optical professional and that they're career optician or they're career optical person.
>
> . . . So there's a lot of fulfillment in that, and there's a – there's not a, oh, should I go work at the restaurant down the street.  *They're competitive.  Their labor frame is other optical firms.  And we've had such nice success for so long that there's a feeling like they are with a winning team, which is always good*.

152.   As the February 28, 2022 call went on, the subject turned to optometrist

retention and whether optometrists were retiring more due to COVID-19.  Fahs

reassured investors about National Vision's competitive advantages in retaining

doctors, stating:

> There have been 2% or 3% of doors have shut since COVID started, that's 2% or 3% of independent doors that have shut.  A lot of doctors just threw in the towel and said, I'm going to retire.  This is too much for us.  And there have been sort of challenged hosts that have been not great places to be in optics.  *And that's -- again, that all favors us.*

153.   When asked during the February 28, 2022 call about the wage cycle of

optometrist wages, Moore commented that wage inflation was tied to supply and

demand, stating, in pertinent part:

> *And I think wages, we're modeling continued levels of kind of wage inflation based on supply and demand in a given specific market.  I*

***do like what we're doing in terms of enhancing our recruiting and retention efforts, trying to find ever more ways to give our doctors flexibility***.

154.   During the February 28, 2022 call, Fahs touted the Company's "key focus" on its "significant" remote medicine initiatives, which Defendants were asserting would "ensure" National Vision could meet demand, and offer optometrists flexibility, stating:

> ***Another key focus to ensure we can serve ever-increasing patient demand has been our remote medicine pilots.  We've spent significant time working to develop these offerings and are very pleased with the progress.  Given the success of these pilots***, I'm pleased to report remote exams are currently offered in over 100 locations.  In 2022, we plan to expand the remote medicine offering and expect to have a total of at least 200 store locations by year-end.  Simply put, ***we believe everybody wins with remote medicine. Optometrists like the flexibility that it provides, while patients benefit from the increased exam availability.  As a result, we're excited by the role that remote medicine can play in serving more patients across both geography and time***.

155.   Later during the call, Defendants were asked about the utilization of remote exams during the initial phase of the Company's remote medicine initiatives. In response, Fahs touted the benefits and efficiencies of the remote medicine initiatives, in expanding exam capacity stating:

> ***So the only difference in the experience is the doctor is on a screen versus actually in the room with the person***.
>
> . . . And now we're sort of moving into a broader expansion phase.  It is all in America's Best at the moment.  ***And in short, the benefit is a***

*patient is more likely to be able to get an exam when they want to have it.  So it's a customer convenience there*.  And the patients enjoy the exam.  They -- *it all works*. I think we're all just getting a lot more used to doing things virtually than we ever thought about in the past.  So we're excited by that, and *it expands exam capacity and allows us to serve more patients*.

156.   Also on February 28, 2022, National Vision filed with the SEC its 2021 10-K.   The 2021 10-K was signed by Fahs and Moore, and included SOX Certifications also signed by Fahs and Moore.   The 2021 10-K reiterated the financial information regarding National Vision's 4Q21 and FY21 financial results contained in the FY21 Release and included misrepresentations and omissions regarding the Company's business and operations.

157.   Moreover, the 2021 10-K assured the market that the Company "tailor[ed]" its operations to be in compliance with applicable state laws governing the practice of optometry, stating in pertinent part:

> Many states prohibit the corporate practice of medicine/optometry where an unlicensed entity practices medicine or employs a physician or optometrist to provide professional medical services.  Many states interpret the corporate practice of medicine/optometry rules broadly to prohibit employment of eye care practitioners by corporations like us and to prohibit various financial arrangements, such as fee-splitting, between eye care practitioners and other entities. . . . These laws and regulations can vary significantly by state, *requiring us to tailor our operations in each state to the particular laws of such state*. . . .

158.   The 2021 10-K also highlighted that the Company's dedicated investment in its remote medicine platform would provide "flexibility and capacity" to foster National Vision's continued growth, stating in pertinent part:

> . . . *Our systems provide the data analysis and automation necessary to support* our marketing, merchandising, inventory, distribution, store operations and point-of-sale, e-commerce, *remote medicine,* finance, accounting and human resources initiatives.  We believe our current systems allow us to identify and respond to operating trends in our business.

> Examples of areas in which *we have invested and continue to invest in* include software systems to enhance the growth of our omni-channel, customer engagement efforts, *remote medicine*, cybersecurity programs and our overall security posture and our point-of-sale system. We believe these investments, along with maintenance of our existing information technology capabilities, *will provide the flexibility and capacity to accommodate our future growth plans*.

159.   The 2021 10-K further discussed the Company's remote medicine initiatives, and explained that the Company had "begun to pilot remote medicine technologies in a limited number of locations to enable the provision of remote eye examinations, *which have expanded* [the Company's] offerings."

160.   As a result of Defendants' materially false or misleading statements and omissions, analysts and investors were under the false impression that National Vision's retention rates remained strong and that remote medicine stood ready to provide a short-term solution to exam capacity constraints.  For instance, on February 28, 2022, Wells Fargo issued a report and, despite lowering the short term

price target for National Vision stock, stated that the Company's near term "[h]eadwinds [were] [b]etter [u]nderstood" and that the Company's pathway to long term "[s]tructural [g]ains remain[ed] [e]vident." The report cited, in part, the rollout of remote medicine, which stood to create "higher customer satisfaction" and boost optometrist "eye exam capacity."

161.  On February 28, 2022, Guggenheim lowered its price target for National Vision stock from $55.00 to $45.00, but stated that it "remain[ed] confident that the company is . . . pursuing the necessary strategies to drive continued market share gains and sustainable growth." Guggenheim was also "encouraged by National Vision's continual optometrist retention rate improvement and expect[ed] higher-than-average levels to continue, considering 1) the company kept paying its optometrists during the pandemic and 2) disruption in the industry." The report noted risks to the downside, however, including National Vision's "inability to attract and retain vision care professionals" and the existence of "inflationary pressures in relation to wages."

162.  On March 10, 2022, Fahs and Moore spoke on behalf of National Vision at the UBS Global Consumer & Retail Conference. At the conference Moore commented on the Company's margins, affirming to the market the strength of National Vision's "long-term margin objectives," stating, "*it all starts with* stores,

comps, managed care tailwinds, [and] ***plenty of doctor capacity***," adding, "***I do think the long-term margin objectives are still absolutely intact***."

163.   When asked generally about optometrist recruitment and retention and resulting labor market pressures, Fahs responded by misrepresenting that the Company had "***high retention rates***" and a "***strong ability to recruit***."

164.   As the conference continued, Fahs highlighted the benefits of the Company's remote medicine initiatives, which he stated were benefitting National Vision's "***recruitment and retention***."  Fahs added that "***we see this as a mode of practice that will help us to attract and retain doctors going forward***."  Fahs also lauded remote medicine's ability to "***improve the efficiency of a doctor because they will be able to be taking exams at multiple stores***."

165.   Defendants' statements on February 28, 2022 and March 10, 2022, as set forth in ¶¶145-159, 162-164, above, were materially false and misleading and omitted material facts for the following reasons:

(a)    National Vision was experiencing extraordinary wage and labor pressures related to the retention and recruitment of its vision care professionals and staff, especially regarding the Company's optometrists, and resulting eye exam capacity constraints, due to industry changes since the start of the pandemic, which

resulted in increased competition for the Company's vision care professionals and increased demand for National Vision's services and products;

(b)    National Vision's low-cost operating platform stemmed, in truth, from overworking the Company's vision care professionals and staff, especially its coveted optometrists who were saddled with stringent exam requirements that required seeing many patients each hour, completely inflexible schedules, and inadequate staffing support, resulting in National Vision's inability to retain and recruit a sufficient number of optometrists to meet demand, which resulted in a substantial undisclosed risk that National Vision's Post-Pandemic Reopening financial results were unsustainable because the Company was extremely vulnerable to staff and optometrist shortages exacerbating exam capacity constraints;

(c)    Defendants knew or were severely reckless in disregarding that National Vision was failing to timely and effectively react to its extraordinary wage and labor pressures, especially regarding the Company's optometrists, as set forth in (b) above, and that the Company's belated and costly recruitment and retention initiatives (including wage investments and other enhanced compensation efforts) and remote medicine initiatives during the Class Period, were primed to negatively impact the Company's financial results and in turn the Company's profitability;

(d)    Leading up to and throughout the Class Period, the Company dedicated minimal attention and effort to its remote medicine initiatives, and the Company's belated efforts during the Class Period were incapable of counteracting the Company's ongoing labor pressures and exam capacity constraints;

(e)    as a result of (a)-(d) above, Defendants knew or were severely reckless in disregarding that the Company's profitability was unsustainable and as a result key financial metrics were expected to deteriorate in the long-term, below previously reported 2020 results and pre-pandemic levels;

(f)    Defendants knew or were severely reckless in disregarding that when they issued guidance for FY22 that the guidance issued was unrealistic and unattainable and would require outlook to be reduced based on information they obtained during quarter on the impact of capacity constraints on the Company's business and future outlook;

(g)    National Vision's extraordinary wage and labor pressures, which left the Company scrambling to retain and recruit enough licensed opticians resulted in National Vision stores regularly operating with non-licensed employees practicing opticianry – the dispensing and fitting of eyeglasses and contact lenses - in violation of state rules and regulations that permitted only licensed opticians to do so; and

- 86 -

(h)    Defendants' SOX Certifications, certified by Fahs and Moore, were false and misleading because they represented that the Company's quarterly and annual filings with the SEC disclosed all material information to investors and did not contain any materially false or misleading statement, when in fact and as set forth above they did.

166.  On March 16, 2022, after hosting a meeting with Fahs and Moore, Wells Fargo issued a report stating that it believed that "[r]emote [o]pportunity [was] an [e]ye [o]pener" and the "key strategic opportunity to improve both new/mature sales productivity."  Wells Fargo noted that the remote medicine rollout would increase the amount of available time slots, improve productivity in case an optometrist "quits, takes vacation, or goes on a lunchbreak," and increase total sales.

### C.    First Quarter 2022 Financial Results: the Disclosure of Emerging Constraints on Exam Capacity

167.  On May 10, 2022, National Vision once again shocked the market by disclosing deeply disappointing financial and operational results for its 1Q22, while also reducing the Company's FY22 outlook.  National Vision's 1Q22 press release, filed with the SEC on Form 8-K ("1Q22 Release"), blamed the Company's poor financial results and near-term performance and reduced outlook on "headwinds from the Omicron variant, weaker consumer confidence, and *emerging constraints*

*to exam capacity*," which directly correlated to a lack of a sufficient number of optometrists.

168.   The 1Q22 Release stated that during the quarter, on a year-over-year basis, compared to 1Q21 the Company's key profitability metrics, including net revenue, adjusted CSS growth, net income, adjusted operating income, and adjusted diluted EPS all decreased.

169.   In the 1Q22 Release, National Vision slashed its FY22 outlook significantly, shocking investors.  Specifically, the Company *lowered adjusted CSS growth from negative 1% to 1.5% to a range of negative 7% to negative 4%, dropped net revenue from $2.12 billion to $2.17 billion to a range of $2.01 billion to $2.07 billion, reduced adjusted operating income from $140 million to $150 million to a range of $85 million to $105 million, and lowered adjusted diluted EPS from $1.03 to $1.10 to a range of $0.65 to $0.80*.  Notably, the revised projections indicated that the Company was actually performing *worse* in terms of profits and earnings than before the pandemic.

170.   Although the 1Q22 Release pinned the reduced FY22 outlook on the economy, COVID-19, and "*constraints on exam capacity*," it made clear the guidance assumed "*no material deterioration to the Company's current business operations as a result of such factors*."

171.   The 1Q22 Release included comments from Fahs regarding National Vision's "emerging constraints to exam capacity," which he described as "short-term" and being addressed by the Company's various recruiting, retention and remote medicine initiates.  Specifically, Fahs stated:

> ***We are actively working to increase exam capacity with enhanced optometrist recruiting and retention programs as well as an accelerated rollout of our remote medicine initiative***.  Also, as we contend with an inflationary operating environment, we implemented this week the first pricing change to our America's Best signature offer in over 15 years.  Yet we are proud to continue to deliver industry-leading value to consumers.  ***We expect these actions, combined with easier compares, to lead to improving performance later this year. Despite the short-term challenges, we are confident in the broad appeal and health of our business model and remain well-positioned to deliver sustainable growth as we move beyond this period.***

172.   Also on May 10, 2022, National Vision hosted an earnings call with analysts and investors to discuss National Vision's 1Q22 results and expected trends, with Fahs and Moore speaking on behalf of the Company.  In his opening remarks, Fahs confirmed that the Company had entered a "challenging" chapter and acknowledged "***emerging constraints to our exam capacity***."  Discussing the changes in demand impacting National Vision, Fahs stated, in relevant part:

> *Additionally, emerging constraints to our exam capacity affected customer traffic in many of our stores.  While we have delivered a record level of optometrist hiring thus far this year, our exam capacity is temporarily out of sync with our needs.*

- 89 -

*This is primarily due to the impact of a modestly lower level of optometrist retention coupled with the start date of many new hires occurring later in the year.* **Both of these challenges are substantially consequences of the COVID era** *and had significant impact on our first quarter performance and updated outlook for fiscal 2022.*

173. As the May 10, 2022 call continued, Fahs informed that market that much of the Company's record recruiting came from "new hires" that would not be starting until summer, but assured the market that any constraints on optometrists and exam capacity were limited to "some locations," and that National Vision recruitment and retention initiatives were promising, stating, in relevant part:

Those of you who have been following us for years have heard us say that we are always seeking more optometrists as the optical consumer journey typically begins with an eye exam. *This has been more true recently. In the first quarter, we experienced constraints in exam capacity in some locations. And by that, I mean specifically that in some locations, we could not fulfill exam demand that is there due to the lack of available optometrists. Some of these constraints relate to pandemic factors, such as scale backs in days worked by individual optometrists or a modest downtick in optometrist retention, and some relates to the mix and timing of new optometrist arrivals.*

*Although our level of optometrist retention has declined since the record high pre-pandemic, it still remains within historical bands.* **We have multiple recent initiatives to drive retention, which are being executed by a new level of clinical management, and the early signs that these initiatives are encouraging**.

In terms of hiring, **we've been investing more heavily in recruiting programs. These efforts are leading to enhanced hiring trends as this year thus far has been a record year for the hiring of optometrists**. *However, many of the new hires will not begin to practice until late this summer. Thus, there is a timing lag between hiring and start dates. We*

*currently expect these disruptions to impact our business performance for the next couple of quarters. Our team is working hard to quickly expand our exam capacity to mitigate this impact*.

174.    Further commenting on the impact of exam constraints, Fahs made clear that the issue stemmed from "not having enough doctors for the demand we have," and disclosed that:

*So to be clear, the exam capacity is not about individual doctors achieving capacity. It's about not having enough doctors for the demand we have. It is a very nice problem having the consumer demand, again, value price, low price provider of a medical necessity. And so it's about having doctors -- incremental doctors there in the geographies where we need them in order to fill the consumer demand that is there for us even in these challenging times economically.*

175.    As the May 10, 2022 call went on, Moore misrepresented that National Vision was equipped to manage any further impact on exam constraints, and stated:

**We've managed through several years of [optometrist doctor] wage pressure. And it generally never comes in a ubiquitous national fashion. It generally comes in specific markets, even specific cities. So I think we've gotten pretty decent at being able to work through those. I would assume that we're going to continue to see a little more of that as we have over the last few years**. And frankly, as we've done at that time, we've looked to offset those pressures across other areas of the P&L.

176.    Fahs similarly emphasized that the "challenges" National Vision faced surrounding exam capacity constraints were only "temporary," stating:

*I want to emphasize that we believe that the challenges we are facing are temporary. **Our team is laser focused on overcoming these headwinds. And we're taking recruitment and retention actions to***

- 91 -

*improve exam capacity, including the acceleration of our remote medicine initiative.*

*We believe remote medicine will help to address our ever-present need for optometrists to keep up with the demand for eye exams at our locations. . . . Our long-term confidence in the health of our model remains unchanged as we remain a low-cost provider of a medical necessity.*

177.    To assuage the fears of investors, Moore echoed Fahs "*confidence in the underlying health of our business*" and further stated "*that we view the current issues as shorter term in nature*" with "the team [being] focused on what we can control: *continuing to invest in key growth initiatives* and appropriately realigning cost to our revenue outlook."

178.    Further clarifying the cause of constraints on exam capacity in response to continued concern from a Barclays' analyst, Fahs, admitted that the Company was suffering from a reduced ability to dictate draconian hours on its optometrist workforce, stating: "*in March, we also saw vacations of optometrists at twice the rate that we had that we would normally expect*."  Similarly, Fahs acknowledged that National Vision was suffering worsening performance as optometrists post-pandemic needed a "work-life balance" and "flexibility."  Fahs tout the Company's remote opportunities as an answer, stating:

But a lot of *optometrists were thinking about work-life balance, asking for another -- a day off, maybe wanting to work 4 days instead of 5 days.  Again, that's something that affects capacity.*  And again, one of

our key excitements about remote is it really does tie into sort of post-COVID trends.

I wouldn't be surprised if many of you are working from home right now, sort of *people wanting more flexibility* in the geography of where they practice, and remote allows people -- optometrists to practice for the first time ever from their den or home office or whatever. So all this ties together in that way.

179. In fact, Fahs repeatedly gave investors the false impression that the Company's remote medicine initiatives could counteract any eye exam capacity constraints throughout the call while omitting that National Vision failed to dedicate sufficient resources to remote medicine, and as a result it was riddled with inefficiencies:

> ***We believe that several initiatives, including our remote medicine rollout, should help us to get our exam capacity more in line with the demand that is there for exams at our stores***. Thus, although we are currently in one of the challenging COVID era chapters, ***our confidence in our mid- and longer-term prospects remain unchanged***.

*     *     *

And then yes, ***we expect capacity to improve. Record hiring, but start dates more later in the summer. And remote medicine is going to help us as well as we have more and more stores there, that is a great way of adding capacity***. Just for perspective at that how this work. When we open a store historically prior to remote, we'd have -- we'd open it with one lane and one doctor and an empty room next door.

***As the store ramps, we fill the second room with exam equipment, and the doctor goes back and forth and is more efficient. . . . So remote is a very versatile solution to something we've been talking about since our IPO road show, where I -- we have been saying we never have enough optometrists, and you're probably never going to hear from***

- 93 -

*us that we have enough optometrists.  But with remote, who knows? We may be able to get close to that state*.

\*        \*        \*

. . . we've looked at remote, watched our initial results, we did announce today that we're accelerating from being in 200 locations this year to 300.  *That really tells you we're pretty happy with what we're seeing. We're happy with the initial economics*.

*We continue to resource that and even accelerate it.  And we think that's going to play a really large role in capacity going forward.*

\*        \*        \*

. . . *we expect capacity to improve. As I said, we have record hiring. That retention versus the end of the year is encouraging*.  And I'd like to emphasize key -- one of the key things that we're excited about in *our remote medicine initiatives is how that addresses localized OD concerns because ODs sort of more fungible over space and time. And that's why we accelerated*.

\*        \*        \*

Amidst this, *we see our remote medicine initiative as a way to address our exam capacity constraints*, and thus, we are accelerating its rollout. We are now targeting to operate remote medicine in up to 300 stores by year-end, up from the previous goal of at least 200 announced last quarter.  *We are extremely pleased with the increasing exam capacity being added by remote medicine and the role it can play in serving more patients across both geography and time*.

*So despite the temporary challenges facing our business, we remain confident in the long-term strength of our business model based on the following.  Our business has shown tremendous consistency and resiliency over long periods of time.  This is a benefit of being a low-cost provider of a medical necessity*.

- 94 -

180.   Also on May 10, 2022, National Vision filed with the SEC its quarterly report on Form 10-Q for the first quarter ended April 2, 2022 ("1Q22 10-Q"), which was signed by Fahs and Moore and included the SOX Certifications also signed by Fahs and Moore.   The 1Q22 10-Q contained the same financial information regarding National Vision's first quarter 2022 financial results contained in the 1Q22 Release and included misrepresentations and omissions regarding the Company's business and operations.

181.   Defendants' statements on May 10, 2022, as set forth in ¶¶169-180, above, were materially false and misleading and omitted material facts for the following reasons:

(a)    National Vision was experiencing extraordinary wage and labor pressures related to the retention and recruitment of its vision care professionals and staff, especially regarding the Company's optometrists, and resulting eye exam capacity constraints, due to industry changes since the start of the pandemic, which resulted in increased competition for the Company's vision care professionals and increased demand for National Vision's services and products;

(b)    National Vision's low-cost operating platform stemmed, in truth, from overworking the Company's vision care professionals and staff, especially its coveted optometrists who were saddled with stringent exam requirements that

required seeing many patients each hour, completely inflexible schedules, and inadequate staffing support, resulting in National Vision's inability to retain and recruit a sufficient number of optometrists to meet demand, which resulted in a substantial undisclosed risk that National Vision's Post-Pandemic Reopening financial results were unsustainable because the Company was extremely vulnerable to staff and optometrist shortages exacerbating exam capacity constraints;

(c)     Defendants knew or were severely reckless in disregarding that National Vision was failing to timely and effectively react to its extraordinary wage and labor pressures, especially regarding the Company's optometrists, as set forth in (b) above, and that the Company's belated and costly recruitment and retention initiatives (including wage investments and other enhanced compensation efforts) and remote medicine initiatives during the Class Period, were primed to negatively impact the Company's financial results and in turn the Company's profitability;

(d)     Leading up to and throughout the Class Period, the Company dedicated minimal attention and effort to its remote medicine initiatives, and the Company's belated efforts during the Class Period were incapable of counteracting the Company's ongoing labor pressures and exam capacity constraints;

(e)     As a result of (a)-(d) above, Defendants knew or were severely reckless in disregarding that the Company's profitability was unsustainable and as a

result key financial metrics were expected to continue to deteriorate in the long-term, below previously reported 2020 results and pre-pandemic levels;

(f)     Defendants knew or were severely reckless in disregarding that when they issued guidance for FY22 on February 28, 2022 and then lowered guidance on May 10, 2022 that the revised guidance was still unrealistic and unattainable and would require outlook to be further reduced based on information they obtained during the first two quarters concerning the impact of capacity constraints on the Company's business and future outlook;

(g)     National Vision's extraordinary wage and labor pressures, which left the Company scrambling to retain and recruit enough licensed opticians resulted in National Vision stores regularly operating with non-licensed employees practicing opticianry – the dispensing and fitting of eyeglasses and contact lenses - in violation of state rules and regulations that permitted only licensed opticians to do so; and

(h)     Defendants' SOX Certifications, certified by Fahs and Moore, were false and misleading because they represented that the Company's quarterly and annual filings with the SEC disclosed all material information to investors and did not contain any materially false or misleading statement, when in fact and as set forth above they did.

182.   On news of Defendants' disclosure of emerging constraints on exam capacity and significantly reduced 2022 outlook, the price of National Vision common stock plummeted **26%**, or $8.64 per share, from a closing price of $33.57 per share on May 9, 2022, to a closing price of $24.93 per share on May 10, 2022, on extraordinarily high volume of over 7.1 million shares traded.  As the market continued to digest and respond to the negative news, the stock continued to drop, falling another 7.7% on May 11, 2022, to close at $23.00.

183.   Analysts did not anticipate the Company's disclosure of "emerging constraints on exam capacity" and the resulting impact on full year 2022 outlook. For example, on May 10, 2022, only two months after Fahs stated that "[w]e have high retention rates and we have strong ability to recruit," Jefferies issued a report stating that it was "[g]ut [p]unched" by National Vision's stock downturn, and accordingly reduced its price target by 38%, from $65.00 to $40.00.  Jefferies stated it was "surprised" by the fact that "[optometrist] retention levels slipped quickly back to pre-pandemic rates, leaving us to reconcile [that] elevated ratios were a temporary phenomenon."   The Jefferies report further tied the stock drop to retention, stating "[t]he lynchpin to th[is] thesis is labor retention (capacity).  If that doesn't show directional improvement off the bottom, a recovery case will be hard

to support."  As such, Jefferies was "forced to flush [their] old resiliency thesis out and to recast from a new lower stock price starting point."

184.   Also on May 10, 2022, UBS issued a report calling National Vision's 1Q22 results "messy" and said the results "likely will sharply weigh on its shares." The UBS report highlighted that the "combo of capacity restraints and negative comps (along with the discussion about recruiting and retention programs) suggests that optometrist turnover has increased."  In a separate report issued later that day, UBS noted "the key takeaway from 1Q is that comp shortfall" was, in part, caused by "[c]apacity constraints due to higher optometrist turnover" and reduced their earlier price target from $60.00 to $40.00.

185.   On May 10, 2022, Barclays also issued a report wherein it reduced its price target by 46%, from $52.00 to $28.00, citing short-term issues caused by optometrist and eye exam capacity restraints.  The next day, May 11, 2022, Guggenheim issued a report reducing National Vision's price target by 21%, from $46.00 to $36.00.  The report referenced "constraints in eye exam capacity in certain locations, which led to the inability to fulfill exam demand due to the lack of available optometrists."  However, Guggenheim analysts did not downgrade National Vision stock, noting National Vision has multiple initiatives in place to

drive retention rates among optometrists" and "[t]he company affirmed that the early signs of these initiatives are encouraging."

### D.    Second Quarter 2022 Financial Results

186.    On August 11, 2022, National Vision issued a press release, filed with the SEC on Form 8-K, which announced the Company's financial results for 2Q22 ("2Q22 Release").  It stated that during the quarter, on a year-over-year basis, the Company's key profitability metrics continued to decrease, including net revenue, adjusted CSS growth, net income, adjusted operating income, and adjusted diluted EPS, when compared to 2Q21.

187.    In the 2Q22 Release, National Vision once again lowered certain aspects of its FY22 outlook, further decreasing adjusted CSS to a range of negative 8% to negative 6.5%, from negative 7% to negative 4%, net revenue to $1.99 billion to $2.02 billion, from a prior range of $2.01 billion to $2.07 billion, and slightly lowering the top end of adjusted diluted EPS to $0.65 to $0.77, from a range of $0.65 to $0.80.  The 2Q22 Release attributed the revised projections to multiple factors, including, "**constraints on exam capacity** and the ongoing COVID-19 pandemic." The Company further stated that "the outlook shown below assumes **no material deterioration to the Company's current business operations as a result of such factors**."

- 100 -

188.   In the 2Q22 Release, Fahs stated, "*we continued to progress our key growth initiatives*" and that "*[o]ur accelerated rollout of remote medicine is adding incremental exam capacity*."  Fahs assured the market that National Vision made "*significant progress in [its] cost alignment efforts*" that would "*temper*" any long-term impact, stating in relevant part:

> *We've made significant progress in our cost alignment efforts that should temper the impact to profitability from the lowered revenues in our Fiscal 2022 outlook.  Looking ahead, we are confident in our business model and our strategy and believe we remain in a position of strength to deliver sustainable growth*.

189.   On August 11, 2022, National Vision held an earnings call with analysts and investors to discuss National Vision's 2Q22 results, with Fahs and Moore speaking on behalf of the Company.  In his opening remarks, Moore minimized the Company's struggles with "the current environment," labeling them as "transitory," and stated:

> *I have every confidence in the underlying health of our business and our value proposition.  We continue to view the current issues as transitory.  In the interim, our management team is focused on what we can control, continuing to invest in key growth initiatives and taking the necessary actions now to return the business to a growth trajectory*.

190.   During the call, Moore discussed the Company's once-again lowered FY22 outlook pinning the reduced performance on "*further degrad[ing]" consumer*

*demand* and "*some of our doctor hiring start dates delay[ing] a bit*."  Going forward however, Moore stated the Company expected:

> *The new ranges, the scenarios there are, we expect demand for the rest of the year at the top of our range to be about where it is now. We do expect to see decent doctor hirings*.  So we have started to see the beginnings of that with the new brass coming on board.  And so that's kind of our top of range.  *Bottom end of the range, it's really less about doctors and far more about consumer demand*.  And that's why we've been working through some nice disciplined smart cost management decisions.

191.    As the August 11, 2022 call continued, Defendants were asked to provide detail regarding the Company's "expected gross margin dilution from remote medicine" and whether the dilution was the result of "lower cost to implement" or "better uptake from consumers than expected."  In response, Moore boasted about exam capacity constraints that were effectively alleviated by National Vision's remote medicine initiative, stating, in relevant part:

> *There are some markets where we needed – we really needed doctors, we were low on doctors and we put remote in there earlier in the year. And that's provided double-digit kind of benefits in terms of productivity*.
>
> Not all markets will look like that because *some other markets had better levels of doctor capacity*.  *But in the initial areas where we rolled it out, where we really needed the assistance from remote medicine capability, we did see significant impact*.

192.    During the question-and-answer portion of the August 11, 2022 call, analysts' emphasis was once again on exam capacity, with one analyst focusing on

capacity "because that seems to be where you can get a lot of kind of incremental margin and profit flow-through," with the analyst questioning how remote medicine "increases capacity."   In response, Fahs refused to give specifics on the capacity relief offered by remote medicine, but gave the impression that it was providing improvements and helping the company, stating:

> Optometric capacity is a key focus area for us.   And again, *we're pleased that retention is up versus last year and improving, and we're pleased that our hiring is going very well and remote is a key part of the improvement program that we have.   We are seeing incremental progress in exam capacity with every month and we're expecting it to improve by year-end*.
>
> *We don't go into a lot of detail on the exact specific productivity related to remote because it's an internal program that we have and like to keep it as such*.   But you're right, what are we believing is going to help us going forward.   *These improvements in exam capacity, what are we seeing?   We are seeing that occurring and we're expecting continued improvement by the end of the year*.

193.   Further discussing the "nuances" of "capacity constraints" in response to another analyst question, Fahs misleadingly stated that any capacity constraints were "*highly localized*," adding:

> But our capacity issues are *highly localized down to specific stores and markets*.   And so in those, there is underserved demand -- there's unserved demand where if we have exam capacity, we would be doing better because there are customers we aren't serving, and they're booking out further and further in advance and it's just harder in that way.

194.    An analyst questioned whether the lack of optometrists was industry-wide or whether National Vision was seeing "per location" issues.  In response, Fahs acknowledged a secular change in the post-pandemic market regarding optometrists retirements – the same changes Fahs stated were *not* impacting the Company earlier in the Class Period – that he claimed the Company was sufficiently addressing "in a variety of ways", and stated:

> I mean, there is a shortage of optometrists in America, an unusually high number of optometrists retired at the pandemic time.  If you're thinking of saying, "Oh, it's going to retire in a year anyway.  Maybe I'll just throw in the towel now."  I think the number is 2% to 3% of doors -- of independent doors shut during the pandemic.  And frankly, *I think what we're seeing of optometrists, something we're seeing in a lot of the workforce with an increased desire for flexibility*.

> So people who were 5-day doctors might say, "You know what, I have decided I'd like to be a 4-day doctor."  And so that's a factor in this.  The schools do not graduate any greater number of optometrists every year.  So now there is a need because there aren't as many the usual cycle of generation to retirement of new to retired has been thrown off.  *And there is an increased desire for flexibility in a variety of ways that we are addressing in a variety of ways*.  But it's different, different than it was pre-pandemic.

195.    While Fahs stated that 2Q22 "would be impacted by the weaker consumer environment as well as constraints on our exam capacity," he also stated that "[i]n terms of constraints to our exam capacity, *we feel incrementally better about our capacity situation*."  In support, Fahs acclaimed successes of the

Company's hiring and remote medicine initiatives in addressing capacity constraints, stating:

> *While exam capacity remains out of sync with our needs in many of our stores in certain markets, thereby affecting patient traffic, we're making sequential progress towards improved retention and strong hirings and continue to project exam capacity to gradually improve by year-end.* Despite these challenges, we continue to focus on our growth initiatives... *We continued our rollout of remote medicine and are on track to operate in up to 300 stores by year-end.*
>
>                    \*     \*     \*
>
> Our business is also facing the challenge of constraints on exam capacity in certain markets. In other words, we could not fulfill the demand for exam appointments in some stores due to the lack of an available optometrist. Our team is working hard to expand our exam capacity to mitigate this impact. This quarter, *I'm pleased that we are making incremental progress on multiple fronts. First, our retention levels stabilized in Q2 and we are up versus last year. This is a testament to multiple recent initiatives to drive retention, which are being executed by a new level of clinical management.*
>
> *In terms of hiring, our increased investments in recruiting continued to pay off. Year-to-date, we've experienced strong hiring of optometrists. We're beginning to see the wave of new hires who had delayed start dates arrive to practice and expect this benefit to begin to accrue in the third quarter.*
>
> Lastly, *we remain excited about our remote medicine initiative to help address our historical and ever-present need for optometrists to keep up with the demand for eye exams at our stores.*
>
> In stores that have operated remote exams for the longest period, we are continuing to see a significant ramp in operating productivity. *We're extremely pleased with the increase in exam capacity being added by remote medicine and the role it can play in serving more patients*

*across both geography and time. Because of these initiatives, we expect that our exam capacity should gradually improve by year-end*.

196. Also on August 11, 2022, National Vision filed with the SEC its quarterly report on Form 10-Q for the second quarter ended July 2, 2022 ("2Q22 10-Q"), which was signed by Fahs and Moore and included SOX Certifications also signed by Fahs and Moore. The 2Q22 10-Q contained the same financial information regarding National Vision's second quarter 2022 financial results contained in the 2Q22 Release and included misrepresentations and omissions regarding the Company's business and operations.

197. As a result of Defendants' false or misleading statements and omissions, analysts and investors were under the false impression that the capacity constraint issues were under control and merely transitory, and that the recruitment, retention and remote medicine initiatives were successfully alleviating capacity issues in markets where National Vision had a lack of optometrists. For example, on August 11, 2022, William Blair noted that although "the company continue[d] to experience suboptimal capacity issues," management was "incrementally more positive on the situation and expect[ed] exam capacity to gradually improve by year-end." Moreover, William Blair commented that "[t]he telehealth investment is now expected to be a $3 million drag on operating income this year, down from an expected $6 million drag previously, as the company is seeing a significant ramp-up

in operating productivity in remote medicine." The report commented that although the company faced the "unique challenge[]" of eye "exam capacity" the issues were only transitory.

198. On August 11, 2022, Guggenheim increased its price target for National Vision stock by more than 5% from $36.00 to $38.00. Although recognizing that "exam capacity constraints" affected adjusted CSS, the analysts "note[d] incremental progress towards higher retention rates and hiring and expect[ed] the capacity to improve by the end of FY22" and that "[r]emote medicine's operating productivity saw significant improvement." Despite the "near term pressures . . . facing the business," Guggenheim trusted National Vision's "management team and business model" and "believe[d] the company will remain focused on investing in its remote medicine initiative to address exam capacity restraints."

199. On August 16, 2022, Barclays increased its price target for National Vision stock by nearly 40%, from $28.00 to $39.00. Despite recognizing the Company was operating in a "challenging" "macro environment" for "the rest of the year," Barclays noted that National Vision expected "sequential improvement in optometrist capacity, including the hiring of a new class of optometrists, as well as increasing remote exam capacity to 300 stores by year-end."

200.   On September 7, 2022, Fahs and Moore spoke on behalf of the Company at the Goldman Sachs Retail Conference.  Responding to a question regarding "headwinds" resulting from exam capacity constraints, Fahs downplayed any concerns regarding retention rates, again assuring the market of the Company's impactful recruitment and retention initiatives, stating:

> *At the end of last year, there was a little bit of dip in retention and recruitment of optometrists in the last couple of months of the year.* And so we sort of turned up the messaging and said, "Hey, actually, something a little strange happened at the end of last year, and we're a little bit more behind on the number on our optometrist capacity."
>
> *Since then, we have done a very nice job of improving retention, and we believe this year we'll have superior retention than what we had last year.  And our recruitment efforts have been strong and year-to-date recruitment has been extremely health and especially student recruitment has been very healthy.  So those 2 piece[s] are coming back nicely, and we expect to end the year in a good place with those that have incremental improvements now through the end of the year*.

201.   Defendants' statements on August 11, 2022 and September 7, 2022, as set forth in ¶¶187-196, 200, above, were materially false and misleading and omitted material facts for the following reasons:

(a)     National Vision was experiencing extraordinary wage and labor pressures related to the retention and recruitment of its vision care professionals and staff, especially regarding the Company's optometrists, and resulting eye exam capacity constraints, due to industry changes since the start of the pandemic, which

resulted in increased competition for the Company's vision care professionals and increased demand for National Vision's services and products;

(b)    National Vision's low-cost operating platform stemmed, in truth, from overworking the Company's vision care professionals and staff, especially its coveted optometrists who were saddled with stringent exam requirements that required seeing many patients each hour, completely inflexible schedules, and inadequate staffing support, resulting in National Vision's inability to retain and recruit a sufficient number of optometrists to meet demand, which resulted in a substantial undisclosed risk that National Vision's Post-Pandemic Reopening financial results were unsustainable because the Company was extremely vulnerable to staff and optometrist shortages exacerbating exam capacity constraints;

(c)    Defendants knew or were severely reckless in disregarding that National Vision was failing to timely and effectively react to its extraordinary wage and labor pressures, especially regarding the Company's optometrists, as set forth in (b) above, and that the Company's belated and costly recruitment and retention initiatives (including wage investments and other enhanced compensation efforts) and remote medicine initiatives during the Class Period, were primed to negatively impact the Company's financial results and in turn the Company's profitability;

(d)    Leading up to and throughout the Class Period, the Company dedicated minimal attention and effort to its remote medicine initiatives, and the Company's belated efforts during the Class Period were incapable of counteracting the Company's ongoing labor pressures and exam capacity constraints;

(e)    as a result of (a)-(d) above, Defendants knew or were severely reckless in disregarding that the Company's profitability was unsustainable and as a result key financial metrics were expected to continue deteriorate in the long-term, below previously reported 2020 results and pre-pandemic levels;

(f)    National Vision's extraordinary wage and labor pressures, which left the Company scrambling to retain and recruit enough licensed opticians resulted in National Vision stores regularly operating with non-licensed employees practicing opticianry – the dispensing and fitting of eyeglasses and contact lenses - in violation of state rules and regulations that permitted only licensed opticians to do so; and

(g)    Defendants' SOX Certifications, certified by Fahs and Moore, were false and misleading because they represented that the Company's quarterly and annual filings with the SEC disclosed all material information to investors and did not contain any materially false or misleading statement, when in fact and as set forth above they did.

E.    **Third Quarter 2022 Financial Results**

202.    On November 10, 2022, National Vision issued a press release, filed with the SEC on Form 8-K, announcing the Company's financial results for the third quarter of 2022 ("3Q22") ("3Q22 Release").  The 3Q22 Release once again reported, year-over-year compared to 3Q21, a decrease in net revenue, adjusted CSS growth, net income, adjusted operating income, and adjusted diluted EPS.  The 3Q22 Release affirmed the Company's revised 2022 outlook previously announced in August 2022.

203.    The 3Q22 Release included a statement by Fahs where he misleadingly emphasized National Vision's "***key growth initiatives***" and highlighted that the "***accelerated rollout of remote medicine***" was "***adding incremental exam capacity***."

204.    Also on November 10, 2022, National Vision hosted an earnings call with analysts and investors to discuss National Vision's 3Q22 financial results and business outlook, with Fahs and Moore speaking on behalf of the Company, along with Melissa Rasmussen ("Rasmussen") in preparation for her new role as CFO starting in early 2023.  In their opening remarks, Fahs and Moore acknowledged the "weaker" and "uncertain environment," but in reaffirming guidance, again hailed the

Company's initiatives, and specifically the remote medicine rollout.  In that vein, Fahs stated:

> *[W]e believe that several initiatives, including our remote medicine rollout should help us to get our exam capacity more in line with the demand that there is for exams at our stores.  Thus, despite the current challenges, our confidence in our mid- and longer-term prospects remain unchanged*.

205.   During the question-and-answer portion of the November 10, 2022 earnings call, when asked about the remote medicine initiatives and when National Vision will "see the benefits in the P&L," Moore responded, "*we're certainly expecting P&L benefit next year*" and that they are "expecting to see good results out of that next year."

206.   While discussing continued exam constraints, Fahs touted the Company's progress, stating "*we're making sequential progress through improved retention, strong hiring and remote medicine*" and remain "*focused on our growth initiatives*."   Further commenting on the Company's initiatives, Fahs misleadingly told the market that exam capacity constraints were "temporary" and should improve going into 2023, and stated:

> *Our team is making incremental progress on key initiatives to expand our exam capacity.  First, retention levels remain up versus last year. This is a testament to our multiple initiatives to drive retention.  In terms of hiring, our increased investments in recruiting continued to pay off. Year-to-date, we've experienced strong hiring of optometrists.*

During Q3, we saw the arrival of the wave of new hires that began to practice in our stores.

. . .  *In stores that have performed remote exams for the longest period, we're continuing to see a significant ramp in operating productivity.  We are pleased with the incremental increase in exam capacity being added by remote medicine and the role it can play in serving more patients across both geography and time.  Because of these initiatives, we expect that our exam capacity should gradually improve going into 2023 and throughout next year*.

So we're in an unusual situation today, in that, we are simultaneously facing both demand headwinds across our network of stores given the current macro environment as well as a supply challenge in a subgroup of stores due to the constraints up on exam capacity, but we see these *as temporary* and *we remain confident in the long-term strength of our business model.*

207.   In response to analyst commentary that National Vision was "fixing" the "lack of optometrist capacity" Fahs reiterated the strength of the Company's "retention" efforts, stating:

But again, on the plus side, *our retention of optometrist is higher than last year.  Our recruiting has been strong year-to-date, and we believe remote medicine will help us even more so to create capacity, flexible capacity, that can help us as the historical cycle returns eventually*.

208.   In comparing the 3Q22 over 1Q22, Fahs stated, "*Our recruitment of new grads was very strong and very healthy and up versus prior year*" and that "*our retention rate of optometrists overall is higher than last year also.  And yes, so we are expecting capacity to gradually improve into 2023 and throughout next year*."

209.   Towards the end of the earnings call, Moore stated: "*[w]e remain in a posture that says we believe there will be demand recovery, and we are going to be very well positioned to take that demand recovery*."  Fahs added that "*we are seeing gradual improvements on all fronts since the last year on this, and we expect gradual improvements to continue*."

210.   Also on November 10, 2022, National Vision filed with the SEC its quarterly report on Form 10-Q for the third fiscal quarter ended October 1, 2022 ("3Q22 10-Q"), which was signed by Fahs and Moore and included SOX Certifications signed by Fahs and Moore.  The 3Q22 10-Q repeated the financial information regarding National Vision financial results contained in the 3Q22 Release and included misrepresentations and omissions regarding the Company's business and operations.

211.   Analysts reacted strongly to Defendants' continued materially false or misleading statements or omissions regarding the Company's retention and recruitment initiatives.  For instance, on November 11, 2022, UBS raised National Vision's price target by 25%, from $40.00 to $50.00, calling National Vision "[o]ne to [w]atch," and adding that 2022 was "proving to be a transition year for [National Vision], positioning it better for next year."  Although "[National Vision] noted its comp weakness was due to lower consumer demand and constraints on its exam

capacity," UBS noted "[National Vision] comp can benefit from added flexibility from remote exams" and as a result "the company is positioning itself well to expand capacity in order to capture market shares. . . ."

212.  On November 11, 2022, Barclays also raised its price target for National Vision stock by 10%, from $39.00 to $43.00.  UBS stated that "[t]he most controllable part of top-line pressure [for National Vision was] the ability to increase optometrist capacity" and the Company was "onboarding a new class of optometrists and now has remote exams in ~ 300 stores, achieving its year-end remote exam store goal earlier than expected."

213.  Defendants' statements on November 10, 2022, as set forth in ¶¶203-210, above, were materially false and misleading and omitted material facts for the following reasons:

(a)    National Vision was experiencing extraordinary wage and labor pressures related to the retention and recruitment of its vision care professionals and staff, especially regarding the Company's optometrists, and resulting eye exam capacity constraints, due to industry changes since the start of the pandemic, which resulted in increased competition for the Company's vision care professionals and increased demand for National Vision's services and products;

(b)    National Vision's low-cost operating platform stemmed, in truth, from overworking the Company's vision care professionals and staff, especially its coveted optometrists who were saddled with stringent exam requirements that required seeing many patients each hour, completely inflexible schedules, and inadequate staffing support, resulting in National Vision's inability to retain and recruit a sufficient number of optometrists to meet demand, which resulted in a substantial undisclosed risk that National Vision's Post-Pandemic Reopening financial results were unsustainable because the Company was extremely vulnerable to staff and optometrist shortages exacerbating exam capacity constraints;

(c)    Defendants knew or were severely reckless in disregarding that National Vision was failing to timely and effectively react to its extraordinary wage and labor pressures, especially regarding the Company's optometrists, as set forth in (b) above, and that the Company's belated and costly recruitment and retention initiatives (including wage investments and other enhanced compensation efforts) and remote medicine initiatives during the Class Period, were primed to negatively impact the Company's financial results and in turn the Company's profitability;

(d)    Leading up to and throughout the Class Period, the Company dedicated minimal attention and effort to its remote medicine initiatives, and the

Company's belated efforts during the Class Period were incapable of counteracting the Company's ongoing labor pressures and exam capacity constraints;

(e)    as a result of (a)-(d) above, Defendants knew or were severely reckless in disregarding that the Company's profitability was unsustainable and as a result key financial metrics were expected to continue to deteriorate in the long-term, below previously reported 2020 results and pre-pandemic levels;

(f)    National Vision's extraordinary wage and labor pressures, which left the Company scrambling to retain and recruit enough licensed opticians resulted in National Vision stores regularly operating with non-licensed employees practicing opticianry – the dispensing and fitting of eyeglasses and contact lenses - in violation of state rules and regulations that permitted only licensed opticians to do so; and

(g)    Defendants' SOX Certifications, certified by Fahs and Moore, were false and misleading because they represented that the Company's quarterly and annual filings with the SEC disclosed all material information to investors and did not contain any materially false or misleading statement, when in fact and as set forth above they did.

**F.    Fourth Quarter and Full Year 2022 Financial Results: the Disclosure of Still Prevalent Exam Capacity Constraints, and Significant Investments in Optometrist Recruiting, Retention, and Remote Medicine Initiatives, Leading to Disappointing Fourth Quarter 2022 Results and 2023 Outlook**

214.    Before the market opened on March 1, 2023, the full truth about the impact of constraints on exam capacity and the need for additional investments in recruitment and retention of optometrists, including rapid and extensive expansion of remote medicine options, was revealed to investors.  On that day, National Vision shocked investors when it issued a press release, filed with the SEC on Form 8-K, announcing disappointing financial results for 4Q22 and FY22, as well as National Vision's outlook for 2023 ("FY22 Release") below market expectations.  The FY22 Release revealed extensive, negative financial impacts from ongoing and prolonged exam capacity constraints at National Vision, which were not being alleviated by the Company's recruitment and retention initiatives or the remote medicine rollout.

215.    In the FY22 Release, National Vision reported further decreases in net revenue, adjusted CSS growth, net income, and adjusted diluted EPS for 4Q22.

216.    The FY22 Release also included the following statement by Fahs, which revealed that National Vision was still facing "exam capacity" constraints, and needed to make material, significant additional investments in optometrist

recruiting and retention, as well as provide flexible scheduling options and remote

medicine initiatives.  Specifically, Fahs stated:

> As we enter 2023, we are building on the progress in 2022, with our 2023 key strategic initiatives including *continuing to expand exam capacity, furthering the digitization of our stores and corporate office*, leveraging our omni-channel capabilities and capitalizing on our whitespace opportunity.  As part of these initiatives, *we are making significant enhancements to Optometrist recruiting and retention initiatives, including increased scheduling options*.  We began piloting these changes in the fourth quarter and have seen early positive results. *We plan to continue to expand our remote medicine and electronic health records capabilities* to additional America's Best stores in 2023. While *we expect* the uncertain macro environment and increased inflationary pressures, along with *the investments in these initiatives, to weigh on profitability in the near-term*, we believe the actions we are taking will better position us for continued success and improved market position longer term.

217.  On March 1, 2023, National Vision hosted an earnings call with

analysts and investors to discuss the Company's financial results, with Fahs,

Rasmussen, and Moore speaking on behalf of the Company.  In his opening remarks,

Fahs admitted that National Vision was finally "*addressing the new reality of the*

*optometrist market and overall business environment in which we are operating*

*today*," adding, that National Vision was offering its optometrists "*a greater variety*

*of scheduling options and improved variable compensation programs*" and that

National Vision was "*progressing the remote medicine initiative that we've been*

*discussing in our last few calls*."

218.   As to the remote medicine initiative specifically, Fahs acknowledged the need for additional resources to "minimize . . . productivity loss," stating:

> While this is a nascent program, we're pleased with the initial results and have incorporated key learnings from the rollout related to the productivity ramp *and learning curve needed for doctors to transition to the new system. We've implemented new techniques and training to minimize the productivity loss*.

219.   As the March 1, 2023 call continued, Fahs provided additional color regarding the "optical industry," "optometrist availability," and the resulting impact on "exam capacity," stating that – as Fahs acknowledged – National Vision's problems began three years prior, and had yet to be sufficiently addressed:

> As I explained, *the pandemic created unprecedented and unique challenges to the optical industry by not only impacting the historically consistent purchase cycle, but also optometrist availability*. This has significantly impacted eye exams capacity for the industry. *Of these factors, the one that we believe we can influence the most is recruiting and retaining doctors in an effort to expand exam capacity, albeit with increased levels of investment.*
>
> We believe that the pandemic led to more doctors retiring from the field or significantly cutting back the number of days they work each week. *Accordingly, changes were needed to continue to maintain healthy retention rates and recruit new talent to our doctor network*.

220.   As the March 1, 2023 call continued, Fahs admitted that the Company's rigid work plan for optometrists was antiquated and no longer viable, stating, in relevant part:

. . . – [S]o it used to be, *we were very, very strict and we said, "Hey, if you want to be a 5-day doctor with us, these are the 5 days you're working and you can take Wednesday off and you can take Sunday off. But these are the 5 days. And I'm sorry, you have to work every Saturday."* In today's optometric market, given changing demographics and the like, *we have found that, that was a turnoff to our recruitment efforts and also a factor in why people left us*.

221. Contrary to the Company's long-standing business model, Fahs admitted to investors that National Vision would now "work around [optometrists'] lifestyle[s]" and offer "flexiblity," whereas National Vision had previously offered only rigidity. Fahs added that National Vision was seeing recruitment and retention benefits as a result: "And frankly, the last few months of recruitment and retention as we've been announcing or since we've announced that has been the best in the past 1.5 years or so."

222. Also on March 1, 2023, National Vision filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2022 ("2022 10-K"), which was signed by Fahs and Rasmussen, and included SOX Certifications signed by Fahs and Rasmussen.

223. In the "Risk Factors" section of the 2022 10-K, the Company included updated language regarding National Vision's "failure to recruit and retain vision care professionals" and the adverse effect on the business, disclosing, in pertinent part, that National Vision had:

*. . . experienced an unexpected degree of vision care professional shortages and related exam capacity constraints over the course of 2022 despite increased recruitment and retention efforts, which included wage investments and other enhanced compensation efforts. Such efforts have, and may continue to, increase our operating costs and adversely impact our results, and ultimately may be unsuccessful.*

224.   Also in the "Risk Factors" section of the 2022 10-K, National Vision updated the following language, which the Company previously stated "could have a material adverse effect on our business" to stating that the Company *was impacted* and may continue to be:

*Increases in compensation, wage pressure and other expenses for vision care professionals, as well as our other associates, have adversely affected, and may continue to adversely affect our profitability.* Increases in minimum wages and other wage and hour regulations and labor shortages can exacerbate this risk. As a result of the impacts of the COVID-19 pandemic, we have experienced an increasingly competitive labor market for vision care professionals and increased preferences for adjusted work schedules, resulting in the demand for optometrists exceeding supply in certain areas during fiscal year 2022 and causing constraints in exam capacity. Due to these factors, we experienced wage pressure for our vision care professionals and associates in 2022. *Targeted wage investments, including increases in compensation and other expenses for our optometrists and associates, along with other initiatives, were implemented in response to these factors that have and will continue to impact our costs applicable to revenue and selling, general and administrative expenses.* The costs to employ or retain optometrists may increase further, potentially materially.

225.   In the "Trends and Other Factors Affecting Our Business" section of the 2022 10-K, the Company included statements regarding "Vision Care

- 122 -

Professional Recruitment, Coverage and Expanded Offerings," and disclosed, in

pertinent part:

> Our ability to continue to attract and retain qualified vision care professionals affect exam capacity. Our operations, like those of many of our competitors, depend on our ability to offer both eyewear and eye exams. *We believe the impacts of the COVID-19 pandemic on vision care professional availability, including a competitive recruiting market and preferences for adjusted work schedules, and the demand for optometrists exceeding supply in certain areas during fiscal year 2022 have caused constraints in exam capacity which are continuing. Due to these factors the costs to employ or retain optometrists have increased and may increase further, potentially materially. Targeted wage investments, including increases in compensation for our optometrists and associates, and flexibility initiatives have impacted our costs applicable to revenue and selling, general and administrative expenses. We are continuing to strategically invest in recruitment and retention initiatives, including flexible adjusted work schedules, along with continuing our implementation of remote medicine technologies, which has expanded our offerings while also increasing costs.*

226. On this news, the price of National Vision common stock tumbled,

falling ***39%***, or $14.60 per share, from a closing price of $37.36 per share on

February 28 2023, to a closing price of $22.76 per share on March 1, 2023 (the next

trading day), on abnormally heavy volume of over 12.9 million shares traded.

227. In addition to the severe price decline, analysts reacted negatively to

March 1, 2023 disclosures regarding the Company's need for significant, immediate

investments in recruitment and retention initiatives, as well as remote medicine, in

order to improve exam capacity restraints, as well as the Company's tepid 2023

outlook. For example, on March 1, 2023, William Blair issued a pre-market note commenting that National Vision's 2023 guidance "was slightly below the incoming Street estimate for revenue and *well below* the incoming estimate for earnings, with the midpoint of adjusted operating income guidance some 50% below the Street." The report noted that National Vision's weak guidance was based on "continued constraints on exam capacity." Following the Company's earnings call, William Blair issued a second report noting "ongoing vulnerability in the model related to availability of optometrists." In a report issued later that day, William Blair reported "deep set frustration" with Defendants' "lack of clear messaging around the access to optometrists."

228. Also on March 1, 2023, Barclays issued a report reducing its price target for National Vision stock by approximately 42%, from $43.00 to $25.00, citing a "lack of optometrist capacity." The report noted that National Vision was "missing out on potential sales due to lack of exam capacity," leading to National Vision "aggressively hiring and onboarding optometrists with increased monetary and non-monetary benefits." Barclays attributed National Vision's 39% stock decline to there being "no clear time horizon as to when the exam capacity constraint will be relieved or when [National Vision] will capture sufficient market share to offset the structurally higher cost of doing business."

229.   The next day, on March 2, 2023, Morgan Stanley issued a report stating, "[s]omething [d]oesn't [l]ook [r]ight" with respect to National Vision's FY22 Release and the Company's 2023 guidance.  The report attributed the stock decline to "2023 guide," which called for continued margin contractions and increases in "optometrist recruitment and retention costs."   Accordingly, Morgan Stanley lowered its 12-month price target for National Vision stock by 44%, from $43.00 to $24.00.

230.   Also on March 2, 2023, Bank of America Securities reduced its price target for National Vision stock from $27.00 to $23.00, citing, in part, constraints to exam capacity.  Bank of America Securities also reaffirmed its "underperform" rating due to "continued risks from: (1) continued wage . . . and other operating cost inflation . . . and (3) continued optometrist capacity-related challenges and potential headwinds associated with the rollout of remote exam capacity."

231.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of National Vision common stock, Plaintiffs and other Class members have suffered significant losses and damages.

## VII.   POST-CLASS PERIOD REVELATIONS

232.   On March 15, 2023, Fahs, Moore, and Rasmussen presented at the UBS Global Consumer and Retail Conference and shed additional light on the "biggest

reason" optometrists were leaving the Company during the Class Period. Fahs confirmed that "the biggest reason" National Vision suffered from material attrition was the Company's "lack of flexibility and because they had to work every Saturday." Fahs added that the Company's antiquated work model also resulted in reduced hiring, stating: "the biggest reason people weren't taking . . . our job offers is around the rigidity of our scheduling." Fahs admitted that National Vision "adapt[ed] to this new marketplace," but did not **start** to do so in a limited fashion until "early Q4 of [2022]" when National Vision "developed a menu of 4 different scheduling options that [optometrists] can select from, one of which is the status quo, but one gives [optometrists] every other Saturday off, one gives [optometrists] 2 days [off] in a row, Sunday, Monday, *et cetera*, that sort of thing."

233.   As the March 15, 2023 conference went on, Fahs added more detail concerning the Company's rollout of flexible scheduling options, making clear they would not be widely implemented until mid-2023, stating: "We started -- we made an expansion decision at the end of the last year, and then earlier this year, we made another expansion decision so that all of America's Best will be in that flexible scheduling options arena by midyear of [2023]."

234.    The price of National Vision common stock has not recovered from its Class Period high of $64.95 per share on November 5, 2021, and closed at approximately $24.12 per share as of June 29, 2023.

## VIII.  BY FAILING TO DISCLOSE THE TRUE IMPACT OF THE OPTOMETRIST LABOR SHORTAGE ON THE COMPANY'S ABILITY TO MEET INCREASING DEMAND, DEFENDANTS VIOLATED SEC DISCLOSURE RULES

235.    SEC rules and regulations explicitly required Defendants to disclose the financial ramifications associated with the Company's optometrist shortage, including its strategy to aggressively recruit and attempt to retain optometrists during the labor shortage that was exacerbated by the post-COVID-19 secular shift, as well as National Vision's inability to meet increased consumer demand during the Class Period.  Defendants were also required to disclose the negative impacts of exam capacity constraints stemming from the optometrist shortage, and the inability of the Company's recruitment, retention, and remote medicine initiatives to alleviate such constraints on the Company's business and future outlook.

236.    Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 required National Vision's quarterly Forms 10-Q and annual Forms 10-K to describe "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. §229.303(a)(3)(ii).  This regulation mandates that

the Forms 10-Q and 10-K that National Vision filed with the SEC during the Class Period disclose "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected."  17 C.F.R. §229.303(a)(3)(i).

237.  The instructions to Item 303(a) of Regulation S-K explain that National Vision's Management's Discussion and Analysis ("MD&A") disclosures during the Class Period was required to "focus specifically" on material events and uncertainties that would cause the Company's reported financial information not to be necessarily indicative of future operating results, including "matters that would have an impact on future operations and [matters that] have not had an impact in the past," stating in pertinent part:

> The discussion and analysis shall *focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.  This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past*, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations.

238.  Concerning material events and uncertainties, in 1989, the SEC issued interpretative guidance on Item 303 of Regulation S-K, which states in pertinent part:

A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

\*    \*    \*

Events that have already occurred or are anticipated often give rise to known uncertainties. For example, a registrant may know that a material government contract is about to expire. The registrant may be uncertain as to whether the contract will be renewed, but nevertheless would be able to assess facts relating to whether it will be renewed. More particularly, the registrant may know that a competitor has found a way to provide the same service or product at a price less than that charged by the registrant, or may have been advised by the government that the contract may not be renewed. The registrant also would have factual information relevant to the financial impact of non-renewal upon the registrant. *In situations such as these, a registrant would have identified a known uncertainty reasonably likely to have material future effects on its financial condition or results of operations, and disclosure would be required.*

Management's Discussion & Analysis of Fin. Condition & Results of Operations; Certain Inv. Co. Disclosures, SEC Release No. 6835, 1989 WL 1092885 (May 18, 1989).

239.   In December 2003, the SEC issued additional interpretative guidance on Item 303 of Regulation S-K ("2003 Interpretive Release"). The 2003 Interpretive Release makes clear that National Vision's MD&A disclosures during the Class Period were required to disclose known demands, events or uncertainties, including, for example, that National Vision's strategy to increase recruitment and retention of

optometrists through several initiatives, such as the rollout of remote medicine at retail locations, would have a near-term negative impact on its future financial results due to the higher expenses associated with the flexible schedules and wage investments, and that the remote medicine initiative was incapable of helping National Vision overcome its optometrist capacity constraints, significantly delaying any potential financial benefit to the Company beyond 2023, unless management determined: (a) they were not reasonably likely to occur; or (b) they would not have a material effect on the Company's operating results.  The 2003 Interpretive Release states, in pertinent part:

> As we have explained in prior guidance, disclosure of a trend, demand, commitment, event or uncertainty *is required unless* a company is able to conclude either that it is not reasonably likely that the trend, uncertainty or other event will occur or come to fruition, or that a material effect on the company's liquidity, capital resources or results of operations is not reasonably likely to occur.

240.    As detailed herein, National Vision derives a substantial portion of its revenue from eyeglass and contact sales that are directly tied to eye exams performed by its optometrists.  *See, e.g.*, §IV.B, *supra*.

241.    During the Class Period, Defendants understood that they were unable to meet increasing demand for eye exams due to exam capacity constraints relating to the labor shortage of optometrists exacerbated from post-COVID-19 and the secular shifts of the changing marketplace.  Although they were too little and too

late, Defendants implemented retention and recruitment initiatives and provided remote medicine options at store locations in an effort to attract more optometrists to combat demand and alleviate exam capacity constraints. However, rather than fully confront exam capacity issues resulting from the optometrist shortage when such issues first appeared, and rather than disclose: (a) the true impact of National Vision's inability to meet demand; (b) that significant costs were associated with the required increase in incentive compensation and the need for flexible schedules for recruitment and retention purposes to investors; (c) that the remote medicine initiative was a mere band aid that required substantial additional development in order to be meaningful to the Company; or (d) that rather than 2023 being a breakout year for National Vision it would be an investment year that required "significant enhancements to Optometrist recruiting and retention initiatives, including increased scheduling options" and significant investment in the remote medicine initiative, Defendants in fact concealed the full extent of problems National Vision faced until they issued three partial disclosures. Instead, during the Class Period, Defendants repeatedly assured investors, at various times, that National Vision had no shortage of optometrists, that National Vision was fully capable – unlike its competitors – of meeting growing demand and delivering sustainable growth, and that National

Vision was poised to have a breakout year in 2023 as it used remote medicine and recruiting and retention plans to meet demand. *See, e.g.*, §§V, VI, *supra*.

242.   Defendants closely monitored the Company's financial performance and position in the vision industry.  As such Defendants knew or acted with severe recklessness in disregarding, but failed to disclose, that the Company was experiencing material, ongoing issues addressing its retention and recruitment efforts, as well as the impact of continued exam capacity constraints, which were negatively impacting the Company's profitability and performance.

243.   *First*, on November 10, 2021, Defendants disclosed that the Company expected lower Q4 profitability due to previously undisclosed and vaguely described wage investments implemented earlier in 2021.  *Second*, on May 10, 2022, Defendants disclosed that National Vision was facing an extreme optometrist labor shortage that negatively impacted its ability to meet demand.  Accordingly, the Company issued weak financial results for 1Q22, and significantly slashed 2022 guidance, due to, in part, "emerging constraints to exam capacity" impacting only "near-term performance."   *Third*, on March 1, 2023, Defendants disclosed disappointing 4Q22 financial results and issued lower than expected 2023 guidance. Defendants revealed the full extent of exam capacity constraints which had prevented and would continue to prevent the Company from meeting demand.

Defendants further admitted the Company needed to make "significant enhancements to Optometrist recruiting and retention initiatives, including increased scheduling options" that would "weigh on profitability." Defendants likewise admitted that National Vison's remote medicine initiatives were still facing profitability loss, and would not provide a viable solution.

244. These admissions, along with the Company's disappointing financial results for FY22 and 4Q22, as well as a tepid 2023 outlook that shocked analysts and investors, provide further evidence that the Company's Forms 10-Q and 10-K filed during the Class Period failed to disclose material information and then-existing trends that National Vision was required to disclose under Item 303.

245. Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), specifically required National Vision's Forms 10-K and 10-Q to provide "a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky." In violation of Item 105, the 2021 10-K for FY21 signed by Fahs and Moore, and the Forms 10-Q for 1Q21, 2Q21, 3Q21, 1Q22, 2Q22, and 3Q22, signed by Fahs and Moore, failed to discuss the significant factors that made investment in National Vision risky.

246. Rather than disclose these factors, Defendants provided false and misleading risk factors that concealed the true risks of investment in National Vision.

## IX.    ADDITIONAL SCIENTER ALLEGATIONS

247.    At all relevant times, the Individual Defendants acted with scienter in making material omissions of fact and materially false and misleading statements during the Class Period.  Each of the Individual Defendants had knowledge that the statements he or National Vision made were false and misleading, or acted with severely reckless disregard for the truth or falsity of those statements, as demonstrated by the allegations above.  The additional substantial direct and circumstantial facts alleged below further support a strong inference of scienter.

### A.    Optometrists Are Critical to the Company's Operations

248.    As Defendants freely admit, hiring and retaining optometrists to meet demand was "critical" to National Vision's success throughout the Class Period and was of likewise importance to investors.  National Vision's long-standing and value-driven business model is rooted in administering eye exams and selling eyewear to as many patients as possible.  Because National Vision's lower-income customers are drawn to the Company's free eye exams and low-cost bundled offers, the availability of vision care professionals and their support staff to perform eye exams is paramount to National Vision's business performance, outlook, and sustained profitability.

249.   To that end, the Company's 2021 10-K states that National Vision's "ability to hire and/or contract with vision care professionals for our stores is ***critical*** to our operations as well as our growth strategy"; its operations "***depend*** on our ability to offer both eyewear and eye exams"; and a "[f]ailure to recruit and retain vision care professionals for our stores could ***adversely affect*** our business, financial condition and results of operations."

250.   At all relevant times, National Vision's eye exams were predominately given through the Company's America's Best and Eyeglass World locations. Notably, America's Best – at which "vision care services are provided by optometrists employed either by [the Company] or by independent professional corporations," – accounted for the lion's share of the Company's business and overall financial performance because it was the single largest revenue-generating brand for the Company, representing 68.4% and 68.1% of National Vision's total net revenues for 2021 and 2022, respectively.  Eyeglass World, in turn, accounted for 10.8% and 10.9% of National Vision's total net revenues for 2021 and 2022, respectively.

251.   Throughout the Class Period, the Individual Defendants repeatedly emphasized the pivotal role that optometrists, and the eye exams they conducted, had on National Vision's financial performance:

- <u>Fahs, 1Q21 Earnings Call, May 13, 2021</u>: ***Optometrists play a key role in our ongoing success***, and we have a great network of over 2,200 optometrists associated with the company.

- <u>Moore, 4Q21 Earnings Call, February 28, 2022</u>: [In response to a question about optometrists conducting remote exams] I would just add, the way I think about it is it takes the most – ***one of the most critical resources in our entire business model***, and it makes that resource more fungible across geography and time.

- <u>Fahs, 2Q22 Earnings Call, August 11, 2022</u>: ***Optometric capacity is a key focus area for us***.

252. Given the importance of optometrists to the Company's overall operations, financial condition, and outlook, and considering Defendants' Class Period statements, it is more reasonable than not to infer that Defendants were closely involved in and monitored all aspects of optometrist recruitment, retention, and compensation, and, therefore, knew or were severely reckless in disregarding that negative optometrist retention trends, materially increased optometrist compensation expenses, and exam capacity constraints would have a material negative impact on the Company's operations and financial results.

## B. The Individual Defendants' Substantial Experience and Control Over the Statements Made to the Market

253. The Individual Defendants have long been responsible for the Company's strategies, decisions, and messaging to the investing public. Fahs has served as the Company's CEO and President for 20 years, which includes the

entirety of National Vision's time as a publicly traded company. Fahs has also been a director on the Company's Board since 2014, and served as the Company's Chief Operating Decision Maker ("CODM") since the Company went public. As CODM – according to the Company's 2021 10-K and 2022 10-K – Fahs would "evaluate performance internally" of the Company's operating segments, and would "regularly review[]" the segments' operating results in order "to allocate resources and assess performance."

254.    Moore served as CFO for almost 10 years, including for several years prior to and following the Company's 2017 initial public offering, and became the Company's COO in August 2022. According to the Company's website, Moore "led numerous enterprise-wide strategic initiatives, including taking the company public in 2017."

255.    In these roles, the Individual Defendants were heavily involved with the Company's operations and finances, and had day-to-day responsibilities concerning "critical" matters affecting the Company. As such, they were intimately aware of the financial condition of the Company, including the sustainability of its financial performance; optometrist shortages; eye exam capacity constraints; and the Company's recruitment, retention, and remote medicine initiatives. Therefore, the Individual Defendants knew or were severely reckless in disregarding that the

Company's financial condition and outlook were worse than had been disclosed to the market during the Class Period.

256.    In their respective roles, Fahs and Moore controlled and actively participated in National Vision's messaging to the investing public concerning many critical topics, including the availability of National Vision's labor force; eye exam capacity constraints; retention, recruitment, and remote medicine initiatives; and the Company's financial results and outlook.  Their control and active participation is supported, for example, by Defendants' repeated statements and emphasis on such matters made during public conference calls, during which they provided detailed prepared statements and responses to specific questions from securities analysts, and in SEC filings and press releases.  *See* §§V, VI, *supra*.

257.    In fact, during the Class Period, Fahs and Moore were the ***only*** National Vision employees: (a) to sign every annual and quarterly report filed with the SEC, with the sole exception of the 2022 10-K, which was signed by Fahs and newly-appointed CFO Rasmussen; and (b) participate in and answer analyst questions on behalf of the Company during quarterly earnings calls and conferences prior to the 3Q22 Earnings Call, when Rasmussen also answered a question after Fahs explicitly directed her to do so.  By choosing to speak about such matters, Defendants undoubtedly had knowledge of such matters.

258.   An additional indicia of scienter results from Fahs and Moore signing SOX Certifications and undertaking the affirmative obligation to ensure the Company's disclosures to the market were true, including statements regarding the Company's recruitment and retention of its vision care professionals, and the Company's compliance with all state regulations.  In fact, by signing the SOX Certifications, Fahs and Moore falsely certified that based on their knowledge, the Forms 10-Q and 10-K filed during the Class Period did "not contain any untrue statement of material fact or omit to state material facts required to make the statements" true, when, in reality, those Forms 10-Q and 10-K included materially false and misleading statements and omitted material facts, as detailed herein.

**C.    The Individual Defendants' Significant Access to Data, and Active Involvement in and Monitoring of the Company's Business**

259.   A strong inference of scienter is further supported by the Individual Defendants' access to highly relevant information concerning National Vision, as well as statements admitting their direct involvement and monitoring of optometrist retention, exam capacity, and the Company's various "initiatives" to increase growth.

260.   *First*, as discussed in §IV.E, Defendants knew or were severely reckless in disregarding that wide-spread labor shortages and eye exam capacity constraints

- 139 -

were negatively impacting the Company's financial performance, as the issue was

methodically tracked through various reports and discussed on internal conference

calls and at Company-wide meetings.  For example:

- National Vision's Professional Services Division prepared and circulated a monthly "OD Retention Report" that included key optometrist retention metrics, to all positions of District Manager or higher;

- America's Best regional directors and regional vice presidents were required to prepare a quarterly "Lost OD Days" report, detailing the days optometrists were present or absent at the store level, that was sent directly to Petitt, who reported directly to Fahs;

- Every Friday, each district manager was required to fill out and email a staffing report, via National Vision's company-wide intranet, to their respective regional recruiter;

- After the start of the pandemic, internal conference calls were initiated and held each Monday and routinely attended by Fahs and Petitt, during which employees discussed staffing shortages and pay issues (these calls were eventually moved to be monthly);

- Defendants held and participated on Company-wide quarterly Zoom meetings after quarterly results were posted.  At an early 2022 Company-wide quarterly Zoom meeting, one participant brought up the fact that a larger number of employees had been leaving the Company since the start of the pandemic, and Fahs directly responded, stating that many of those employees were returning;

- General managers sent messages about staffing shortages to the Company's corporate office via email or through National Vision's "In Touch" messaging system, which was accessible via a 1-800 number or the Company's internal email system.  Fahs would routinely access and use the In Touch system to leave a weekly message for Company employees;

- Optometrist retention issues were discussed at in-person "Kick Off" meetings in the first quarter of each year and "Back to School" meetings in the third quarter of each year, which Fahs and other high-ranking executives attended;

- Fahs spoke to the Company's doctors at annual continuing education sessions in locations such as Texas and Florida, and optometrist retention was a key focus and metric that was always the main topic of conversation during break-out sessions;

- From 2020-2022, the Company held monthly meetings in the Retail Support Center in the Company's headquarter city of Duluth, GA, at which attendees, including the Company's high-ranking executives, would discuss doctor retention issues;

- In the third and fourth quarters of 2020, the Company hired seven doctor recruiters, one for each region of the country, to assist with optometrist retention and recruitment;

- In 1Q21, the Company created the Regional Clinical Director position to serve as a liaison between doctors and the Company's professional services office to maximize optometrist recruiting and retention;

- The Company maintained an internal reporting system stored on the Company's intranet that would track bonus and incentive increases along with employee retention information;

- The Individual Defendants had access to tools that tracked which stores were operating without a licensed optician. These tools included individual stores' payroll and time sheets that were maintained Company-wide, as well as "open position reports" showing openings for Company positions that needed to be filled.

261. *Second*, throughout the Class Period, Defendants specifically acknowledged that they had access to, and were continuously monitoring, reviewing, and evaluating precise data regarding the Company's critical vision care specialists;

eye exam capacity constraints; the recruitment, retention, and remote offering initiatives; and their effect on the Company's ability to meet demand and financial performance. As part of this monitoring process, Defendants spent nearly two years gathering remote pilot data prior to the belated accelerated rollout of the remote initiative. For example, Defendants stated as follows:

- <u>Fahs, 4Q20 Earnings Call, March 3, 2021 (pre-Class Period)</u>: Lastly, our efforts in remote medicine are continuing as well, and we're pleased with their progress.

- <u>Fahs, 1Q21 Earnings Call, May 13, 2021</u>: And we like to pay competitively and make sure that our folks are well compensated. So that's something we're watching and managing carefully.

- <u>Fahs, 1Q21 Earnings Call, May 13, 2021</u>: [w]e're always working on different ways to make sure the flow through the store is as efficient as possible so that our doctors can do what they do best, which is sort of do the good eye exam.

  And we have a lot of people sort of helping to get them the data they need to be great optometrists along the way. But we do think – we aren't feeling that there's tremendous capacity constraints for us. We do think the industry is seeing some capacity constraints . . .

- <u>Moore, 2Q21 Earnings Call, August 12, 2021 (in response to questions about labor and expected inflationary wage pressures)</u>: I don't think there's any surprises inside of the year. We've seen – if we go to a bigger picture, we've seen some degree of modest wage inflation for our doctors. We're happy to pay them competitive rates because they do a lot of work here for us and for the patients. That has moderated a bit across the last year, and we've been happy to see that moderation.

- <u>Fahs, 2Q21 Earnings Call, August 12, 2021</u>: Our efforts in remote medicine are continuing, and we're pleased with the progress and the additional flexibility that remote exams provide.

- <u>Fahs, 3Q21 Earnings Call, November 10, 2021</u>: Our pilots in remote medicine are continuing, and we are thus far pleased with the pilots.

- <u>Moore, 4Q21 Earnings Call, February 28, 2022</u>: And I think wages, we're modeling continued levels of kind of wage inflation based on supply and demand in a given specific market. I do like what we're doing in terms of enhancing our recruiting and retention efforts, trying to find ever more ways to give our doctors flexibility.

- <u>Fahs, 4Q21 Earnings Call, February 28, 2022</u>: [W]e've been encouraged with the early results of these [optometrist compensation and recruiting] initiatives.

- <u>Fahs, 4Q21 Earnings Call, February 28, 2022</u>: Another key focus to ensure we can serve ever-increasing patient demand has been our remote medicine pilots.  We've spent significant time working to develop these offerings and are very pleased with the progress.

- <u>2021 10-K, February 28, 2022</u>: [O]perating results [for the Owned & Host segment and Legacy segment were] regularly reviewed by our CODM [Fahs] to allocate resources and assess performance.

- <u>Fahs, 1Q22 Earnings Call, May 10, 2022</u>: In terms of hiring, we've been investing more heavily in recruiting programs.  These efforts are leading to enhanced hiring trends as this year thus far has been a record year for the hiring of optometrists. . . . Our team is working hard to quickly expand our exam capacity to mitigate this impact.

- <u>Moore, 1Q22 Earnings Call, May 10, 2022</u>: The -- all of the cost of sale elements are, frankly, the same.  We have long-term contracts with vendors and have not experienced any significant pressure there.  So probably the #1 item is just wrestling with some of the wage pressures that we've seen across in retail.

- <u>2022 10-K, Mar 1, 2023</u>: [Fahs as a member of the Board, was responsible for] oversee[ing] human capital matters with regular updates and discussion on . . . hiring and retention, [and] compensation and benefits.

- <u>Moore, 1Q23 Earnings Call, May 11, 2023 (post-Class Period)</u>: So we do look at coverage and capacity in terms of stores where we have a substantial demand in coverage need.  We've seen double-digit productivity improvement.  So we do track metrics around capacity, matching to demand, doctor and store productivity as well as, frankly, sales comps . . . We are expecting to roll out at least 200 new sites this year, bringing that to 500.  We do think remote is also healthy retention.

- <u>Fahs, 1Q23 Earnings Call, May 11, 2023 (post-Class Period)</u>: Well, Patrick [Moore] is our COO. One of his big responsibility [sic], he is looking over our remote program.

### D.    Defendants' Admissions and Belated Disclosures Support a Strong Inference of Scienter

262.    Defendants' scienter is further supported by their own admissions and post-Class Period disclosures that the Company's challenges with optometrist availability and exam capacity were ongoing since prior to the Class Period.

263.    At the end of the Class Period, Defendants acknowledged that – despite Defendants' Class Period statements touting record optometrist retention and National Vision's ability to meet growing demand – the Company's challenges with optometrist availability and eye exam capacity began almost three years prior, with the *start* of the pandemic.  More specifically, during the 4Q22 Earnings Call held on March 1, 2023, Fahs stated that "*the pandemic created* unprecedented and unique

challenges to the optical industry by not only impacting the historically consistent purchase cycle, *but also optometrist availability*."   Fahs clarified that these "optometrist availability issues" "significantly impacted eye exams capacity for the industry" – and importantly National Vision.  Fahs' admission directly contradicted Defendants' Class Period statements.  For example, on May 13, 2021 (over a year after the start of the pandemic, and just under a year after the Post-Pandemic Reopening), Fahs assured the market that "with [National Vision's] healthy doctor coverage, we're able to meet strong patient demand for eye exams" and unlike the industry and its competitors, "the Company was ***not*** experiencing tremendous capacity constraints for us."  Likewise, on the 4Q21 Earnings Call held on February 28, 2022, Fahs and Moore both falsely blamed "macro headwinds" from the Omicron variant and severe winter weather for the Company's "inability to staff stores based on optometrists and associate illness."  By pointing their fingers at temporary disruptions (such as weather), Defendants omitted the real reasons why National Vision was suffering from a lack of optometrists, which, in turn, was negatively impacting exam capacity.

264.  After the Class Period, at the UBS Global Consumer and Retail Conference held on March 15, 2023, Defendants disclosed that, despite all their many statements touting that the Company's various compensation and remote

offering initiatives were sufficient to counteract exam capacity constraints, in truth, "the biggest reason people were leaving [National Vision] was because of [the Company's] lack of flexibility and because they had to work every Saturday." Notably, Fahs reiterated yet again, that these heightened flexibility concerns began subsequent to the pandemic, and prior to the start of the Class Period, stating "in a world of scarce doctors amidst the great rethink of post-COVID values, *that wasn't going to work anymore*."

### E. The Magnitude of the Fraud, the Timing of Defendants' Statements, and Subsequent Revelations of the Truth Are Indicative of Scienter

265.    The timing of Defendants' statements and subsequent revelations of truth are also indicative of scienter.  Defendants' statements on the 4Q21 Earnings Call held on February 28, 2022, during which the Company announced its FY22 outlook for net revenue of $2.12 billion to $2.17 billion, adjusted CSS growth of negative 1% to positive 1.5%, adjusted operating income between $140 million and $150 million, and adjusted diluted EPS between $1.03 to $1.10, were made at a time when the majority of 1Q22, which ended on April 2, 2022, had already elapsed.  *See* §VI.A, *supra*.  Accordingly, Defendants had access to two months of actual results for 1Q22, and undoubtedly knew or disregarded with severe recklessness that the Company's net revenue, adjusted CSS growth, adjusted operating income, and

adjusted diluted EPS for 1Q22 had declined and were going to dramatically and negatively impact the Company's FY22 financial performance.

266.   Indeed, just three months after issuing the Company's FY22 financial outlook, and assuring the market that National Vision's "consistent performance over time gives us sustained confidence in our business, and we are continuing our practice of providing selected full year outlook for fiscal 2022," Defendants – when announcing and discussing the Company's 1Q22 earnings – steeply lowered National Vision's projected net revenue adjusted CSS growth, adjusted operating income, and adjusted diluted EPS guidance as a result of "constraints on exam capacity."

267.   The magnitude of Defendants' fraud and the content of their misstatements and omission surrounding the Company's growth prospects further support Defendants' scienter.  When Defendants' fraud was revealed, after more than 21 months of misleading the public about optometrist availability and National Vision's ability to meet ongoing demand, the stock fell by 39% on abnormally high trading volume, on a day when the Company's peer index only fell 1% and the NASDAQ Index fell 0.7%.

268.   As disclosed at the end of the Class Period, the Company reported disappointing 4Q22 financial results well below market expectations for revenue and

earnings and issued disappointing 2023 guidance, with the midpoint of adjusted operating income guidance being *50%* below market estimates. The poor results and tepid 2023 guidance were based, in part, on ongoing exam capacity constraints and a lack of optometrist availability; and after touting the Company's various retention, recruitment and remote medicine initiatives, since May of 2021, the Company still needed to make "*significant enhancements*" to optometrist recruiting and retention initiatives that would "weigh on profitability."

269.    Because, as alleged herein, the Individual Defendants were directly and intimately involved with all aspects of running the Company – especially matters involving optometrist levels and exam capacity, they knew or were severely reckless in disregarding the reasons why National Vision suffered from increasingly poor financial results, increased costs, and a worsened outlook. Nonetheless, they failed to disclose those negative trends to the market as they occurred, instead misrepresenting and omitting key facts to investors.

## F.    The Individual Defendants Were Motivated to Artificially Inflate the Price of National Vision Stock

270.    The Individual Defendants' scienter is further supported by the fact that they were highly motivated to misrepresent and omit material facts concerning the true financial and operating condition of the Company in order to artificially inflate

the price of National Vision common stock, enabling them to capitalize on the artificial inflation by selling their personal shares of National Vision common stock.

271. The Individual Defendants sold more than **$34 million** of their personally held stock during the Class Period at artificially inflated prices while in possession of material nonpublic information regarding the negative impact that ongoing optometrist shortages and increasing eye exam capacity constraints would have on National Vision's financial results and outlook. As detailed below, Fahs' and Moore's respective sales were unusual and suspicious in both amount and timing, providing a strong, additional inference of the Individual Defendants' scienter.

272. *First*, Fahs sold over 584,430 shares of his National Vision common stock for proceeds of over **$30.6 million** during the 21.5-month Class Period. Specifically, Fahs sold over 160,000 shares for $7.75 million on May 19, 2021, which amounted to nearly *eight* times his 2021 base salary of $983,650, and over 10% of his holdings at the time. Notably, Fahs did not have a 10b5-1 trading plan at the start of the Class Period, and his $7.75 million sale was suspiciously timed to close the day before he put one in place.[4] Then, just three months later, between

---

[4]    Fahs' May 20, 2021 10b5-1 plan was adopted during the Class Period, which was: after Defendants began making materially false statements and omissions to the market; directly after his May 19, 2021 sales for $7.75 million in proceeds; at

August 11-18, 2021, Fahs sold another 423,602 shares, for an enormous gain of $22.8 million – *more than 23 times* his 2021 base salary – and more than 30% of his holdings at the time.  Fahs' cumulative sales throughout the Class Period represented more than 38% of his holdings.

273.   In contrast, during the 21.5 months leading up to the Class Period ("Comparison Period"), Fahs sold only 175,000 shares, worth a total of $7,117,500. This was *less than one-fifth* of his Class Period sales.  Put another way, the number of shares Fahs sold during the Class Period was 233% greater than his Comparison Period sales, while his Class Period proceeds were 330% more than his Comparison Period proceeds.  The haste with which Fahs disposed of his shares during the Class Period as compared with the Comparison Period is further supportive of Fahs' scienter. Notably, Fahs' Class Period proceeds were 52% greater than the proceeds he made during the *entire 43 months* prior to the start of the Class Period in which the Company's stock publicly traded.

274.   Specifically, Fahs made the following sales during the Class Period, taking advantage of artificially inflated prices at numerous times:

--------

the same time Defendants began implementing National Vision's significant wage investment program; and prior to any disclosure of the known negative impacts of the plan on 4Q21 profitability, and the Company's ongoing optometrist labor shortages.

| Date of Sale | Sales Proceeds | Shares Sold | Price Per Share |
|---|---|---|---|
| 5/19/2021 | $7,756,734 | 160,828 | $48.23 |
| 8/11/2021 | $44,008 | 800 | $55.01 |
| 8/12/2021 | $2,554,375 | 46,401 | $55.05 |
| 8/13/2021 | $156,484 | 2,840 | $55.10 |
| 8/16/2021 | $17,338,595 | 323,602 | $53.58 |
| 8/17/2021 | $1,010,736 | 18,367 | $55.03 |
| 8/18/2021 | $1,744,194 | 31,592 | $55.21 |
| **Total** | **$30,605,127** | **584,430** | |

275. Fahs' Class Period sales occurred when the Company's common stock was trading near all-time highs and before any partial revelation was made to the market:

- 27.5% of his Class Period sales occurred on May 19, 2021, prior to the enactment of a 10b5-1 plan, and just 6 days after National Vision issued its positive 1Q21 financial results;

- 72.5% of his Class Period sales occurred on – or within a week of – August 12, 2021, when National Vision issued its positive 2Q21 financial results; and

- 100% of his Class Period sales occurred before November 10, 2021, when National Vision made its first partial revelation surrounding the negative impact of its wage and compensation investments.

276. Likewise, Moore sold over 64,080 shares of National Vision common stock for proceeds of over $3.4 million during the Class Period. Moore made all of his sales over just a four-day period from July 30, 2021 through August 2, 2021. These insider sales amounted to over *six* times his 2021 annual base salary of

$515,000 and represented more than 26% of his holdings of National Vision stock at the time.

277. Specifically, Moore made the following sales during the Class Period, taking advantage of the artificially inflated price of National Vision stock:

| Date of Sale | Sales Proceeds | Shares Sold | Sales Price Per Share |
|---|---|---|---|
| 7/30/2021 | $1,421,820 | 26,330 | $54.00 |
| 8/2/2021 | $2,038,500 | 37,750 | $54.00 |
| **Total** | **$3,460,320** | **64,080** | |

278. Moore's Class Period stock sales occurred when the Company's common stock was trading near all-time highs and before any partial revelation was made to the market:

- 100% of his Class Period sales occurred two weeks prior to August 12, 2021, when National Vision issued positive 2Q21 financial results, as well as an upward revision of fiscal year 2021 outlook; and

- 100% of his Class Period sales occurred before November 10, 2021, when National Vision made its first partial revelation surrounding the negative impact of its wage and compensation investments.

279. The Individual Defendants' lucrative stock sales – including the suspicious timing, the large amounts sold, and the short periods during which the sales were made – show that the Individual Defendants were looking to cash out significant portions of their holdings at artificially inflated prices before the truth regarding National Vision's extraordinary wage and labor pressures and the resulting negative financial impact was revealed, causing the Company's stock price to

plummet.  These sales, detailed in the chart below, provide powerful additional

indicia of the Individual Defendants' scienter:



## X.    LOSS CAUSATION

280.    As further described above, during the Class Period, Defendants issued

a series of false and misleading statements and omitted material information

concerning the Company's optometrist shortage, including its strategy to

aggressively recruit and attempt to retain optometrists during the labor shortage

resulting from the post-pandemic secular shift, as well as National Vision's inability

to meet increased consumer demand during the Class Period.  Defendants were also

required to disclose the negative impacts of exam capacity constraints, and the

inability of the Company's recruitment, retention, and remote medicine initiatives to

alleviate such constraints on the Company's business and future outlook. As a result of Defendants' material misrepresentations and omissions, the price of National Vision common stock was artificially inflated throughout the Class Period. The alleged false and misleading statements and omissions, individually and collectively, had the intended effect of preventing the market from learning the truth and keeping the price of National Vision's stock artificially inflated until, as indicated herein, the relevant truth about the Company was revealed through three partial disclosures. Indeed, Defendants' false statements and omissions had the intended effect and caused, or were a substantial contributing cause of, National Vision stock trading at artificially inflated prices, resulting in a Class Period high of $64.95 on November 5, 2021. As the truth began to leak out through three partial disclosures, the price of National Vision stock declined dramatically, inflicting significant financial harm on Lead Plaintiffs and the Class.

281.    Lead Plaintiffs and members of the Class purchased National Vision common stock at artificially inflated prices during the Class Period. But for Defendants' materially false and misleading statements and omissions, Lead Plaintiffs and members of the Class would not have purchased National Vision common stock at artificially inflated prices.

282. As Defendants' materially false and misleading statements and omissions, individually and collectively, were revealed to the market through three partial corrective disclosures, the price of National Vision common stock declined significantly. The corrective impacts of the first two partial disclosures alleged herein were tempered, however, because Defendants continued to make false and misleading statements and omit material information.[5]

### A.     November 10, 2021 Corrective Disclosure

283. The truth began to emerge on November 10, 2021. Before the market opened on that day, National Vision reported its 3Q21 financial results and filed its 3Q21 10-Q with the SEC. At 10:00 a.m. that morning, the Company hosted an earnings conference call to discuss its 3Q21 results and outlook. In the 3Q21 Release, the Company reported some positive financial results, but during the earnings call disclosed that it expected lower profitability for 4Q21 due to the "impact of the wage investments implement earlier this year." *See* ¶¶128-137, *supra*.

---

[5]   Importantly, the three corrective disclosures described below do not necessarily represent an exhaustive list of all stock price declines attributable to Defendants' fraudulent conduct, given that fact and expert discovery in this case has not yet begun. Lead Plaintiffs expressly reserve the right to identify additional relevant disclosures and price declines following an opportunity to conduct full fact and expert discovery in this case.

284.    As a result of the information provided to the market, the price of National Vision stock dropped 13%, or $8.30 per share, from a close of $63.52 on November 9, 2021, to close at $55.22 per share on November 10, 2021, on unusually high trading volume.  The stock continued to drop in the following days, closing at $48.24 on November 16, 2021, representing a more than 24% decline from the November 9, 2021 close.

285.    The decline in the price of National Vision stock on November 10, 2021, and in the following days, was the direct result of the nature and the extent of the partial revelations made to the market regarding the negative financial impact of the Company's investment in employee wages.  The partial removal of artificial inflation from the price of National Vision stock would have been greater had Defendants fully disclosed the truth regarding the Company's financial performance and outlook.  But, because of Defendants' materially false and misleading statements and omissions, including statements regarding changes in the optometrist labor market and resulting impact on exam capacity, as well as the success and expansion of the Company's recruitment, retention, and remote medicine initiatives, the price of National Vision stock remained artificially inflated.

B.    **May 10, 2022 Corrective Disclosure**

286.    Additional problems at National Vision caught investors by surprise on May 10, 2022, when, before the market opened, Defendants reported the Company's 1Q22 financial results and revealed for the first time that National Vision was performing *worse* than prior to the pandemic due to "emerging constraints on exam capacity." *See* ¶¶167-179, *supra*.

287.    As a result of the information provided to the market, National Vision stock price plummeted approximately 26%, or $8.64 per share, from a closing price of $33.57 per share on May 9, 2022, to a closing price of $24.93 per share on May 10, 2022, on unusually high volume of over 7.1 million shares traded.  As the market continued to digest and respond to the negative news, the price of National Vision stock continued dropping, falling another 7.7% on May 11, 2022, to close at $23.00.

288.    The decline in the price of National Vision stock following the information disclosed on May 10, 2022 was the direct result of the nature and the extent of the partial revelations made to the market regarding the Company's poor performance due to, among other things, constraints on exam capacity.  The partial removal of artificial inflation from the price of National Vision stock would have been greater had Defendants fully disclosed the truth regarding the problems underlying National Vision's recruitment and retention of optometrists and the

resulting impact on exam capacity that had driven Defendants' disclosure.  In fact, as alleged herein, by the time of the May 10, 2022 disclosure, Defendants knew or were severely reckless in disregarding that additional investments and options for flexible schedules were needed to increase retention and attract new employees, especially critically important optometrists, which exposed National Vision to substantial additional losses.

### C.    March 1, 2023 Corrective Disclosure

289.    On March 1, 2023, before the market opened, National Vision issued its 4Q22 and FY22 financial results.  In the 4Q22 Release, Defendants disclosed that "significant enhancements to Optometrist recruiting and retention initiatives, including increased scheduling options" were necessary because National Vision was suffering from an optometrist shortage that was negatively impacting the Company's exam capacity, and in turn, the Company's overall business, which ultimately exposed National Vision to substantial additional losses.

290.    Then, on the same day, also before the market opened, National Vision hosted an earnings call with investors to discuss its 4Q22 and FY22 financial results.  During the call, Fahs disclosed that National Vision was making significant changes to finally "address . . . the new reality of the optometrist market and overall business environment in which we are operating today."  Fahs added, "optometrists in our

network are now being offered a greater variety of scheduling options and improved variable compensation programs and we are progressing the remote medicine initiative that we've been discussing in our last few calls." Fahs revealed that "changes [at National Vision] were needed to continue to maintain healthy retention rates and recruit new talent to our doctor network."

291.    In response to the disclosures on March 1, 2023, National Vision stock plummeted 39%, or $14.60 per share, from a closing price of $37.36 per share on February 28, 2023, to a close of $22.76 per share on March 1, 2023 (the next trading day) on abnormally high trading volume.

292.    All told, National Vision stock fell nearly **65%**, or $42.19 per share, from its Class Period high of $64.95 per share on November 5, 2021, to the closing price of $22.76 on March 1, 2023.

293.    The declines in the price of National Vision common stock after the revelations came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations and omissions of material fact being revealed to the investors and the market. The timing and magnitude of the price declines in National Vision common stock negate any inference that the losses suffered by Lead Plaintiffs and the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent

conduct. This point is supported by the performance graph below, which demonstrates a clear divergence in the price of National Vision common stock from the stock prices of National Vision's self-identified peer indexes[6] as the truth began to emerge on November 10, 2021. Notably, National Vision stock fell 39% on March 1, 2023, while the Company's peer index modestly declined only 1%, and the NASDAQ Index fell only 0.7%:

---

[6] The peer group included in this chart includes 13 of the publicly-traded companies that National Vision identified as competitors for compensation purposes in its Definitive Proxy Statement filed with the SEC on April 22, 2022. The peer group includes: Caleres, Inc., Columbia Sportswear Co., Dentsply Sirona Inc., Five Below, Inc., Floor & Décor Holdings, Inc., ICU Medical, Inc., Merit Medical Systems, Inc., Ollie's Bargain Outlet Holdings, Inc., Oxford Industries, Inc., Surgery Partners Inc., The Container Store Group, Inc., The Cooper Companies, Inc., West Pharmaceutical Services, Inc. (excluded from the chart below are two peers, Alight Technology, Inc. and At Home Group, Inc., for which there was incomplete data to represent them in the chart). Separately, in the Company's 2022 10-K, the Company identified the NASDAQ Global Composite Index and NASDAQ US Benchmark Retail Index as performance comparisons.



294.  As a result of their purchases of National Vision common stock at artificially inflated prices during the Class Period and the subsequent declines in the value of those shares when the truth was revealed to the market through three disclosure events and the artificial inflation was removed, Lead Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## XI.   APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

295.   At all relevant times, the market for National Vision stock was an efficient market for the following reasons, among others:

(a)   National Vision common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient, national stock market;

(b)   as a regulated issuer, National Vision filed periodic public reports with the SEC;

(c)   National Vision regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   National Vision was followed by securities analysts employed by major brokerage firms, including Bank of America Securities, Barclays, BMO Capital Markets, Jefferies, Morgan Stanley, UBS, Wells Fargo, and William Blair & Company, who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

296.   As a result of the foregoing, the market for National Vision common stock promptly digested current information regarding National Vision from all publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of National Vision common stock during the Class Period suffered similar injury through their purchases of National Vision common stock at artificially inflated prices, and the losses they suffered when the artificial inflation was removed, and a presumption of reliance applies.

297.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XII.  NO SAFE HARBOR

298.  The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false or misleading statements alleged herein.  Many of the statements alleged were not "forward-looking" when made, or omitted material information, and, therefore, are not protected by the safe harbor.  Alternatively, to the extent any statements were forward-looking, the safe harbor still does not apply because they were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

299.  To the extent Defendants provided risk warnings in their Class Period statements, they were mere boilerplate warnings.  As a result, the generic warnings were not narrowly-tailored to the actual risks associated with investing in National Vision stock and did not fairly and adequately warn actual and potential investors of the appropriate risks.  Indeed, the risk warnings provided by Defendants in their Class Period statements included boilerplate statements,[7] such as:

---

[7]  *See* National Vision's 2021 10-K, 1Q22 10-Q (incorporating by reference the 2021 10-K), 2Q22 10-Q (same), and 3Q22 10-Q (same).

- The COVID-19 pandemic has had, and may in the future continue to have, a material adverse impact on our business;

- Failure to recruit and retain vision care professionals for our stores could adversely affect our business, financial condition and results of operations;

- Our stock price may be volatile or may decline regardless of our operating performance; and

- The optical retail industry is highly competitive, and if we do not compete successfully, our business may be adversely impacted.

300. These or other materially similar risk disclosures disseminated throughout the Class Period did not serve to adequately inform the market of the true risks and actual operational experience of the Company. Indeed, that these stated warnings were inadequate and provided no new, meaningful information is evident from Defendants' failure to meaningfully modify the Company's risk factor language as well as the market's reaction to the revelation of Defendants' untrue and/or misleading statements.

301. Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements alleged, Defendants are liable for such statements because, at the time each forward-looking statement was made, the speaker knew the particular forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of National Vision who knew that the forward-looking statement was false when made.

Moreover, to the extent that Defendants issued any disclosures designed to warn or caution investors of certain purported risks, those disclosures were also false and misleading since they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and had actual knowledge of material, adverse facts undermining such disclosures.

## XIII. CLASS ACTION ALLEGATIONS

302. Plaintiffs bring this action as a class action on behalf of a class consisting of all persons who purchased National Vision common stock during the Class Period. Excluded from the Class are Defendants and their families, the officers, directors, and affiliates of defendants, at all relevant times, and members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

303. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, National Vision common stock actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by National Vision or its transfer agent and may be notified

of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

304.   Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.  Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

305.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c)    whether Defendants failed to convey material facts or to correct material facts previously disseminated;

(d)    whether Defendants participated in and pursued the fraudulent scheme or course of business complained of herein;

(e)     whether Defendants acted knowingly or with severe recklessness in omitting and/or misrepresenting material facts;

(f)     whether the market prices of National Vision stock during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g)     the extent of damages sustained by members of the Class and the appropriate measure of damages.

306.   Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs have retained counsel competent and experienced in class action litigation under the federal securities laws.

307.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impracticable for members of the Class to individually seek redress for the conduct alleged herein.  Plaintiffs know of no difficulty that will be encountered in this litigation that would preclude its maintenance as a class action.

## COUNT I

### For Violations of §10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

308.   Plaintiffs incorporate ¶¶1-307 by reference as if fully set forth herein.

309.   During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or severely recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

310.   Defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that they:

(a)   employed devices, schemes, and artifices to defraud;

(b)   made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)   engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of National Vision common stock during the Class Period.

311.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their respective purchases of National Vision common stock during the Class Period because, in reliance on the integrity of the market, they paid artificially inflated prices for National Vision common stock and experienced losses when the artificial inflation was released from National Vision common stock as a result of the leakage and disclosure of information and price declines detailed herein.  Plaintiffs and the Class would not have purchased National Vision common stock at the prices they paid, or at all, if they had been aware that the market price for National Vision common stock had been artificially and falsely inflated by Defendants' false and misleading statements.

312.   By virtue of the foregoing, Defendants have each violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violations of §20(a) of the Exchange Act
### Against the Individual Defendants

313.   Plaintiffs incorporate ¶¶1-307 by reference as if fully set forth herein.

314.   The Individual Defendants acted as controlling persons of National Vision within the meaning of §20(a) of the Exchange Act.

315.  By virtue of their high-level positions, participation in and/or awareness of National Vision's operations, and/or intimate knowledge of National Vision's disclosures, policies, and financial performance, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of National Vision, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading.  The Individual Defendants were provided with, or had unlimited access to, copies of the reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

316.  As set forth above, National Vision and the Individual Defendants violated §10(b) and Rule 10b-5 promulgated thereunder by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, and as a result of their aforementioned conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act for National Vision's §10(b) violations alleged herein.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and other Class members suffered damages in connection with their purchases of National Vision stock during the Class Period, as

evidenced by, among others, the stock price decline alleged above, when the artificial inflation was released from the price of National Vision stock.

317.  By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

## COUNT III

### For Violations of §20A of the Exchange Act
### Against Fahs

318.  Plaintiffs incorporate ¶¶1-307 by reference as if fully set forth herein.

319.  The insider trading claims alleged herein arise from Fahs' sale of 373,561 shares of National Vision stock on or around the period of August 16, 2021 and August 18, 2021, inclusive, while in possession of material, nonpublic information.

320.  As alleged herein, Fahs knowingly and severely recklessly made materially false and misleading statements and/or omitted to state facts necessary to make the statements made therein not false or misleading.  Fahs had access to and knowledge of material, nonpublic information concerning all aspects of National Vision's business, operations, and outlook, including, without limitation, information concerning the status and condition of the Company's labor shortages, retention, recruitment, and remote medicine initiatives, and any and all operational or business issues associated therewith.  Fahs' material misstatements and omissions

concerning the Company's labor shortages, retention, recruitment, and remote medicine initiatives, which were in violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder, and §20(a) of the Exchange Act, form the predicate violations for this §20A claim.

321.   Between August 16, 2021 and August 18, 2021, inclusive, while in possession of the material, nonpublic information, Fahs sold 373,561 shares while National Vision's common stock was trading near all-time highs of around $55 per share, in excess of $20 million.  These sales were made more suspicious by the fact that he sold more shares in this 3-day period than he had in the previous 18 months.

322.   As set forth herein, after Fahs' lucrative sales, the price of National Vision shares dropped precipitously as the material, nonpublic information was disclosed to the public.  *See e.g.*, ¶279.   Investors who purchased shares contemporaneously with Fahs' sales lost 12% of their investment within three months, and within a year they lost 32% of their investment.

323.   This claim is asserted pursuant to §20A of the Exchange Act, which provides, in part, that "[a]ny person who violates any provision of [the Exchange Act] or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable . . . to any person

who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased . . . securities of the same class."

324.   Fahs violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by knowingly, and with severe recklessness, making false and misleading statements and omitting to disclose material facts to investors, as detailed herein. While in possession of material, nonpublic information, between or around the period of August 16 through August 18, 2021, inclusive, Fahs sold 373,561 shares of National Vision stock for proceeds of more than $20 million.   As the CEO, President, CODM, and a director, Fahs owed a duty to National Vision and its shareholders to maintain the material, nonpublic information in confidence and not trade on the basis of it.   In breach of that duty, Fahs knowingly and severely recklessly traded National Vision stock on the basis, and while in possession, of the material, nonpublic information concerning National Vision's improper business practices.

325.   Fahs also violated §20(a) of the Exchange Act because he had the power to control, and did influence and control, directly or indirectly, the decision-making of National Vision, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading.

326.    Southfield purchased shares of National Vision stock as set forth in its Certification (ECF 24-4) and brings this claim against Fahs pursuant to §20A of the Exchange Act, 15 U.S.C. §78t-1, on behalf of itself and the other members of the Class who purchased shares of National Vision common stock contemporaneously with the unlawful insider trading described herein.  Southfield purchased shares contemporaneously with Fahs on the following dates:

| Date of Fahs' Sales | Shares Sold by Fahs | Fahs' Proceeds | Southfield's Date of Purchases |
|---|---|---|---|
| 8/16/2021 | 323,602 | $17,338,595 | 8/18/2021 |
| 8/17/2021 | 18,367 | $1,010,736 | 8/18/2021 |
| 8/18/2021 | 31,592 | $1,744,194 | 8/18/2021 |

327.    Southfield and all similarly situated members of the Class: (a) have suffered damages in that they paid artificially inflated prices for National Vision stock as a result of the violations herein described, and suffered economic losses as the truth was revealed through several partial disclosures; (b) have suffered damages because Fahs gained an advantageous market position through his possession of material, nonpublic information; and (c) would not have purchased National Vision stock at the prices they paid, or at all, if they had been aware that the market prices

- 175 -

had been artificially inflated by Defendants' false and misleading statements and material omissions.

328.   Under §20A of the Exchange Act, Fahs is jointly and severally liable to Southfield and the Class for all profits gained and losses avoided by him as a result of his insider trading.

329.   By virtue of the foregoing, Fahs violated §20A of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action, certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure, and designating Lead Counsel as Class Counsel;

B.     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  June 30, 2023          ROBBINS GELLER RUDMAN
                                          & DOWD LLP

                                          */s/ Robert J. Robbins*
                                          ROBERT J. ROBBINS
                                          (admitted *pro hac vice*)
                                          KATHLEEN B. DOUGLAS
                                          (admitted *pro hac vice*)
                                          BAILIE L. HEIKKINEN
                                          (admitted *pro hac vice*)
                                          MASON G. ROTH
                                          (admitted *pro hac vice*)
                                          225 NE Mizner Boulevard, Suite 720
                                          Boca Raton, FL  33432
                                          Telephone:  561/750-3000
                                          561/750-3364 (fax)
                                          rrobbins@rgrdlaw.com
                                          kdouglas@rgrdlaw.com
                                          bheikkinen@rgrdlaw.com
                                          mroth@rgrdlaw.com

                                          JOHNSON FISTEL, LLP
                                          MICHAEL I. FISTEL, JR.
                                          Georgia Bar No. 262062
                                          MARY ELLEN CONNER
                                          Georgia Bar No. 195007
                                          40 Powder Springs Street
                                          Marietta, GA  30064
                                          Telephone:  470/632-6000
                                          770/200-3101 (fax)
                                          michaelf@johnsonfistel.com
                                          maryellenc@johnsonfistel.com

*Lead Counsel for Lead Plaintiffs*

VANOVERBEKE, MICHAUD &
  TIMMONY, P.C.
THOMAS C. MICHAUD
(admitted *pro hac vice*)
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

KOSKIE MINSKY LLP
MARK ZIGLER
20 Queen Street West
Suite 900, Box 52
Toronto, Ontario M5H 3R3
Telephone:  416/977-8353
416/977-3316 (fax)
mzigler@kmlaw.ca

*Additional Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 30th day of June, 2023, I caused a true and correct copy of the foregoing to be filed with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing and make available the same to all attorneys of record.

/s/ Robert J. Robbins
ROBERT J. ROBBINS