# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

CITY OF SOUTHFIELD GENERAL
EMPLOYEES' RETIREMENT
SYSTEM, individually and on behalf
of all others similarly situated,

      Plaintiff,

v.

NATIONAL VISION HOLDINGS,
INC., et al.,

      Defendants.

Civil Action No.
1:23-cv-00425-VMC

## ORDER

This matter is before the Court on Defendants National Vision Holdings, Inc. ("National Vision"), L. Reade Fahs, and Patrick R. Moore's ("Individual Defendants," and with National Vision, "Defendants") motion to dismiss Plaintiffs' Amended Complaint for failure to state a claim upon which relief can be granted ("Motion" Doc. 53). For the reasons below, the Court will grant the Motion.

## I.  Background

### A.      Parties

National Vision is an optical retailer that provides eye exams, eyeglasses, and contact lenses at over 1,300 stores in the United States. (Doc. 46 ¶ 19, the "Amended Complaint" or "AC"). National Vision common stock trades on the

NASDAQ under the ticker symbol "EYE." (*Id*.). Lead Plaintiffs City of Southfield General Employees' Retirement System ("Southfield") and International Union of Operating Engineers, Local No. 793, Members Pension Benefit Trust of Ontario (collectively, "Lead Plaintiffs" or "Plaintiffs") bring this action on behalf of themselves and all other purchasers of National Vision common stock ("class") between May 13, 2021 and February 28, 2023 ("Class Period"). (*Id*. ¶ 1).

Plaintiffs allege that Defendants National Vision, L. Reade Fahs, and Patrick R. Moore violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), Rule 10b-5 promulgated thereunder ("Rule 10b-5"), and Section 20(a) of the Exchange Act. (*Id*. ¶ 2). Mr. Fahs has served as the Chief Executive Officer ("CEO") and President of National Vision since January 2003, and has served as a director on the Company's Board of Directors ("Board") since 2014. (*Id*. ¶ 20). Plaintiffs allege that during the Class Period, Mr. Fahs gained over $30.6 million in insider proceeds through his sales of Company stock. (*Id*.). Mr. Moore has served as the Company's Chief Operating Officer ("COO") since August 2022, after serving as National Vision's Chief Financial Officer ("CFO") and Senior Vice President since 2014. (*Id*. at 21). Plaintiffs allege that during the Class Period, Mr. Moore gained over $3.4 million in insider proceeds through his sales of Company stock. (*Id*.).

**B.**    **Facts**

Plaintiffs bring this case on the theory that Defendants misled investors about National Vision's ability to recruit and retain its critical vision care professionals, especially its optometrists, necessary to meet increasing demand for eye exams during the COVID-19 pandemic. (*Id.* ¶ 2). The Court includes a detailed examination of Plaintiffs' allegations in its analysis, but provides here a general summary for context:

> 3. National Vision, an optical retailer, historically experienced significant growth by catering to value-seeking, lower-income consumers. Consumers valued the Company's bundled offers that provided "free" eye exams along with the purchase of two pairs of glasses at low prices. National Vision's customer's purchases were, therefore, directly tied to the volume of eye exams its optometrists performed, making optometrist availability paramount to the Company's growth.

> 4. Unbeknownst to investors, however, prior to the Class Period and leading up to the COVID-pandemic, growth in the Company's high volume, thin margin business stemmed from a churn and burn business model, in which consumers needing eye exams were seen as quickly as possible. To maintain this pace, National Vision required its optometrists to work an inflexible and demanding schedule, while requiring them to see a high volume of patients per hour, despite having inadequate staffing support, resulting in high attrition rates and ongoing frustration. In addition, the Company's below market pay to its non-optometrist staff resulted in significant staff turnover and often left its retail stores dispensing glasses and contact lenses through non-licensed employees in violation of state optical board rules.

5. When the pandemic hit, National Vision, along with businesses worldwide, was severely disrupted. But by the time the Company's stores fully reopened, an industry shift was underway. As a result of the economic strain of the pandemic and government stimulus checks, both lower-income and higher-income consumers flocked to National Vision's "free" eye exams and value-centered products. Competition for the Company's vision care professionals, especially skilled optometrists, dramatically increased, while in-demand optometrists sought a better work-life balance and pushed back against the Company's rigid and inflexible work requirements. National Vision, however, refused to abandon its archaic churn and burn business model and failed to timely adjust, leaving it unable to meet growing consumer demand for its services or optometrists' demand for better working conditions. For example, the Company's remote medicine initiatives, which were supposed to allow optometrists to see patients from the comforts of the doctor's home—and help National Vision combat exam capacity issues resulting from a lack of optometrists, were sparse, costly, and riddled with problems. Given these increased demands and pressures, optometrist burnout and attrition continued to rise, and optometrists retired at unprecedented levels or left the Company in search of an improved work-life balance.

6. By the start of the Class Period, on May 13, 2021, the Company's staffing and optometrist labor shortage problems were immense. It was eminently clear within the Company that National Vision could not continue to meet surging demand for eye exams. Starting in mid-2021, and throughout the Class Period, National Vision implemented belated and costly recruitment and retention initiatives in an attempt to address, but not fully disclose, the Company's struggles. Unbeknownst to investors, however, National Vision's initiatives were too little and too late, and incapable of counteracting the Company's labor crisis without having a material

negative impact on National Vision's financial performance and outlook.

7. Despite the widespread and internal problems detailed herein, which were known or disregarded with severe recklessness by Defendants, throughout the Class Period, Defendants repeatedly made false and misleading statements and omissions assuring the market that National Vision was skillfully navigating the post-pandemic business environment and had largely avoided the labor disruptions that were then impacting other retailers, including the Company's competitors. Defendants claimed that the Company was outperforming the industry in terms of recruitment and retention, implementing mere ordinary compensation increases, and developing a robust remote medicine program that would drive the Company's continued profitability and growth.

8. As a result of Defendants' false statements and material misrepresentations and omissions, National Vision common stock traded at artificially inflated prices, reaching as high as $64.95 per share during the Class Period. The Individual Defendants (defined herein) personally benefitted from National Vision's artificially inflated stock price, and collectively sold more than $34 million of their personally-held Company shares in transactions that were suspiciously timed over a three-month period while the stock traded at artificially inflated prices. While Defendants were cashing in, investors were in the dark about the true extent of the Company's problems, and were ultimately damaged as a result.

9. As the truth was exposed through three partial disclosures, National Vision's stock price dropped, causing significant investor losses as the artificial inflation was removed. *First*, on November 10, 2021, National Vision reported its third quarter 2021 ("3Q21") financial results and shocked investors by announcing

5

that the Company expected "lower Q4 profitability" due to previously undisclosed and vague "wage investments" "implemented earlier" that year. Defendants further adjusted National Vision's 2021 guidance, signaling the Company would suffer from gross margin compression and earnings pressures. In response to these disclosures, the price of National Vision stock fell 24% from a closing price of $63.52 on November 9, 2021, to a closing of $48.24 on November 16, 2021.

10. *Second*, on May 10, 2022, Defendants reported disappointing first quarter 2022 ("1Q22") financial results, and significantly slashed National Vision's 2022 outlook due, in part, to "emerging constraints to exam capacity." Defendants acknowledged that eye exam capacity constraints stemmed from "not having enough doctors for the demand we have." The lowered 2022 outlook demonstrated that National Vision was actually performing worse, in terms of profits and earnings, than before the pandemic. The market was stunned and the price of National Vision stock fell over 31% from a closing price of $33.57 per share on May 9, 2022, to a closing price of $23.00 on May 11, 2022.

11. Throughout this entire period, and up until the final revelation of truth on March 1, 2023, Defendants continued to downplay the Company's labor shortages, highlight the Company's growth initiatives, and assure the market that any exam capacity constraints were temporary.

12. *Third*, on March 1, 2023, and despite Defendants' ongoing assurances, investors were shocked once more when Defendants reported disappointing fourth quarter 2022 ("4Q22") financial results and issued lower than expected 2023 guidance because of significant exam capacity constraints that were still negatively impacting the Company's financial performance and outlook. Defendants confirmed that despite their affirmations

throughout the Class Period, National Vision's labor situation was indistinguishable from the labor shortages of its competitors, and its problems with "optometrist availability" had been ongoing since "the pandemic" — which began three years prior. Defendants further disclosed the need for "significant enhancements to Optometrist recruiting and retention initiatives, including increased scheduling options" that would "weigh on profitability," and that the Company needed to implement "new techniques and training to minimize" previously undisclosed "productivity loss" in the Company's remote medicine initiatives. Once more, the market and investors were shocked by Defendants' disclosures, and National Vision's stock price fell 39%, from a closing price of $37.36 per share on February 28, 2023 to a closing of $22.76 per share on March 1, 2022 (the next trading day).

13. In response to Defendants' March 1, 2023 disclosures, analysts highlighted "ongoing vulnerability in [the Company's business] model related to availability of optometrists" and voiced their "deep set frustration [with] a lack of clear messaging around [National Vision's] access to optometrists."

14. The price of National Vision common stock has yet to recover from its Class Period high of $64.95 per share on November 5, 2021.

(Doc. 46 ¶¶ 3–14).

## C.    Procedural History

Plaintiffs initiated this action on January 27, 2023 (*see* Doc. 1) and later amended their complaint to include the March 2023 allegations (Doc. 46). In the Amended Complaint, Plaintiffs bring three claims: Count I—Violations of Section 10(b) of the "Exchange Act and Rule 10b-5 promulgated thereunder against all

Defendants; Count II—Violations of Section 20(a) of the Exchange Act against the Individual Defendants; and Count III—Violations of Section 20(a) of the Exchange Act against Mr. Fahs. (*See id.* ¶¶ 308−29).

On August 21, 2023, Defendants moved to dismiss for failure to state a claim. (Doc. 53). Plaintiffs opposed Defendants' motion (Doc. 55), and Defendants submitted a reply brief. (Doc. 56). On January 18, 2024, the Court heard oral argument from the Parties regarding the Motion. Having been fully briefed and argued, Defendants' Motion is now ripe for the Court's review.

## II. Legal Standards

### A. Securities Fraud

"Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b–5 prohibit making any material misstatement or omission in connection with the purchase or sale of any security." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014). As explained by the Eleventh Circuit:

> Section 10(b) makes it unlawful to
>
>> use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the

> public interest or for the protection of
> investors.

15 U.S.C. § 78j(b). Rule 10b–5, in turn, forbids any person, directly or indirectly, . . .

> (a) To employ any device, scheme, or artifice
> to defraud,
>
> (b) To make any untrue statement of a
> material fact or to omit to state a material
> fact necessary in order to make the
> statements made, in the light of the
> circumstances under which they were
> made, not misleading, or
>
> (c) To engage in any act, practice, or course
> of business which operates or would
> operate as a fraud or deceit upon any
> person, in connection with the purchase or
> sale of any security

17 C.F.R. § 240.10b–5.

See *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236 (11th Cir. 2008). Thus, to state

a claim under Section 10(b) and Rule 10b–5, a plaintiff must sufficiently allege six

elements:

> (1) a material misrepresentation or omission; (2) made
> with scienter; (3) a connection with the purchase or sale
> of a security; (4) reliance on the misstatement or
> omission; (5) economic loss [i.e., damages]; and (6) a
> causal connection between the material
> misrepresentation or omission and the loss, commonly
> called "loss causation."

*See FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1295 (11th Cir. 2011) (internal quotation omitted).

Additionally, to state a claim under Section 20(a), Plaintiffs must allege that: (1) National Vision committed a primary violation of the securities laws; (2) the Individual Defendants had the power to control the general business affairs of National Vision; and (3) the Individual Defendants "had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in primary liability." *In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1274 (S.D. Fla. 2017). If Plaintiffs fails to plead a violation of Section 10(b), a claim under Section 20(a) necessarily fails as well. *See Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006).

### B.    Heightened Pleading Standard

The Eleventh Circuit has set out the heightened pleading standard governing Defendants' instant motion to dismiss as follows:

> To survive a motion to dismiss, a claim brought under Rule 10b–5(b) must satisfy: (1) the federal notice pleading requirements in Federal Rule of Civil Procedure 8(a)(2) ("Rule 8(a)(2)"); (2) the special fraud pleading requirements in Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"), and; (3) the additional pleading requirements in the Private Securities Litigation Reform Act of 1995 ("PSLRA").[1] *See Phillips v. Scientific–Atlanta, Inc.*, 374 F.3d 1015, 1016 (11th Cir. 2004) (reviewing a

---

[1] Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub.L. No. 104–67, 109 Stat. 737 (codified as amended in scattered sections of 15 U.S.C.).

Rule10b-5(b) claim for a company's alleged exaggeration of product demand); *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1197, 1202 (11th Cir. 2001) (reviewing a Rule 10b-5(b) claim for a company's alleged misrepresentation of its profits).

Under Rule 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must allege "enough facts to state a claim to relief that is plausible on its face," and the factual allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

In addition to the Rule 8(a)(2) requirements, Rule 9(b) requires that, for complaints alleging fraud or mistake, "a party must state with particularity the circumstances constituting fraud or mistake," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). While Rule 9(b) does not abrogate the concept of notice pleading, it plainly requires a complaint to set forth: (1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff, and; (4) what the defendant obtained as a consequence of the fraud. *Garfield* [ ], 466 F.3d [at] 1262; *Ziemba*, 256 F.3d at 1202. The "[f]ailure to satisfy Rule 9(b) is a ground for dismissal of a complaint." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005) (per curiam).

The PSLRA imposes additional heightened pleading requirements for Rule 10b–5(b) actions. For Rule 10b–5(b) claims predicated on allegedly false or misleading statements or omissions, the PSLRA provides that "the complaint shall specify each statement alleged to have

> been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u– 4(b)(1). And for all private Rule 10b–5(b) actions requiring proof of scienter, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [i.e., scienter]." *Id*., § 78u–4(b)(2). Although factual allegations may be aggregated to infer scienter, scienter must be alleged with respect to each defendant and with respect to each alleged violation of the statute. *Phillips*, 374 F.3d at 1016–18. If these PSLRA pleading requirements are not satisfied, the court "shall" dismiss the complaint. 15 U.S.C. § 78u–4(b)(3)(A).

*See In re Galectin Therapeutics, Inc. Sec. Litig*., 843 F.3d 1257, 1269–70 (11th Cir. 2016).

In reviewing a motion to dismiss a securities law claim, the court accepts all allegations as true and asks "would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Mizzaro*, 544 F.3d at 1239.

Finally, in assessing whether a complaint sufficiently states a claim for securities fraud, the court "may take judicial notice of the contents of relevant public documents filed with the [SEC] and may also consider undisputedly authentic evidence outside the pleadings on which the plaintiffs rely in their complaint." *City of Pontiac Gen. Emps. Ret. Sys. v. Schweitzer-Mauduit Int'l*, 806 F. Supp. 2d 1267, 1290 (N.D. Ga. 2011) (internal citation omitted); *see also Harris v. Ivax Corp*., 182 F.3d 799, 802 n.2 (11th Cir. 1999)).

### III.    Discussion

Having set forth the overarching legal standards, the Court now turns to the substance of Defendants' Motion and Plaintiffs' opposition. (Docs. 53, 55, 56). Defendants move to dismiss the entire Amended Complaint for failure to state a claim of securities fraud. In the Motion, Defendants argue that Plaintiffs' Count I should be dismissed for four reasons. (Doc. 53 at 2). First, Defendants argue that Plaintiffs challenge statements that are protected by the PSLRA's statutory "safe harbor" for forward-looking statements, as provided by 15 U.S.C. § 78u-5. (*Id.*). Second, Defendants argue that Plaintiffs challenge statements that are not actionable as a matter of law, either because they are corporate "puffery" or non-actionable statements of opinion. (*Id.*). Third, Defendants argue that Plaintiffs fail to satisfy the first element of a Section 10(b) and Rule 10b–5 claim—pleading with particularity that an actionable, material misrepresentation or omission occurred. (*See id.*). And fourth, Defendants argue that Plaintiffs fail to adequately plead facts establishing scienter, the second necessary element. (*See id.*).

While some of the challenged statements may fall under the PSLRA's "safe harbor" and some constitute non-actionable corporate "puffery," the Court finds that Plaintiffs' Amended Complaint fails for the independent reason that Plaintiffs do not plead with particularity facts showing that any challenged statement was false or misleading at the time it was made. Fed. R. Civ. P. 9(b); 15 U.S.C. § 78u-

4(b)(1). As a result, Plaintiffs have not met their burden at this stage. Accordingly, Defendants' motion to dismiss is granted.

### A. Failure to Plead Falsity with Particularity

First, Defendants argue that Plaintiffs fail to plead sufficiently particularized facts establishing that certain challenged statements or omissions were false or misleading when made, as required by Rule 9(b) and 15 U.S.C. § 78u-4(b)(1). (*See* Doc. 53-1 at 25). A complaint sufficiently pleads falsity by specifying "the who, what, when[,] where, and how" of statements made. *Garfield*, 466 F.3d at 1262. A statement is misleading if, in the light of the facts that existed when the statement was made, a "reasonable investor, in the exercise of due care, would have been misled by it. Thus, the appropriate primary inquiry is into the meaning of the statement to the reasonable investor and its relationship to truth." *See FindWhat*, 658 F.3d at 1305 (internal quotation omitted).

"A duty to disclose may . . . be created by a defendant's previous decision to speak voluntarily. Where a defendant's failure to speak would render the defendant's own prior speech misleading or deceptive, a duty to disclose arises." *Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040, 1043 (11th Cir. 1986). Further, the Eleventh Circuit has explained that:

> Rule 10b-5 prohibits not only literally false statements, but also any omissions of material fact "necessary in order to make the statements made, in the light of the circumstances under which they were made, not

14

misleading." 17 C.F.R. § 240.10b–5(b). By voluntarily revealing one fact about its operations, a duty arises for the corporation to disclose such other facts, if any, as are necessary to ensure that what was revealed is not "so incomplete as to mislead." *Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir. 1990) (en banc) (*quoting SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 862 (2d Cir. 1968); *accord Rudolph*, 800 F.2d at 1043 ("Where a defendant's failure to speak would render the defendant's own prior speech misleading or deceptive, a duty to disclose arises."); *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 248 (5th Cir. 2009) ("[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers."). "[E]ven absent a duty to speak, a party who discloses material facts in connection with securities transactions assumes a duty to speak fully and truthfully on those subjects." *In re K-tel Intern., Inc. Sec. Litig.*, 300 F.3d 881, 898 (8th Cir. 2002) (internal quotation marks and alteration omitted).

*See FindWhat*, 658 F.3d at 1305. Put differently, "a defendant may not deal in half-truths." *Id.* (internal quotation omitted).

Only misrepresentations or omissions that are "material" give rise to a securities fraud cause of action. 17 C.F.R. § 240.10b–5. In determining whether the public statements made were "material," the Court must make an "'objective' inquiry [into] the significance of an omitted or misrepresented fact to a reasonable investor." *SEC v. Morgan Keegan & Co.*, 678 F.3d 1233, 1245 (11th Cir. 2012) (quoting *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 445 (1976)). "In other words, a misstatement or omission is material if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor

as having significantly altered the total mix of information made available." *Id.* (internal quotations omitted).

Plaintiffs have the burden of explaining how National Vision's statements to the public differed from the reality that National Vision knew it was facing at the time. Defendants argue that in, "conclusory fashion and with the benefit of hindsight," Plaintiffs criticize Defendants for "inadequate" actions to address staffing and retention problems that amounted to "too little too late." (Doc. 53-1 at 25 (citing AC ¶ 64)). The Court agrees. Throughout the Amended Complaint, Plaintiffs fail to put forth any facts that explain *how* any of the challenged statements were false or misleading. Plaintiffs fail to allege with particularity the specific facts that underlie each alleged misstatement, misrepresentation, or omission. *See In re Royal Caribbean Cruises Ltd. Sec. Litig.*, No. 1:11-22855-CIV, 2013 WL 3295951, at *11 (S.D. Fla. Apr. 19, 2013).

Plaintiffs repeatedly allege in a conclusory fashion that statements made to investors on May 13, August 10, November 10, and December 1, 2021, and February 28, March 10, May 10, August 11, September 7, and November, 10, 2022 were "materially false and misleading and omitted material facts" because Defendants:

> knew or were severely reckless in disregarding that National Vision was failing to timely and effectively react to its extraordinary wage and labor pressures, especially regarding the Company's optometrists . . . and

> that the Company's belated and costly recruitment and
> retention initiatives (including wage investments and
> other enhanced compensation efforts) and remote
> medicine initiatives during the Class Period, were
> primed to negatively impact the Company's financial
> results and in turn the Company's profitability[.]

(AC ¶¶ 113, 126, 144, 165, 181, 201, 213). Yet on each of these occasions, Plaintiffs'

fail to allege facts that show Defendants were reporting false or misleading

information about National Vision's performance and that Defendants knew or

should have known that information was false or misleading. Without

particularized allegations, the Court has no basis to determine the substance of the

alleged fraud or whether Defendants' statements were material. Instead, the

statements on which Plaintiffs rely appear to show that National Vision repeatedly

informed investors that it was experiencing varying degrees of wage inflation and

sought to pay its providers competitively to maximize retention and improve eye

exam capacity.

### 1.   Wage Inflation and Retention Allegations

Plaintiffs' allegations show that National Vision repeatedly informed

investors that it was experiencing wage inflation and retention pressures

throughout the Class Period, and Plaintiffs fail to plead with specificity how

Defendants' statements were false or misleading. The Class Period begins on May

13, 2021 when National Vision announced positive financial results for the first

quarter of 2021, including across-the-board increases in net revenue. (AC ¶ 101).

During the earning call that day, Plaintiffs allege that Fahs "falsely and misleadingly touted the Company's record 'high retention rates' of key optometrists and that the Company was successfully meeting 'strong patient demand for eye exams,' stating, in pertinent part:

> . . . we continue to invest in our top optometrist recruitment and retention programs to keep our high retention rates near record levels. With healthy doctor coverage, we're able to meet strong patient demand for eye exams with a safety-first approach.

(*Id.* ¶ 104). Yet Plaintiffs offer no facts that explain what is allegedly false or misleading about this statement. Further, Plaintiffs allegation misstates Fahs's statement. Fahs did not tell investors that National Vision had record high retention rates; he said, "we continue to invest in our top optometrist recruitment and retention programs to keep our high retention rates *near* record levels." (*Id.*) (emphasis added).

Plaintiffs further allege that Fahs "deflected" when asked whether the Company was experiencing significant wage pressures:

> [W]hen asked during the May 13, 2021 earnings call whether the Company was experiencing "significant wage pressures either for the optometrists and/or the store associates," Fahs deflected, and stated that National Vision was "operat[ing] in the same world everyone else does." Fahs acknowledged that National Vision was "in a chapter now of tight labor," but assured investors that the Company simply "like[s] to pay competitively and make sure that our folks are well compensated," which "we're watching and managing carefully."

(*Id.* ¶ 106). Despite the assertion that Fahs "deflected," National Vision did inform investors of the "tight labor" market and its priority to provide competitive compensation. Fahs's statement contradicts Plaintiffs' later allegations that National Vision hid these challenges from investors.

On August 12, 2021, National Vision hosted an earnings call during which Fahs reported that it "continue[d] to invest in [its] optometrist recruitment and retention programs to keep [its] high retention rates near record levels." (*Id.* ¶ 117). Plaintiffs allege that Fahs "misleadingly boasted" about National Vision's retention rates:

> In terms of staffing challenges, we're not immune to macro trends, **but the impact to us on staffing challenges is mild relative to what we're all sort of hearing about and reading about in much of retail in the service industry.** And again, I think that relates to the fact that we are an environment of optical professionals who define themselves as optical professionals, who have their – what makes careers in optics and the – given our success, **we're considered a great and very secure place to have your optical career.** I mean, **the nice thing about the growth that we had, it provides lots of opportunity for career development here.**

(*Id.* ¶ 118). Again, aside from the superficial accusation that Fahs "misleadingly boasted," Plaintiffs identify no facts that demonstrate how this account differed from the reality National Vision was facing at the time.

Also during the August 12, 2021 earnings call, Plaintiffs allege that Moore "minimize[ed] any wage inflation pressures and claims that any increases were already considered and captured by the Company's 2021 guidance" with citation to Moore's statement:

> **I don't think there's any surprises inside of the year. We've seen—if we go to a bigger picture, we've seen some degree of modest wage inflation for our doctors.** We're happy to pay them competitive rates because they do a lot of work here for us and for the patients. **That has moderated a bit across the last year, and we've been happy to see that moderation.** But we also understand that it's a supply-demand equation in every market. It's not – **they're not ubiquitous supply demand challenges for optometrists**, but we do that in every market.
>
> So I would expect to see **some** degree of continued wage inflation there. In terms of our associates, it really, it's a function of what our [*sic*] states doing with minimum wages —what are we doing relative to market changes. **We have guided that we are not immune to wage inflation. We expect to see some of that. It's absolutely included in our guide. So really more of the same, we're expecting a little more associate inflation, which is in the guide.**
>
> And then longer term, . . . I think the things that **we're doing our best to work around all this wage inflation, which thus far, we've not had to signal huge implications there. We've managed through that really well. Not expecting that to continue to change to a large degree.**

(*Id.* ¶¶ 119−20). With these excerpts, Plaintiffs highlight that Defendants *did* inform investors that National Vision was experiencing wage inflation and "supply

demand challenges for optometrists." (*Id.*). Plaintiffs attempt to imbue falsity, misrepresentation or omission with the emphasized text but fail to connect any dots for Defendants or the Court to understand their theory of fraud.

Plaintiffs allege that by November 2021, "Defendants could only conceal the truth for so long" regarding the "undisclosed, extraordinary wage and labor pressures and resulting eye exam capacity constraints negatively impacted National Vision" and "[t]he truth was ultimately revealed in a series of partial disclosures causing significant declines in the price of National Vision stock." (*Id.* ¶ 127). In the November 10, 2021 earnings call, National Vision reported higher sales but lower profitability, which Moore explained resulted from NV making "surgical wage investments around midyear" in its stores, specifically in "associates and lab associates where [NV] saw immediate returns in hiring and retention rates" and "also made investments in doctor compensations." (*Id.* ¶ 132). Moore further reported that "there had been three wage 'adjustments' and any impacts were 'mid-single-digit millions' and that the Company would return to 'normal seasonality' in 2022." (*Id.* ¶ 133). The November 10, 2021 announcement resulted in the first major hit to National Vision's stock price. (*Id.* ¶ 138).

Plaintiffs rely on Moore's statement about midyear wage investments to infer an earlier omission without contemporaneous support. Plaintiffs cannot rely on an after-the-fact statement made in November 2021 to "infer that [earlier

statements] were false or misleading at the time they were made." *Belmont Holdings Corp. v. SunTrust Banks, Inc.*, No. 1:09-CV-1185-WSD, 2010 WL 3545389, at *7 (N.D. Ga. Sept. 10, 2010). Rather, Plaintiffs must point to particularized, contemporaneous facts showing why a specific challenged statement was false because of an alleged omission. *See In re Floor & Decor, Inc. Sec. Litig.*, No. 1:19-CV-2270-SCJ, 2020 WL 13543880, at *8 (N.D. Ga. Sept. 21, 2020) (rejecting similar "fraud by hindsight" claims); *In re Aaron's, Inc. Sec. Litig.*, No. 1:17-CV-2270-SCJ, 2018 WL 11343741, at *7 (N.D. Ga. Sept. 26, 2018) (similar); *In re HomeBanc Corp. Sec. Litig.*, 706 F. Supp. 2d 1336, 1360 (N.D. Ga. 2010) (similar).

Further, Plaintiffs' own allegations demonstrate that Defendants publicly discussed wage and compensation pressures earlier in the year. Plaintiffs argue that "[w]hen Defendants spoke in May and August of 2021 about compensation, noting NV was seeing 'more of the same' 'wage inflation,' they had a duty to disclose that NV had already made material 'wage investments' 'mid-year' that would 'lower Q4 profitability.'" (Doc. 55 at 24). This argument is logically incoherent because a duty to disclose is created "only when necessary to make . . . statements made, in light of the circumstance under which they were made, not misleading.'" *See Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1324 n.8 (11th Cir. 2019) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43 (2011)). As Defendants reported wage inflation in May and August 2021, a reasonable

investor would understand that to mean National Vision was paying its employees more than in previous quarters. Whether referred to as "wage inflation" or "wage investments," both phrases communicate that National Vision was paying more for labor than it was previously. Thus, Plaintiffs' allegation of "undisclosed" wage investments does not establish a prior material omission. Other than this semantic difference, Plaintiffs never explain how Defendants' November 2021 representations were allegedly misleading when they were made.

On February 28, 2022, National Vision hosted an earnings call with analysts and investors to discuss National Vision's 4Q21 and FY21 results and 2022 trends. (AC ¶ 147). Plaintiffs allege that National Vision "gave unrealistic and unattainable guidance for 2022." (*Id.* ¶ 146). After a rocky start to the year, Plaintiffs allege that "Fahs falsely blamed 'macro headwinds' including the Omicron variant and winter weather for affect[ing] store operations and customer traffic thus far in 2022," which "impacted [National Vision's] ability to staff stores based on optometrist and associate illness." (*Id.*). It is unclear what about this statement is purportedly false or misleading.

Plaintiffs further allege that Fahs "touted" National Vision's retention rates and its recruiting initiatives:

> This means continuing to invest in programs that attract optometrists and maintain high retention rates. In 2021, new initiatives related to optometrist compensation and recruiting were implemented. And thus far, we've been

> encouraged with the early results of these initiatives.
> These initiatives will continue to be a focus area in 2022.

(*Id.* ¶ 150). Still, Moore acknowledged that National Vision continued to face wage inflation tied to supply and demand for optometrists. (*Id.* ¶ 153). Despite Plaintiffs' allegations that National Vision "gave unrealistic and unattainable guidance for 2022" (*Id.* ¶ 146), they also allege that analysts heeded the warnings in the February 2022 guidance and lowered their price targets for National Vision Stock (*see id.* ¶¶ 160−61). This fact contradicts Plaintiffs' insinuation that the 2022 guidance was overly optimistic.

Yet, Plaintiffs allege that on May 10, 2022, "National Vision once again shocked the market by disclosing deeply disappointing financial and operational results for its 1Q22, while also reducing the Company's FY22 outlook." (*Id.* ¶ 167). Fahs and Moore explained that this fall was due to "emerging constraints to exam capacity:"

> **We are actively working to increase exam capacity with enhanced optometrist recruiting and retention programs as well as an accelerated rollout of our remote medicine initiative.** Also, as we contend with an inflationary operating environment, we implemented this week the first pricing change to our America's Best signature offer in over 15 years. Yet we are proud to continue to deliver industry-leading value to consumers. **We expect these actions, combined with easier compares, to lead to improving performance later this year. Despite the short-term challenges, we are confident in the broad appeal and health of our**

> **business model and remain well-positioned to deliver
> sustainable growth as we move beyond this period.**

(*Id.* ¶ 171). During the earnings call, Plaintiffs allege that Moore "misrepresented that National Vision was equipped to manage any further impact on exam constraints" by stating:

> **We've managed through several years of [optometrist
> doctor] wage pressure. And it generally never comes in
> a ubiquitous national fashion. It generally comes in
> specific markets, even specific cities. So I think we've
> gotten pretty decent at being able to work through
> those. I would assume that we're going to continue to
> see a little more of that as we have over the last few
> years.** And frankly, as we've done at that time, we've
> looked to offset those pressures across other areas of the
> P&L.

(*Id.* ¶ 175). Despite calling this a "misrepresentation," Plaintiffs again fail to explain what is false about Moore's statement. Indeed, the May 2022 announcement resulted in the second significant hit to National Vision's stock price. (*See id.* ¶ 182).

On August 11, 2022, National Vision again reported disappointing financial results and lowered certain aspects of its 2022 outlook, citing exam capacity constraints. (*Id.* ¶ 187). Looking forward to the rest of the year, Fahs used cautious language, "[i]n terms of constraints to our exam capacity, we feel incrementally better about our capacity situation." (*Id.* ¶ 195). On November 10, 2022, National Vision again reported lower revenue than the previous year but affirmed the

Company's revised 2022 outlook previously announced in August 2022. (*Id.* ¶ 202). Plaintiffs allege that National Vision's representations of "incremental improvement" were somehow misleading without explanation:

> **While discussing continued exam constraints**, Fahs touted the Company's progress, stating 'we're making **sequential** progress through improved retention, strong hiring and remote medicine' and remain 'focused on our growth initiatives.' **Further commenting on the Company's initiatives, Fahs misleadingly told the market that exam capacity constraints were 'temporary' and should improve going into 2023[.]**

(*Id.* ¶ 206) (emphasis added).

The final significant hit to National Vision's stock price during the Class Period occurred on March 1, 2023 when Plaintiffs allege that "the full truth" about exam capacity constraints and the need for additional investment in the recruitment and retentional of optometrists "was revealed to investors." (*Id.* ¶ 214). On that day, Plaintiffs allege that National Vision again "shocked investors" by announcing disappointing financial results for 2022 and that National Vision's outlook for 2023 was below market expectations. (*Id.*).

In support of the Amended Complaint, Plaintiffs point to *Phoenix Insurance Co. v. ATI Physical Therapy, Inc.*, No. 1:21-CV-04349, 2023 WL 5748359 (N.D. Ill. Sept. 6, 2023). In *Phoenix*, plaintiffs brought a class action following the acquisition of ATI Physical Therapy, an outpatient physical therapy company, alleging that investors were misled by projections related to physical therapist retention rates.

*Id.* at *1. The Northern District of Illinois analyzed the distinction between corporate puffery and actionable statements related to healthcare provider retention:

> [I]t is clear that some of the alleged misstatements are indeed mere, non-actionable puffery: specifically, that ATI had "a competitive compensation model" with the "superior ability to recruit and retain physical therapists," and that ATI had "favorable clinician retention rates and engagement scores." Those adjective-laden statements are too vague and unverifiable. They contain intrinsically vague terms that would alert any reasonable investor that puffery is at play: "competitive," "superior," and "favorable." Those terms are not concrete enough for a listener to discern with reasonable precision how competitive or superior or favorable ATI's business models, abilities, rates, and scores are. No reasonable investor could rely on these statements to form a concrete opinion about the health of ATI. The same is true of the statements that ATI had "attractive recruiting and retention capabilities" and that it was "the Employer of Choice for P[hysical] T[herapy] Clinicians" with "[b]est-in-class infrastructure" for retaining physical therapists. Again, these statements contain no concretely useful information; they are window-dressing—"optimistic rhetoric" (or hot air) used indiscriminately by companies and executives. *See Searls* [*v. Glasser*], 64 F.3d [1061,] 1066 [(7th Cir. 1995)] (holding "recession-resistant" to be a "promotional phrase used to champion the company but [ ] devoid of any substantive information").

*Id.* at *6. In comparison to those "high-level, flowery statements," the court concluded that "those asserting that ATI had 'very high retention' and 'low turnover' of its physical therapists" were potentially actionable because they

"target a very specific aspect of ATI's operations" and "they are also more determinate and verifiable." *Id.*

Although it's true that Defendants did assert "high retention rates" (AC ¶¶ 117, 150), Plaintiffs still fail to make particularized allegations necessary to state a claim for relief. The Amended Complaint differs from the complaint in *Phoenix* because the *Phoenix* plaintiffs' allegations were supported by several confidential sources who identified how the reality ATI was experiencing differed from the story its leaders were communicating to the market. These sources were ATI employees who observed attrition and retention problems leading up to the merger:

> Source 1, an ATI talent acquisition specialist from May 2019 to September 2021, noticed that, by early 2020, recruits were rejecting ATI's employment offers almost 50% of the time, mainly because of concerns over compensation. For context, Source 3, an ATI revenue cycle analyst until April 2020, observed that before late-2020 the attrition rate "hovered just above 20%."

> [. . .]

> Source 2, another talent acquisition specialist, worked at ATI from October 2020 to August 2021 and oversaw the onboarding of physical therapists. This source also noticed an elevated attrition rate of 41% in late-2020 and also in 2021, driven by worse pay and hours compared to other companies. Source 2 heard Coco (the then-Chief Human Resources Officer) acknowledge retention problems at an HR department lunch in either November or December 2020 or January or February 2021.

[. . .]

> Source 4 prepared monthly slide-decks for ATI's executive leadership that included a monthly scorecard, including a chart with a trend line that detailed climbing attrition rates throughout the whole year of 2020. Similarly, Source 5, a former sales director from March 2016 to March 2021, observed the physical-therapist attrition rate reaching around 40% because employees were overworked. And finally, Source 6, a former ATI clinic director, had monthly calls at the end of 2020 or beginning of 2021 with the then-Chief Operating Officer Ray Wahl who said that ATI needed to "hold onto people because employees were leaving at an alarming rate," which was "starting to impact the service that ATI was able to provide to patients."

*Phoenix*, 2023 WL 5748359, at *3. The specificity of these "falsifiable, concrete" allegations demonstrate why Plaintiffs' claims are insufficient. *See id.* at *6. Plaintiffs do not provide confidential sources or allege verifiable numbers demonstrating the falsity of defendants' statements about wage inflation or employee retention. *See Pub. Emp. Ret. Sys. of Miss. v. Mohawk Indus., Inc.*, 564 F. Supp. 3d 1272, 1289 (N.D. Ga. 2021) (allegations were supported by 14 confidential witnesses); *In re Flowers Foods, Inc. Sec. Litig.*, No. 7:16-CV-222 (WLS), 2018 WL 1558558, at *15–*17 (M.D. Ga. Mar. 23, 2018) (allegations supported by testimony from former CFO that he repeatedly warned senior management about the compliance risks); *Hubbard v. BankAtlantic Bancorp, Inc.*, No. 07-61542-CIV-UNGARO, 2009 WL 3261941, at *3 (S.D. Fla. May 12, 2009) (allegations were sufficient to state a claim when confidential witnesses supported that defendants

were concerned about lending practices and had information that could show falsity of the company's financials).

    2.  <u>Remote Medicine Allegations</u>

Plaintiffs also rely on National Vision's remote medicine initiative for evidence of Defendants' fraud. Plaintiffs allege that "National Vision never took the steps necessary to seriously implement a remote option until it was far too late. By March 1, 2023, remote offerings were only available in one-third of America's Best locations, and Defendants admitted remote medicine needed significantly more resources to 'minimize' previously undisclosed 'productivity loss.'" (AC ¶ 62). Plaintiffs further allege that Defendants "repeatedly gave the market the false impression that remote medicine initiatives were going to be the savior to the Company's exam capacity constraints, and falsely assured the market that remote medicine would bring the Company to profitability in 2023." (*Id.* ¶ 94). However, as with the wage inflation and retention allegations, Plaintiffs make only conclusory allegations without particularized facts that explain how Defendants' representations or omissions were false or misleading.

Plaintiffs first raise the issue of remote medicine with the August 12, 2021 earnings call. They allege that Fahs "touted" the remote medicine pilot but "failed to disclose the Company was, in truth, dedicating minimal attention and effort to remote medicine, which was riddled with technical issues and extremely costly to

implement." (*Id.* ¶ 121). Yet this allegation is only supported with quotes of what Fahs said to investors, which offer only general statements about the possible success of the remote pilot program: "We believe that, that [remote medicine] should be able to be helpful to us in expanding capacity over time and making our stores overall more productive." (*Id.* ¶ 122). Plaintiffs later point to a November 10, 2021 statement to allege that Fahs "continued to give the market the false impression that National Vision was advancing towards viable remote medicine initiatives" but Fahs said little more than "we are are thus far pleased with the [remote] pilots." (*Id.* ¶ 136). Plaintiffs fail to provide any particularized facts supporting their allegations that "the truth" was how they describe it at the time of these statements, and that National Vision somehow failed to disclose "the truth" to investors. (*See id.* ¶ 121). For example, Plaintiffs' assertion that the pilot was "riddled with technical issues" is not supported by examples of those technical issues, and the assertion that it was "extremely costly to implement" is not supported by details of its cost. (*See id.* ¶¶ 121, 179).

According to Plaintiffs' allegations, Fahs provided a more complete update on the remote medicine pilot during the February 28, 2022 earnings call. Fahs stated:

> **Another key focus to ensure we can serve ever-increasing patient demand** has been our remote medicine pilots. We've spent significant time working to develop these offerings and are very pleased with the

progress. Given the success of these pilots, I'm pleased to report remote exams are currently offered in over 100 locations. In 2022, we plan to expand the remote medicine offering and expect to have a total of at least 200 store locations by year-end. Simply put, we believe everybody wins with remote medicine. Optometrists like the flexibility that it provides, while patients benefit from the increased exam availability. As a result, we're excited by the role that remote medicine can play in serving more patients across both geography and time.

(*Id.* ¶ 154). Plaintiffs mischaracterize this statement, alleging that "Fahs touted the Company's 'key focus' on its 'significant' remote medicine initiatives, which Defendants were asserting would 'ensure' National Vision could meet demand, and offer optometrists flexibility." Rather than asserting remote medicine affirmatively "would ensure" that National Vision could meet demand, Fahs identifies it as a "key focus to ensure." (*Id.*). Still, this difference is minor because both phrases constitute forward-looking statements protected by the PSLRA's statutory safe harbor, discussed below. *See Ocwen*, 934 F.3d at 1326; *e.g., Bhatt v. Tech Data Corp.*, No. 8:17-cv-02185-T-02AEP, 2018 WL 6504375, at *3 (M.D. Fla. Dec. 11, 2018) (statements about how company "might execute over the next quarter" are forward looking).

The 2021 10-K issued on February 28, 2022 also reflected the limited scope of the remote medicine program, explaining that the Company had "begun to pilot remote medicine technologies in a limited number of locations to enable the provision of remote eye examinations, which have expanded [the Company's]

offerings." (AC ¶ 159). Despite this, Plaintiffs allege without substantiation that "[a]s a result of Defendants' materially false or misleading statements and omissions, analysts and investors were under the false impression that . . . remote medicine stood ready to provide a short-term solution to exam capacity constraints." (*Id.* ¶ 160).

During the May 10, 2022 earnings call, National Vision announced "an accelerated rollout of [its] remote medicine initiative" to help increase exam capacity. (*Id.* ¶ 171). Plaintiffs allege that "Fahs repeatedly gave investors the false impression that the Company's remote medicine initiatives could counteract any eye exam capacity constraints throughout the call while omitting that National Vision failed to dedicate sufficient resources to remote medicine, and as a result it was riddled with inefficiencies." (*Id.* ¶ 179). While Plaintiffs allege that National Vision "omitted" that it failed to dedicate sufficient resources to remote medicine or that the pilot was riddled with inefficiencies, they again fail to identify any particularized facts supporting this claim. (*See id.*).

During the August 11, 2022 earnings call, National Vision reported lackluster results with muted optimism: "[i]n terms of constraints to our exam capacity, we feel incrementally better about our capacity situation." (*Id.* ¶ 195). Following these updates, one analyst commented that "[t]he telehealth investment is now expected to be a $3 million drag on operating income this year, down from

an expected $6 million drag previously, as the company is seeing a significant ramp-up in operating productivity in remote medicine." (*Id.* ¶ 197). This fact demonstrates that the market was aware that the remote medicine pilot was unprofitable and contradicts Plaintiffs' claims that investors were unaware of the resources being devoted to it.

National Vision continued to report "incremental" and "sequential" progress with the remote medicine pilot during the November 10, 2022 press release and earnings call. (*Id.* ¶ 206). However, Plaintiffs again allege that Fahs "misleadingly emphasized National Vision's 'key growth initiatives' and highlighted that the 'accelerated rollout of remote medicine' was 'adding incremental exam capacity.'" (*Id.* ¶ 203). They also allege that Fahs "misleadingly told the market that exam capacity constraints were 'temporary' and should improve going into 2023." (*Id.* ¶ 206). Plaintiffs do not explain what is misleading about these statements.

On March 1, 2023, Plaintiffs allege that "the full truth" about the effect of constraints on exam capacity and the need for additional investments in recruitment and retention of optometrists, including rapid and extensive expansion of remote medicine options, was revealed to investors." (*Id.* ¶ 214). Moore reported that National Vision was "progressing the remote medicine initiative that we've been discussing in our last few calls." (*Id.* ¶ 217). Fahs referred

34

to remote medicine as a "nascent program" and "further acknowledged" the need for additional resources to "minimize . . . productivity loss," stating:

> **While this is a nascent program**, we're pleased with the initial results and have incorporated key learnings from the rollout related to the productivity ramp and learning curve needed for doctors to transition to the new system. We've implemented new techniques and training to minimize the productivity loss.

(*Id.* ¶ 218) (emphasis added). Here, the Court again struggles to decipher how this statement supports Plaintiffs allegations.

Plaintiffs argue that these "actionable statements were false because NV's remote medicine initiatives were too ineffective and undeveloped to offset optometrist shortages and exam capacity problems." (Doc. 55 at 20 (citing *In re Avon Sec. Litig.*, No. 19-CIV-01420-CM, 2019 WL 6115349, at *20 (S.D.N.Y. Nov. 18, 2019) (statements "tout[ing] the new training program" actionable because training was lacking)). Plaintiffs also argue that "Defendants' failure to commit to remote medicine while simultaneously telling investors that it was capable of alleviating doctor shortages and capacity constraints demonstrates falsity, not 'mismanagement.'" (Doc. 55 at 20–21 (citing *In re Towne Servs., Inc. Sec. Litig.*, 184 F. Supp. 2d 1308, 1322 (N.D. Ga. 2001) ("an existing problem at the time [of] the [misstatement] renders the no-hindsight cases inapplicable")).

However, Plaintiffs' arguments fall short because the Amended Complaint fails to plausibly plead that the remote medicine initiatives were, in fact, "too

ineffective and undeveloped" to succeed. The Amended Complaint's allegations are distinguishable from the cases cited by Plaintiffs. In *Avon*, plaintiffs supported their allegations that the new training program was lacking with reports from seven confidential witnesses who provided information on what was happening inside the company. 2019 WL 6115349, at *2. In *Towne Services*, the court found a potentially actionable omission because defendants failed to disclose an isolated event that resulted in customer losses—the relocation of the company's headquarters resulted in a temporary shutdown of the company's data lines on June 7, 1999. 184 F. Supp. 2d at 1320. Here, Plaintiffs do not offer any witnesses to verify their claims and the alleged mismanagement of the remote medicine rollout over two years is not akin to the circumstances in *Towne Services*.

Plaintiffs allege that the Company's remote medicine program was "inefficient and flawed" and Defendants failed to take steps "to seriously implement a remote option until it was far too late." (AC ¶¶ 60–62). At most, that is an allegation of non-actionable corporate mismanagement, not securities fraud. *See Superintendent of Ins. v. Bankers Life and Cas. Co.*, 404 U.S. 6, 12 (1971) ("We agree that Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement."); *Cutsforth v. Renschler*, 235 F. Supp. 2d 1216, 1242 (M.D. Fla. 2002) (holding severe problems integrating computer systems, inadequately billing customers, setting unattainable budgets,

and arbitrarily increasing revenues on monthly reports alleged only corporate mismanagement, not securities fraud). Plaintiffs fail to plead how any statement was false when made, especially where the Company described remote medicine as a "pilot" in 2021 (AC ¶ 122), stated it would "accelerate" the rollout on May 10, 2022 (*id.* ¶ 171), and then achieved its stated goal of rolling out remote medicine to over 300 stores in 2022 (*id.* ¶ 212).

### 3.  Post-Pandemic Business and Sustainable Growth

Plaintiffs argue that "Defendants made material misstatements regarding NV's post-pandemic operations and ability to sustain growth. For example, Defendants stated NV was 'well positioned to navigate the rest of the pandemic and beyond;' set to 'continue to outpace the industry and grow market share;' and 'pursuing the right strategies to drive continued market share gains and sustainable growth.'" (Doc. 55 at 21 (citing AC ¶¶ 101, 103, 134)). Plaintiffs allege that when these statements were made, National Vision "was already experiencing a labor crisis and exam capacity constraints, making profitability unsustainable." (*Id.*). Plaintiffs' argument fails because the Amended Complaint fails to plead particularized facts that demonstrate why profitability was unsustainable or how National Vision's labor crisis and exam capacity constraints were allegedly different from what they disclosed to investors. (*See id.*). Plaintiffs' cited case law does not apply because the Amended Complaint fails to allege that

Defendants had knowledge contrary to what they reported to investors. *See Emps. Ret. Sys. of the P.R. Elec. Power Auth. v. Conduent Inc.*, No. 19-8237-SDW-SCM, 2020 WL 3026536, at *5 (D.N.J. June 5, 2020) ("Without these misrepresentations, investors could only assume that the Strategic Transformation remained on track, **despite Defendants' alleged knowledge to the contrary.**" (emphasis added)); *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 1:16-CV-3591-GHW, 2020 WL 1877821, at *9 (S.D.N.Y. Apr. 14, 2020) ("**[Plaintiff] alleges that Defendants knew that their sales strategy 'had a Ponzi Scheme-like quality.'** Because Defendants specifically cited their strategy as a source of their success, they were obligated to "to tell the whole truth[.]" (emphasis added)).

Instead, in conclusory fashion and with the benefit of hindsight, Plaintiffs criticize Defendants for their inaccurate predictions regarding the COVID-19 pandemic and its impact on the Company. Courts have routinely rejected this kind of hindsight pleading in the wake of the pandemic.[2] For example, in *Douglas v.*

---

[2] *See, e.g., Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*, No. 21-CIV-4390-VM, 2023 WL 3569068, at *3, *11 (S.D.N.Y. May 19, 2023) (dismissing hindsight allegations that company misled investors regarding "soaring price of steel" and its effect on margins during pandemic because plaintiffs' argument "collapse[d] to merely a quarrel with [the company's] inability to accurately predict the future"); *In re Garrett Motion Inc. Sec. Litig.*, No. 1:20-CV-07992-JLR, 2023 WL 2744029, at *19 (S.D.N.Y. Mar. 31, 2023) (dismissing "hindsight-based" allegations that company misled investors about prospects during pandemic); *Robeco Cap. Growth Funds SICAV v. Peloton Interactive, Inc.*, 665 F. Supp. 3d 522, 540 (S.D.N.Y. Mar. 30, 2023) (similar); *Hunter v. Elanco Animal Health Inc.*, No. 1:20-CV-01460-SED-MG, 2022 WL 3445173, at *11 (S.D. Ind. Aug. 17, 2022) (similar); *In re Fastly, Inc. Sec. Litig.*,

*Norwegian Cruise Lines*, plaintiff challenged statements included the cruise line's assurances that "despite the current known impact" from COVID-19, "record bookings" were attributable to the "strength and resilience" of its business model. No. 20-21107, 2021 WL 1378296, at *5 (S.D. Fla. 2021). The court dismissed the complaint because plaintiffs failed to plead actionable misstatements or omissions: "Considering the Defendants' undisputed acknowledgement of the pandemic's impact on bookings during the conference call, press release, and Form 10-K, no reasonable investor would believe that a statement regarding a brief window of improvement in bookings during a global pandemic implied that all was well within the company[.]" *Id.* at *6; *see also In re Royal Caribbean*, 2013 WL 3295951, at *12 ("Plaintiffs must look beyond these optimistic characterizations to the specific, verifiable statements made by Defendants if they are to successfully allege a violation of the federal securities laws."). Similarly, in *Siegel v. Boston Beer Co.,* the court granted a motion to dismiss, recognizing that the statements plaintiff challenged as inaccurate were "largely statements of optimism about [the company's] performance as the country emerged from the pandemic." No. 21-CV-7693-DLC, 2022 WL 17417111, at *1 (S.D.N.Y. Dec. 5, 2022).

---

No. 20-CV-06024-PJH, 2021 WL 5494249, at *12 (N.D. Cal. Nov. 23, 2021) (rejecting "hindsight speculation" that company misled investors about business prospects during pandemic).

Because the Court finds that the Amended Complaint does not adequately allege with particularity how any statements were false and misleading, it fails to state a claim for securities fraud and the Court need not continue its analysis. Yet for the sake of completion, the Court briefly address the Parties' arguments about the PSLRA's safe harbor and scienter.

### B. PSLRA's Statutory "Safe Harbor"

Defendants argue that the Amended Complaint should fail because nearly all the statements that Plaintiffs challenge are protected by the PSLRA's statutory "safe harbor" for forward-looking statements, as provided by 15 U.S.C. § 78u-5. (Doc. 53 at 2).[3] The PSLRA contains two safe harbor provisions that the Court may consider in deciding a motion to dismiss in a securities fraud case. *Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enters., Inc.*, 572 F. App'x 713, 717 (11th Cir. 2014). The first safe harbor provision protects "forward looking statements" if accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). Scienter is not pertinent to this provision. *See Harris*, 182 F.3d at 803. The second safe harbor provision, on the other hand, protects forward-

---

[3] Defendants argue that the remaining statements are limited to the SOX Certifications (AC ¶¶ 107, 123, 137, 156, 180, 196, 210) and three statements that Plaintiffs have not adequately alleged were false and misleading (*Id.* ¶¶ 132, 157, 159).

looking statements, even absent cautionary language, unless the plaintiff shows that the statement was made with actual knowledge that the statement was false or misleading. *Id*. Since the Court has established that Plaintiffs failed to plead that Defendants' statements were made with actual knowledge that they were false or misleading, the same statements are also protected under the second safe harbor provision.

Defendants argue that nearly all the challenged "forward-looking statements" were "identified as such and accompanied by meaningful cautionary language that was 'detailed and informative,' thus qualifying the statements for protection under the first prong of the safe harbor." (Doc. 53-1 at 21 (citing *Harris*, 182 F.3d at 807). On the other hand, Plaintiffs contend that the statements at issue are not entitled to protection because they relate to present-tense descriptions of past or current events, the safe harbor does not apply to omissions, and Defendants' cautionary language was insufficient because it was boilerplate, vague, or warned of risks already transpired and are thus not entitled to protection. (*See* Doc. 55 at 30–32). Since the Court has established that Plaintiffs failed to plead that Defendants' statements were made with actual knowledge that they were false or misleading, the Court need not analyze whether the forward-looking statements were accompanied by meaningful cautionary language

because the same statements are also protected under the second safe harbor provision.

### C. Scienter

Having addressed whether Plaintiffs sufficiently allege actionable statements or omissions with particularity, the Court now turns to the issue of scienter. The PSLRA mandates that a plaintiff asserting a securities fraud claim "shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The required state of mind for a § 10(b) claim is "scienter," which is defined as an intent to deceive, manipulate or defraud, or a showing of severe recklessness. *Mizzaro*, 544 F.3d at 1238. "The PSLRA demands specific, particularized pleading" of scienter. *In re NDCHealth Corp., Inc. Sec. Litig.*, No. 1:04–cv–970–WSD, 2005 WL 6074918, at *7 (N.D. Ga. 2005) (adding that conclusory allegations are insufficient and that a securities fraud complaint "must provide a factual basis for allegations of scienter").

The Eleventh Circuit has explained the criteria for a "strong inference" of scienter as follows:

> "To qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor*

> *Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). "The inquiry
> is inherently comparative," as "the court must take into
> account plausible opposing inferences." *Id.* at 323. The
> PSLRA also mandates that the court assess scienter "with
> respect to each act or omission alleged to violate this
> chapter." 15 U.S.C. § 78u–4(b)(2); *accord Phillips*, 374 F.3d
> at 1016 ("[Scienter] must be inferred for each defendant
> with respect to each violation." (emphasis added)). "In
> sum, the reviewing court must ask: When the allegations
> are accepted as true and taken collectively, would a
> reasonable person deem the inference of scienter at least
> as strong as any opposing inference?" *Mizzaro*, 544 F.3d
> at 1239 (quoting *Tellabs*, 551 U.S. at 326).

*FindWhat*, 658 F.3d at 1299–1300. Further, "all relevant facts and reasonable

inferences therefrom may be aggregated to establish the necessary strong

inference" of scienter. *See Phillips*, 374 F.3d at 1018 n.6 (11th Cir. 2004) (citing 15

U.S.C. § 78u–4(b)(2)) (internal punctuation omitted); *In re Equifax Inc. Sec. Litig.*,

357 F. Supp. 3d 1189, 1232 (N.D. Ga. 2019) (same).

Defendants claim Plaintiffs fail to plead particularized facts giving rise to a

"strong inference" that Defendants acted with the "required state of mind," as

required by 15 U.S.C. § 78u-4(b)(2). (Doc. 53 at 2). In response, Plaintiffs contend

that scienter is "evident" because Defendants "tracked optometrist employment

and exam capacity metrics," "received reports," and discussed recruiting,

retention, and exam capacity on scheduled calls. (Doc. 55 at 13). However, this

theory of scienter fails because, as the Court has now discussed extensively,

Plaintiffs never allege particularized facts demonstrating how the content of those

43

metrics, reports, or calls differed materially from what was contemporaneously disclosed by the Company. *See Garfield*, 466 F.3d at 1264–65 (allegations that defendants attended "monthly operations meetings" where "every aspect" of the business was "discussed in detail, including the aggressive channel stuffing and mounting problems with accounts," lacked "particularized averments of fraud or scienter"). Accordingly, the Court finds that the aggregated allegations of the Amended Complaint viewed in the light most favorable to Plaintiffs—and the "reasonable inferences therefrom"—are insufficient to plead scienter. *See Phillips*, 374 F.3d at 1018 n.6; *see also FindWhat*, 658 F.3d at 1299–1300 (citing *Mizzaro*, 544 F.3d at 1239).

### D. Section 20(a) Claims

The viability of a Section 20(a) claim depends on the successful pleading of a primary violation under Section 10(a) of the Exchange Act. *Mizzaro*, 544 F.3d at 1237. "Therefore, the pivotal issue in this case [is] whether [Plaintiffs] have adequately pleaded a violation of § 10(b) and Rule 10b–5." *Id*. Because the Court has determined that Plaintiffs have failed to plead a primary violation of Section 10(b) and Rule 10b-5, the secondary liability claims against the Individual Defendants (Counts II and III) must also be dismissed.

## IV.    Request for Leave to Amend

Plaintiffs request that, if Defendants' motion to dismiss is granted, they be given leave to amend the Amended Complaint. (Doc. 55 at 44). Leave to amend should be "freely give[n] when justice so requires." Fed. R. Civ. P. 15(a)(2). "Nevertheless, a motion for leave to amend may appropriately be denied "(1) where there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by amendments previously allowed; (2) where allowing amendments would cause undue prejudice to the opposing party; or (3) where amendment would be futile." *In re Engle Cases*, 767 F.3d 1082, 1108–09 (11th Cir. 2014) (citation omitted). However, "[w]here a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly." *In re Galectin Therapeutics*, 157 F. Supp. 3d 1230, 1240 (N.D. Ga. 2015) (citing *Rosenberg v. Gould*, 554 F.3d 962, 967 (11th Cir. 2009), *aff'd*, 843 F.3d 1257 (11th Cir. 2016)).

Here, Plaintiffs' request for leave to amend has not been raised properly because it is imbedded in the final sentence of their opposition memorandum and does not identify how further amendment would address the deficiencies in the Amended Complaint. Moreover, after extensive analysis of the statements included in the Amended Complaint, the Court finds that any amendment would be futile.

## V. Conclusion

Accordingly, the Court **GRANTS** Defendants' Motion to Dismiss the Amended Complaint. (Doc. 53). The Clerk is **DIRECTED** to close the case.

**SO ORDERED** this 30th day of March, 2024.

_____
Victoria Marie Calvert
United States District Judge

46