The following is the PDF of an official transcript.  Official transcripts may be filed in CM/ECF only by the Official Court Reporter and will be restricted in CM/ECF for a period of 90 days.  You may cite to a portion of the attached transcript by the docket entry number, referencing page and line number, only after the Court Reporter has filed the official transcript; however, you are prohibited from attaching a full or partial transcript to any document filed with the Court.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CITY OF SOUTHFIELD GENERAL         )
EMPLOYEES' RETIREMENT SYSTEM,      )
                                   )
              Plaintiff,           )
         v.                        )   CIVIL ACTION
                                   )   FILE NO. 1:23-CV-00425-VMC
NATIONAL VISION HOLDINGS,          )
INC. et al.,                       )
                                   )
              Defendants.          )   MOTION HEARING
_____)


----------------------------------------------------------------


BEFORE THE HONORABLE VICTORIA M. CALVERT

TRANSCRIPT OF PROCEEDINGS

JANUARY 18, 2024


----------------------------------------------------------------


*Proceedings recorded by mechanical stenography*
*and computer-aided transcript produced by*


WYNETTE C. BLATHERS, RMR, CRR
Official Court Reporter
2114 U.S. Courthouse
75 Ted Turner Drive, SW
Atlanta, Georgia  30303
(404) 215-1547

APPEARANCES:

For the Plaintiff:        KATHLEEN B. DOUGLAS
                          MASON ROTH
                          ROBERT J. ROBBINS
                          Attorneys at Law
                          Robbins Geller Rudman & Dowd LLP
                          225 NE Mizner Boulevard
                          Suite 720
                          Boca Raton, Florida  33432

                          MARY E. CONNER
                          Attorney at Law
                          Johnson Fistel, LLP
                          40 Powder Springs Street
                          Marietta, Georgia  30064

For the Defendants:       B. WARREN POPE
                          BRIAN D. BARNES
                          BETHANY M. REZEK
                          Attorneys at Law
                          King & Spalding, LLP
                          1180 Peachtree Street NE
                          Suite 1600
                          Atlanta, Georgia  30309-3521

Thursday Morning Session

January 18, 2024

10:30 a.m.

- - -

P R O C E E D I N G S

COURTROOM SECURITY OFFICER:  All rise.  United States District Court for the Northern District of Georgia, Atlanta Division, is now in session, the Honorable Victoria Marie Calvert presiding.

THE COURT:  Good morning.  Please be seated.  We are here in the case of City of Southfield General Employees' Retirement System et al. v. National Vision Holdings, Inc. et al., Case No. 23-CV-425.  Can I have appearance on behalf of the plaintiffs.

MS. DOUGLAS:  Yes, your Honor.  Kathleen Douglas from Robbins Geller Rudman & Dowd.  I'm joined by my colleagues, Robert Robbins and Mason Roth, as well as our local counsel from Johnson Fistel, and we're on behalf of the plaintiffs.

THE COURT:  Good morning to all of you.  All right. On behalf of the defendants?

MR. POPE:  Good morning, your Honor.  Warren Pope from King & Spalding on behalf of the defendants.  With me today is Brian Barnes and Bethany Rezek, and then also today we have Amy Auffant from National Vision.  She's the assistant general counsel with the company.

THE COURT: All right. Good morning to all of you. All right. So we are here for an oral argument on the defendants' motion to dismiss the amended complaint. I allotted 20 minutes for each side. I figured since it's the defendants' motion you would go first. Is that right, Mr. Pope?

MR. POPE: Yes, your Honor.

THE COURT: All right. Do you want to allot your time in any way?

MR. POPE: Roughly I'm going to speak to falsity and try to take around 10 minutes, your Honor, and then Mr. Barnes is going to cover scienter. And hopefully he'll take around 10 minutes. That's the goal. And we do have a short presentation, your Honor. I believe there's a copy at your desk, and then we passed out one to your law clerk as well. And then the plaintiffs received a copy before the hearing as well. So hopefully the technology will work. Thank you, your Honor.

THE COURT: All right. Go ahead.

MR. POPE: May I approach?

THE COURT: You may.

MR. POPE: Warren Pope on behalf of the defendants. This is a securities fraud class action subject to heightened pleading requirements, which I'll cover in a moment. So this is not a typical motion to dismiss under the Private

Securities Litigation Reform Act -- I'm sorry.  Slow down a little bit?  Okay.

Under the Private Securities Litigation Reform Act, district courts are the gatekeepers responsible for weeding out non-meritorious claims at the pleading stage.  To survive dismissal plaintiffs have to do two things:  First they have to plead particular facts as to why each --

COURT REPORTER:  Could you please go a little slower.

MR. POPE:  I'm sorry.  I'm trying to stick to the 10 minutes -- must plead particular facts as to why each statement was false or misleading at the time it was made, and plaintiffs have to state with particularity facts that give rise to a, quote, strong inference that defendants acted with scienter.  As were explained to the Court, I'm going to cover falsity today.  My colleague, Mr. Barnes, will cover scienter, each of which provides an independent basis to dismiss the case.  Before I get to falsity, though, I want to provide a brief background of why we're here, and then I'm going to briefly cover the arguments we will not address today but instead we'll rely on the briefing for.

So National Vision is one of the largest optical retailers in the United States.  It's headquartered here in Duluth, Georgia.  It provides eye exams, eyeglasses, contact lenses.  This case centers around the company's annual financial guidance and related commentary that was issued to

investors in 2021 and 2022.

Each year the company issues yearly guidance at the beginning of the year that contain forward-looking projections of expected results for the full year, and after each quarter, the company revisits its annual guidance when it reports its earnings.  So this case is focused on essentially a roughly two-year class period, May of 2021 to February of '23.

The plaintiffs focus on three stock drops, each of which occurred after these quarterly earnings announcements that I mentioned.  One is in November of 2021 where the company maintained the guidance.  The second is in May of '22 where the company lowered the guidance, and the third is in March of '23 when the company reported results in line with the guidance.

Plaintiffs allege that defendants were intentionally misleading investors by issuing guidance and making related statements that were contrary to what defendants knew about the true state of the business, namely that defendants must have known that they would not have enough optometrists to meet the guidance it was issued.

At the time the defendants were making these statements, your Honor, defendants were navigating the Covid pandemic, its variants, and after effects in realtime. Forecasting is never easy but admits the uncertainty and volatility of the Covid era, projections, and discussing those

projections were harder than ever.

There's a well known principle that we talked about at length in our briefs in securities litigation that there can be, quote, no fraud by hindsight.  This principle applies to both falsity and to the scienter element that Mr. Barnes will discuss.  And under this principle the relevant cases posit that it's not appropriate to hold defendants liable when later circumstances cause actual results to be different than the defendants originally expected.

So what it takes to succeed in these cases and what the plaintiffs here lack are particularized facts that the defendants knew when they made the statements, that those statements weren't true.

So briefly what we won't cover today, your Honor, and will rely on the briefs for are the Safe Harbor argument and the puffery and opinion arguments.  I'll briefly note, as you'll see from Exhibit 27 attached to our motion to dismiss where we catalog all of the challenged statements, that 73 of the 107 challenged statements in defendants' opinion are forward looking and therefore protected by the Safe Harbor.  And that's in our motion to dismiss at 11 to 15, reply at 1 to 6.  And the remaining 34 statements are otherwise inactionable, namely because they're puffery or opinion or otherwise not actionable.  And that's also in Exhibit 27 and the motion to dismiss at 15 to 17.

So each of those arguments taken together provide an independent basis to dismiss the complaint.  You need not reach falsity or scienter.  But I'm going to cover falsity today.  Mr. Barnes is going to cover scienter.

So that brings us to falsity, and we have the standard for pleading falsity here on the slide, which is before your Honor.  I'm going to summarize essentially what I said earlier, which is that the plaintiffs have to plead particular facts as to why each statement was false or misleading, importantly, at the time it was made.

So where plaintiffs fall short here is the particularity requirement.  They don't have the detail they need and the temporal requirement.  They don't tell us how the statements were false importantly when they were made rather than in hindsight which is our principal argument.  As Chief Judge Batten stated in the *HomeBanc* case, to show falsity, one typically juxtaposes alleged misrepresentations to a contrary true fact.  And what we contend is they have not sufficiently alleged that juxtaposition.

So with regard to the categories of falsity -- and, again, these are summaries, and it's covered in more detail in the briefing -- they have four categories.  I'm going to briefly try to touch on all of them in the time I have left. The first is wage and compensation.  And so essentially the plaintiffs allege here that the company failed to disclose

that it raised wages for doctors and staff in the middle of 2021, and this was a material omission.  But the plaintiffs never identify any particular statement that was rendered false as a result.  Instead, they allege that the investment that the company made in wage and comp should have been disclosed earlier, but the plaintiffs ignore importantly what the company did disclose.  And these are cataloged here on the slide for your Honor.

In March of '21 the company said increased compensation could raise costs and put pressure on margins.  May of '21 the company said it was in a chapter of tight labor, would pay competitively, make sure our folks are well compensated.  And then in August '21 the company projected continued wage inflation and decline in profitability.

As we cited the *Ocwen* case, your Honor, that case stated, among other things, that material information need not be disclosed unless its omission would render misleading other information that an issue has disclosed.  So we ask, how were the disclosures on this particular slide rendered materially misleading when they were made?  The plaintiffs don't tell us, and they certainly don't tell us in particularity as the standard requires.

So the next category of allegations, your Honor -- and this is really at the heart of the plaintiff's complaint -- are the recruiting and retention allegations.

And essentially the plaintiffs here allege that there were undisclosed pressures related to recruiting and retention that constitute a material misstatement.  They essentially say that every challenged statement in the amended complaint is false or misleading because National Vision was, quote, experiencing extraordinary wage and labor pressures related to the retention and recruitment of its Vision Care professionals and staff.

We contend, your Honor, that is a conclusory allegation.  It's not sufficiently supported, and you need not credit that allegation.  Even though you have to take well pled allegations as true, that is not a well pled allegation. It's conclusory, and I'll explain why.

Essentially in this court, as your Honor knows, as we cited from *Montgomery County Bankshares*, again a Judge Batten, Chief Judge Batten opinion, and Judge Thrash's *Coca-Cola* opinion, in each of those cases the plaintiffs pled the types of reports they were relying on, even named them like the plaintiffs do here.  But they didn't provide the detail on how those internal reports rendered the challenged statement misleading, and they also fail to allege sufficiently with respect to the timing of how the content internally was contradicted by what the defendants said externally.

So that is -- that principle applies here, your Honor, and in particular if you look at the complaint,

paragraph 65, they make reference to the playbook calls. Paragraph 70 of the complaint they reference the Kick Off meeting. And, again, they have -- we give them credit for naming the particular meeting or call, but what they lack is any detail of how that meeting contradicted what the company was saying publicly. So, again, they've named the report or the meeting or the call, but they haven't supported that allegation they made that the company was experiencing extraordinary wage and labor pressure.

So bottom line, your Honor, of course, the company is going to have regular calls and meetings. That's what companies do. Of course, executives are going to attend those meetings. That in recruiting and retention is a key part of the company's business, but what this complaint lacks is any particular information about the information shared at those meetings or on those calls that render the statements misleading at any particular point in time.

Your Honor is familiar with the *Mohawk* case. I believe you had the second motion to dismiss in that case. Your Honor, contrast this case with *Mohawk*. In *Mohawk* they name the scheme, the Saturday scheme, but then they also had a bunch of confidential witnesses and explained how the scheme operated. And they explained, they the plaintiffs, that 50 percent of the product that the company had was, quote, unsaleable scrap. That's the kind of detail this complaint

lacks.

So quickly, your Honor, with regard to recruiting and retention, I didn't, again, want to contrast what they, they the plaintiffs, said that the company said versus what the company actually said.  So I think you'll see in the first bullet point here that plaintiffs claim that defendants said they were not experiencing labor, recruiting, or capacity problems and were unaffected by the pandemic's industry-wide labor shortages.  That's the opposition brief, pages 8 and 10.

Look at what we actually said.  We can always use more optometrists.  We're in a chapter now of tight labor, and demand for optometrists may continue to exceed supply.  So there's just a disconnect between what they said we said and what we actually said, which, of course, in these cases you have to look at what we actually said.

I'll move quickly now, your Honor, to the churn and burn allegations.  Again, these, we believe, are an example of fraud by hindsight.  Here they take particular issue with the way the company staffed people's schedules, and our view of this, your Honor, is, of course, as Covid unfolded and the aftereffects, the variants of Covid unfolded, the company began to realize that it needed to offer more flexibility in its work schedules.

But plaintiff's attempt with the benefit of considerable hindsight in this case, your Honor, to second

guess the business judgment of how the company managed its people's schedules, that is not the stuff of securities fraud. As we've cited in our brief, your Honor, at worst it's corporate mismanagement, and that is not securities fraud. And we cited the *Winn-Dixie* case for that.

So, finally, with regard to remote medicine, your Honor, again here we see pleading fraud by hindsight. This is in paragraph 113 of their complaint, and really all of the categories are all summarized in 113. So that's the relevant paragraph, and that same list of allegations is repeated throughout the complaint. But 113 is illustrative.

Plaintiffs again overstate their claim in this regard, so compare what the company actually said to what the plaintiffs represented we said or implied we said, which is in the opposition brief at page 11 and 25. They said we said remote medicine was a, quote, savior and capable of alleviating doctor shortages and capacity constraints. But what we actually said was it was a pilot, and it would expand capacity over time.

So to the extent the plaintiffs are second guessing how we rolled out the program, the effectiveness of the program, that at best is corporate mismanagement, and it's not securities fraud. So with that, I'm going to turn it over, unless you have questions, to Mr. Barnes to discuss scienter. Thank you for your time, your Honor.

THE COURT:  Thank you.

MR. BARNES:  Good morning, your Honor.

THE COURT:  Good morning.

MR. BARNES:  Brian Barnes for the defendants.  I'm going to talk about scienter today.  Scienter is another independent reason to dismiss the entire complaint because without scienter, there can be no securities fraud.  And the PSLRA imposes a very stringent heightened standard for the plaintiffs to plead scienter.  They must plead with particularity --

THE COURT:  Slow down just a tad.

MR. BARNES:  Absolutely, your Honor.  The plaintiffs must plead with particularity facts supporting a strong inference of scienter, and that means intent to deceive, manipulate or defraud or severe recklessness.  And as a part of this analysis, the Court must weigh the competing inferences only if the fraudulent inferences are equally as compelling as the non-fraudulent inferences, does the complaint adequately plead scienter?  So, again, securities motions to dismiss are different than a typical motion to dismiss where you ordinarily wouldn't do that weighing exercise.  Here you do.

So I want to discuss a few of plaintiff's arguments on scienter.  They refer to what they call seven indicia of scienter in their brief.  None of these are sufficient, even

when taken together.  I'm going to focus on three in particular today, the first being the alleged access to information.  Plaintiffs allege that because defendants had access to information through certain reports or meetings, that they've pled a strong inference of scienter, but that's not so.  Every executive has access to information, and that's not enough to plead scienter in these cases.

For example, we cited the *Garfield* case.  It's a published case from the Eleventh Circuit where the Eleventh Circuit affirmed dismissal of plaintiff's allegations in that case where the executives attended meetings at which every aspect of the business, including the alleged channel stuffing in that case discussed.  The detail in that case was actually more than in this case, and still the Eleventh Circuit recognized that those were generalized allegations and affirmed dismissal.

We also cited the *Floor & Decor* case from this circuit.  The allegations in that case the plaintiffs alleged with -- the plaintiffs alleged the name of the internal system that they said gave the defendants access to sales information on a realtime basis and sales trends.  They named it was called the Prophix system.  But, again, this is not a labeling exercise.  That's not enough to just name the system.  As Judge Jones recognized in that case in dismissing the case, those were generalized allegations about access to

information.  What it lacked was particularized contemporaneous facts connecting defendants to knowledge of the alleged fraud.

Then just to give one more example, your Honor, again from the Northern District, the *Coca-Cola Enterprises* case that Mr. Pope also referred to, plaintiffs in that case alleged access to internal reports.  Again they said that the defendants had access through a specifically named program, Margin Minder, in that case.  So again named the program, but Judge Thrash dismissed that case recognizing again generalized allegations about access to information, not particularized facts connecting defendants to knowledge of the alleged fraud.

So the same holds true in this case, and I'll give just a couple of examples.  If you look at paragraph 67 of the amended complaint, plaintiffs allege that the OD Retention Report contained statistics on optometrist employment levels within the company and that it was circulated to the district manager level or higher.

If you look to paragraph 68 of the amended complaint, they say that the Lost OD Days report contained statistics about optometrist availability and coverage.  But here's what's missing:  The particular contents of any particular report or meeting, the particular timing of any report or meeting or when the executives receive them and, most importantly, they're missing the reasons why any particular

contents of those reports gave -- connected the defendants to knowledge of the alleged fraud.

You contrast that with the *Phoenix v. ATI* case that they cite in their brief, for example. In that case the plaintiffs allege specific details supporting the conclusion that the defendants knew attrition had doubled in that case from a specific rate of 20 percent to just over 40 percent, and they supported that with particular facts in the complaint. Those kind of detailed allegations are just not present in this case.

So bottom line for this argument, a mere allegation that a defendant, or in some cases lower level employees, in this case had general access to information, is not the same as pleading with particularity facts connecting defendants to knowledge of the alleged fraud.

The second argument that I want to cover, your Honor, is the alleged admissions. Plaintiffs say that Mr. Fahs or the CEO of National Vision admitted to the alleged fraud after the class period ended in March 2023. First of all, as a matter of law this circuit is very strong on rejecting allegations of fraud by hindsight, which this argument absolutely is. Plaintiffs are trying to look to an after-the-fact statement and take that after-the-fact statement and infer a prior fraud, which is impermissible fraud by hindsight.

I also want to take their argument at face value and explain why it doesn't work.  If you look, just to give an example, at paragraph 264 of their amended complaint, that's one of the statements that they rely on for this argument.  Mr. Fahs in March 2023 said, the biggest reason that people were leaving National Vision was because of the company's lack of flexibility and because they had to work every Saturday.  And he continued and said, in a world of scarce doctors amidst the great rethink of post-Covid values, that wasn't going to work anymore.

So what he was doing then in March 2023 is giving investors his hindsight analysis, his retrospective analysis of the challenges that the pandemic created in talking about how the company adjusted to those challenges in realtime.  There's no admission of contemporaneous fraud in that March 2023 statement.  It's just a hindsight observation and a retrospective analysis.

What plaintiffs are trying to do is look at that March 2023 statement and claim that statements made months or even years earlier in 2021 or 2022 were false or misleading and that Mr. Fahs must have known back then of what he was telling investors now in March 2023.  And that's a giant unsupported leap of speculation.  It's not supported by particular contemporaneous facts, which is what the PSLRA requires.  So bottom line these allegations about alleged

omissions don't support scienter.

And, finally, your Honor, I'd like to discuss the alleged stock sales, first of all, because plaintiff's scienter allegations are conclusory, and they fail to plead any other particular facts supporting scienter.  All you're left with is these alleged stock sales.  And so in this circuit you don't need to address the stock sales because plaintiffs cannot plead scienter based solely on stock sales.  But, again, taking them at face value, plaintiffs have the burden at this stage of proving -- of showing that the stock sales were unusual or suspicious, and they don't meet that standard for a few reasons.

First of all, all of Mr. Moore's trades and most of Mr. Fahs' trades were made pursuant to 10b5-1 trading plans.  Those are written plans that establish predetermined parameters for future trades, and they negate any inference of scienter, as we explained at pages 30 to 31 of our motion to dismiss brief.

Second of all, the defendants' trading history cuts against scienter, and we submitted Exhibits 29 and 30 with our motion to dismiss that show the context of defendants' trading history leading up to the start of the class period in May 2021.  And that trading history shows that both Mr. Fahs and Mr. Moore regularly traded in each of the years leading up to the class period.  So far from being unusual or suspicious,

the class period trades are just a continuation of a regular annual pattern of dispositions, which cuts against scienter.

And, third, your Honor, both of the defendants increased their holdings of National Vision stock throughout the course of the class period, so all these factors cut against any inference of fraud, which brings me finally, your Honor, to the weighing of the competing inferences, which this Court does in considering scienter in a securities class action motion to dismiss.

The plaintiffs have not raised a strong inference of fraud in this case.  The amended complaint is based on hindsight speculation unsupported by particularized contemporaneous fact, and that hindsight speculation is made against the backdrop of the Covid pandemic, the volatility of the Covid pandemic, which obviously impacted the ability of the company to staff at stores.  And that was no secret to investors because defendants discussed that with the investors throughout the class period.

So the far more compelling inference here is that defendants were discussing their business with investors in realtime based on what they knew at the time, and where necessary they revisited and adjusted their financial guidance, again, based on what they knew at the time.  There's no inference of fraud here.

Just to wrap up, your Honor, Courts in this district

and in this circuit when faced with allegations like these, regularly dismiss these cases.  We've put a few here on the slide and cited more in our motion to dismiss brief.  I mentioned the *Garfield* case.  I also mentioned the *Floor & Decor* case, and then, finally, the *Aaron's* case, another guidance-based case from this district in which there were fraud by hindsight problems with the complaint.  Just like these cases and others in our brief, plaintiffs have failed to plead a strong inference of scienter.

So, your Honor, for anything not covered in our argument today, we'll rest on our motion to dismiss briefing, and for all of these reasons we're asking the Court to grant our motion to dismiss.

THE COURT:  Thank you.

MR. BARNES:  Thank you.

MS. DOUGLAS:  Now, defendants have told you their view of the case, and before I delve into all of my responses as to why I respectfully disagree with them, I think it's important for us to take a few steps back and really orient ourselves with the actual facts that are pleaded in this amended complaint.  Defendants do a lot of glossing over, a lot of citing to, you know, summary paragraph from our introduction, and they're not actually citing all the array of facts that we really allege.

So, first, it's important to focus on what this case

is not.  This is not a guidance case.  We allege two statements out of, as Mr. Pope pointed out, over a hundred statements that are false and misleading.  This is not a fraud by hindsight case, and this is not a failure to respond to Covid case.

What this case is, is a very straightforward case about how National Vision, a huge optical retailer in the United States, did not have enough doctors to conduct eye exams.  That's what this case is about.  Conducting eye exams was its bread and butter, and it did not have sufficient doctors and staff to conduct these exams, medically necessary exams, that its customers could not purchase its products without.

Despite this, defendants lied about it.  They told investors during the class period, which begins over a year after Covid and a year -- 11 or 10 to 11 months after their stores had fully reopened, they told investors that they denied the industry-wide problems that their competitors were facing in offering eye exams as well as having doctors in their stores.  They said specific statements like, we aren't feeling there's a tremendous capacity constraint for us.  We do think the industry is feeling some.  That's in paragraph 105.

They downplayed any undisclosed wage investments and wage inflation saying we've not had to signal huge wage

implications.  The impact to us on staffing challenges is mild.  That's paragraph 118.  And we're pleased with our ability to staff our stores amongst this more difficult labor environment.  That's paragraph 143.

So while they did recognize labor constraints, as defendants pointed out, they told the market that they weren't impacting them.  Those were the statements that defendants said, and those were the statements that are actionable.

Second, to the extent defendants did tell investors about National Vison's remote medicine and recruitment initiatives, they told defendants that they were pursuing -- I'm sorry.  They told the market that they were pursuing the right strategies to drive continued market chains and sustainable growth.  That's paragraph 134.  And they made over 30 statements about how remote medicine was advancing the company's efforts to expand exam capacity, meaning expand ability to have eye exams to see patients and to meet ever increasing demand, 30 statements.

So defendants want to talk about one statement pre-class period about remote medicine being a pilot, but during the class period there were over 30 statements where defendants told the market specifically -- and they're cited in our complaint -- told the market that remote medicine was going to help with any exam capacity constraints, and it was going to help with doctor scheduling.  And these statements

24

were false and misleading because, as we allege in the complaint, remote medicine was never up to par in order to make up for these losses.

Third, and fundamentally without being able to perform eye exams, the company's bread and butter, National Vision customers were unable to buy glasses, and they were unable to buy their contacts. Customers went elsewhere, and National Vision's financial performance was negatively impacted. Rather than tell the market the truth, they made over a hundred statements from May of 2021 to November of '22 telling the market just the opposite.

Now, defendants make a big issue saying that we haven't alleged particular facts, but if you actually read the complaint and for what it actually says, we allege falsity and scienter with particularity. Paragraphs 39 and 72 detail specific facts supporting the falsity of these statements when they're made.

Paragraphs 41 through 45 explain how National Vision's unrelenting work environment led the company to suffer labor shortages and high turnover starting in 2019. So before the class period they were already facing these issues. And why? Because they required their doctors to see between four and six patients an hour and to work Saturdays, which was much more than their competition. And this is the churn and burn business model that were referred to in the complaint.

Paragraphs 49 through 51 detail how in early 2022 demand for National Vision's eye exams and products increased rapidly, and once stores were opened, they were backlogged. Patients couldn't even see their doctors.  That's in paragraph 51.

In paragraphs 40 through 47 it details specific retention rates, just like in *Mohawk*, your Honor, where the complaint alleges how in 2020 the company's optometrist retention rates were only 40 to 60 percent with optometrists consistently burning out and leaving within two years.  These are specific facts, your Honor.

By the start of the class period on May 13th, 2021, which I want to remind you is 11 months after the stores had fully reopened, National Vision was in dire straits.  Doctors were retiring or leaving at record rates causing exam appointment delays, lost sales, reduced profitability, and unsustainable outlook.  That's in paragraph 51.

We have specific allegations that things were so bad that in Fairfax, Sterling, and Woodbridge, Virginia you had stores operating illegally without licensed opticians.  And National Vision lacked the viable remote medicine option, and that's detailed in paragraphs 55 through 62.  For example, it cost approximately $300,000 to equip stores with remote technology and would take 15 to 40 minutes for a doctor to connect with patients due to technology inefficiencies, issues

with sit-lamps and which took hours to charge.  Those specific allegations are detailed in paragraphs 55 through 62.

Defendants knew all of this, your Honor.  That's where we come to our scienter facts, paragraphs 23 to 26, 63 to 70, and, most importantly, paragraphs 247 to -69, which I notice were not mentioned.  We have a specific section of the complaint called additional allegations of scienter where we laid out our seven indicia easily for the Court.  They span 35 paragraphs and over 14 pages that when taken collectively, as the Supreme Court requires, demonstrate that defendants acted or made statements with an intent to defraud or severe recklessness.

If you look at paragraph 260, your Honor, we have 13 bullet points that do detail the timing, names, and content of specific reports, meetings, and presentations.  We don't just list names.  We don't just list that there's a playbook that exists, your Honor.  We talk about a playbook and multiple weekly calls scheduled in response to the pandemic that discuss doctor capacity and retention.

When we talk about OD Retention Reports, we don't just give you the title.  We say they were regularly prepared by a professional service which provided realtime data on optometrist retention and stores with the highest and lowest levels of retention, and these reports were sent to all higher level employees, including Petit (phonetic) who reported

directly to Fahs.

We talk about lost OD Days Reports.  Those were prepared by America's Best regional directors and regional VPs, and they reported things called as dark days.  And a dark day is something where a store cannot run because it does not have sufficient staff.

So we're giving you specific detailed reports, more than just titles.  We're giving you actual content.  Conferences such as the biannual Kick Off, we don't just name it.  We say it occurred during the first quarter of each year as well as back-to-school meetings that were in the third and fourth quarter.  They were attended by the entire company, including Defendant Fahs.  And these were company-wide meetings that plugged the company's need to go above and beyond to keep optometrists happy and to remain at the company.  That's alleged in paragraph 70.  So we give you specific allegations, your Honor.

Then paragraph 61 provides 14 instances of defendant's own words confirming that they monitor rates on eye exam capacity constraints, optometrist retention and recruitment, and over two years of data of remote medicine.  There's a statement that we allege in paragraph 261 by Defendant Moore where he specifically states that they track these metrics.  So the truth eventually came to the market in three separate disclosures, each of which resulted in

extraordinary stock drops and demonstrated that defendant's prior statements were falsely made.

In November of 2021, defendants admitted to previously undisclosed wage investments that had already happened midyear, and the key to that statement, your Honor, is that these statements -- this statement was made in November of 2021.  The class period starts in May.  There were two sets of false statements, May and August, where defendants gave the false impression that they were only experiencing mild wage investments.  So this is not fraud by hindsight.  This is a statement that this giant wage investment actually happened midyear.  That's May, your Honor. That's when this class period starts, and it wasn't disclosed until November.  And it negatively impacted the company's Q4 profitability.

Another disclosure.  In May of 2022 the company acknowledged that despite previous denials about issues with exam capacity constraints, that it was indeed facing constraints in doctor capacity.  But even then they said these severe issues were only temporary, and they were limited to some locations.  That's in paragraphs 172 to 176.  This disclosure, as limited as it was, still resulted in a 31 percent stock decline.

And, finally, at the end of the class period in March of 2023, defendants finally admitted that National Vision was

being crippled by labor shortages and problems with optometrist availability, and they said that the optometrist availability problems had been since the pandemic. The pandemic, as we all know, started in February or March of 2020. Our class period does not start until May of 2021, your Honor, and these statements were made in May of 2023.

So to think that a CEO and a CFO who regularly monitored all these reports told investors that they monitored these metrics and regularly talked about these issues didn't know about it for three years, is completely nonsensical, your Honor.

Defendants concede on page 9 of their motion to dismiss that they also disclosed for the first time the need for significant enhancements to optometrist recruiting and retention despite continually touting them to the market, and defendants admitted the need for increased scheduling options that would weigh on profitability.

Lastly, the company admitted that remote medicine was actually a drain on productivity riddled with productivity loss. So it's not just that remote medicine didn't do what they said it would, that it wasn't some savior. And, by the way, we never quote savior as a statement. That's taken from our intro, believe. But they admitted that remote medicine was a drain on profitability and riddled with productivity loss. Productivity loss means instead of it being productive,

it was actually hurting the business, which was the complete opposite of what they were telling the market.  As a result, the company stock price fell 39 percent.

So this is not a case about future predictions, about an immaterial aspect of a company's business.  It's about a medically necessary industry.  This is not about a cruise line.  This is not about a restaurant industry.  This is not about a Peloton bike, which a lot of defendants' cases talk about.  This is not how a business would weather Covid in 2020, but to the contrary it centers on defendants' known and reckless misstatements about the company's livelihood, its ability to perform eye exams over a 20-month period through 2023.  And these problems existed in 2019.  These were not Covid created problems, and there's no doubt that investors would have wanted to know the truth.

Now, our opposition brief provides your Honor with a roadmap of legal authority that sustains complaints based on almost identical allegations finding similar statements actionable in like context and finding each of our seven indicia sufficient, especially when viewed collectively as the Court requires.

Now I just want to highlight two of those, and you'll see them throughout our briefing.  First, Judge Chang's case from the Northern District of Illinois -- I know defendants' counsel mentioned that -- it's denying defendants' motion to

dismiss in part in *Phoenix v. ATI*.  Now, that's a securities fraud case, and that case centers on a post merger disclosure of poor financial results stemming from physical therapist attrition rates that were not made public.

In *ATI* Judge Chang found statements regarding very high retention and low turnover of its physical therapists and high retention and strong retention of employees actionable. Like our case none of the public filings mention the actual realtime problems that were happening, and the Court says that at 3 in ATI.  And like here, in that case plaintiff's 40 percent attrition leading up to the class period, weekly reports, quarterly in person meetings, and the fact that defendants made a spiel about needing to recruit and retain clinicians to support the company's growth as well as slide-decks and calls and only hypothetical risks, allowed the Court to deny defendant's motion.

The second case I want to draw your attention to is Judge Rakoff's case out of the Southern District of New York, and that's *Nayani v. LifeStance*.  And that's a securities case.  And, now, that case concerns a company that offered mental health services through physicians.  And plaintiffs alleged Section 11 liability in that case about a registration statement that failed to tell investors that LifeStance was struggling to retain physicians.  Just like in our case, in *LifeStance* defendants do not dispute LifeStance's retention of

doctors was an important metric to success.  And just like in our case, LifeStance defendants sought to shield themselves from liability because it warned investors that a retention rate might change in the future.

In denying defendant's motion to dismiss and in finding defendant's nondisclosure of these declining retention rates material, the Court held, a reasonable investor plausibly would have taken great interest in learning that LifeStance might not only cease to retain physicians in the future but, in fact, was already struggling to retain them. So those are two cases throughout our brief that I wanted to highlight for you, your Honor, that provide a really great roadmap in very similar factual situations.

Now I just want to touch a bit on defendants' arguments.  So after reading their briefs and hearing their arguments, it kind of made it seem like it was some insurmountable hurdle to deny a motion to dismiss, and as your Honor knows from *Mohawk*, that's not the case.  In fact, in *Tellabs* the Supreme Court and Justice Ginsburg stated nothing in the PSLRA casts doubt on the conclusion that private securities litigation is an indispensable tool with which defrauded investors can recover their losses, a matter crucial to the integrity of the domestic capital markets.

So when viewing the complaint, *Tellabs* states that when faced with a 12(b) motion, a Court still must consider

the complaint in its entirety, accept all factual allegations as true, and construe all reasonable inferences in plaintiff's favor.  The only thing the PSLRA requires is that falsity and scienter need to be pleaded with particularity, which is what we have done here.

Now I want to touch on falsity for a little bit.  I think it's important to remember that when it comes to falsity, that as the Eleventh Circuit acknowledged in *FindWhat*, it's not just false statements that are actionable, it's also omissions of a material fact necessary to make statements made, in light of the circumstances in which they were made, not misleading.  And we have that here, your Honor. We have false statements, and we have omissions.  And I will go through those in a little bit more detail.

So first I just want to talk about how we meet the particularity standard.  In the Eleventh Circuit in *Garfield*, it's defined as meeting the who, what, where, when, how of misstatements when made.  And we've done that, your Honor.  We laid out in our opp on pages 6 to 7.  We detail the specific paragraphs that make it very easy to see that we've met that. And as defendants acknowledge, for efficiency we have grouped our statements into categories.

So I do want to talk a bit about the recruiting, retention, and eye exam statements.  Now, these are the false statements regarding high retention and recruiting and denying

34

issues with exam capacity.  What defendants ignore is that not only were these statements said, but these statements were actual denials where the market was asking about things that were affecting the industry.  And while acknowledging they were affecting the industry, defendants said they weren't impacting them.

So defendants boasted about these high rates of retention of doctors and National Vision's strong ability to recruit while they denied their actual issues saying in paragraph 105, we aren't feeling that there's tremendous capacity constraints for us.  We do think the industry is seeing that.  Defendants also downplayed their wage investments and wage inflation by saying we pay competitively, and we've not had to signal huge wage implications.

Now, defendants had a duty to disclose.  By speaking about these material and critical topics of doctor recruiting and retention, eye exam capacity, and remote medicine, they had a duty to fully disclose relevant material facts.  As the Court said in *FindWhat*, even absent a duty to speak, a party who discloses material facts assumes a duty to speak fully and truthfully.  When asked about these topics, your Honor, defendants never said no comment, we'll get back to you, we don't know how we're doing with exam capacity constraints.  No, your Honor.  They answered the questions to the market, and they made representations explicitly.

Some examples of the omissions.  While defendants spoke about industry labor, they claimed that on my competition their rates were at near levels with healthy doctor coverage and an ability to meet strong demand.  Those are paragraphs 104, 117, and 143.  They omitted that the company was facing exam capacity constraints.  And I know I keep hammering this, your Honor.  But it's because it's so clearly laid out in our complaint, and it was not addressed by defendants.

On February 28th, 2022, Fahs and Moore both falsely blamed macro headwinds from Omicron and winter weather for issues affecting store operations and customer traffic.  They also said that it was due to store illnesses, is why doctors weren't showing up.  That's in paragraphs 87 and 147.  But they were omitting that it was actually a lack of critical staff.  That's why these stores weren't staffed.  It wasn't just Covid.  It wasn't winter weather.  It was that -- it wasn't that staff was absent due to illness but because they simply didn't exist.  These half truth and omissions make clear that defendants breached their duty to disclose.

Like in the Northern District's case of *Sunrise v. FleetCor*, statements touting fee free cards created a duty to disclose that there was actually a scheme charging fraudulent fees.

THE COURT:  You've got about a minute.

MS. DOUGLAS:  A minute left.  Okay.  So some other things that I do just want to highlight when we talk about, I think, the retention and allegations, next we'll turn to the churn and burn allegations, your Honor.  And I think one of the main points here is that this is not a case of fraud by hindsight.  The statements that were made specifically said at the time these admissions that we talk about specifically give you times.  They say the pandemic created issues.  Issues were stemming over the course of '22, and the rigid schedule was the reason why people left us.  So this is not a fraud by hindsight case.

When it comes to scienter, your Honor, I'm just going to say that we allege in multiple paragraphs reports laying things out.  We have seven specific indicia of scienter.  Our admissions here are very different than the cases that defendants cited.  We also allege core operations, something that defendants completely waived by not even talking about, core operations and critical to access of information.

In regard to the stock sales alleged, your Honor, we don't even need stock sales.  There's not some requirement that you allege stock sales, but the reason we alleged them here is because they made over 34 million in proceeds on these stock sales.  So Fahs's pattern of trading was hundreds of percentages larger during the class period as it was prior to that, and for Moore the proceeds that he made on those four

days of trading was more than he made over four years.

So in the end, your Honor, as the Court has done in many Eleventh Circuit cases, we believe that defendants' motion should be denied.  Thank you.

THE COURT:  Thank you.  All right.  Well, I appreciate you all coming here for this argument.  I think that there's a lot of detail or I should say the complaint is very long, and there are a lot of allegations.  I do sort of wonder about whether minimization perhaps of problems equates to the falsity that plaintiffs want me to find.

It seems like in some of the quotes there is some acknowledgment.  It's just not maybe at the level that plaintiffs say it was, and so I'm going to look at the cases that plaintiffs rely heavily on to sort of compare the information to see if it's the same.  But a lot of it, honestly, to me just seems like maybe they didn't disclose it to the degree that plaintiffs thinks they should have.  But it wasn't a complete denial.

MS. DOUGLAS:  If I may, your Honor, just respond?

THE COURT:  Sure.  Briefly.

MS. DOUGLAS:  So I think the issue that we have to take into account here is that according to the Eleventh Circuit, the standard is that a reasonable person.  So whether we phrase it as a denial or not, it doesn't have to be an overt denial.  It has to be the impression that was given to

the market about those statements, and the statements that we're alleging are misleading.  They are material.  If you look at the analysts' reactions, your Honor, no one knew.  People didn't know that they were facing exam capacity constraints.  We have three significant stock reactions.  In each one analysts are saying we didn't know that, we didn't know that this was happening.

We have one stock reaction where an analyst comments that they were gut punched.  At the end of the class period, you have analysts saying that everything the company disclosed was very messy.  And this is an analyst's job.  This is what they do.  And even they were surprised at the disclosures that defendants made, and the standard is a reasonable investor.

So I just want if you could just keep that in mind when you're looking at these statements because it's not just saying something once.  It's not just saying something twice.  Like I said with remote medicine, they make the statement over 30 times to investors on every single call in seven quarters.  And I think those are things that take it to that degree of what a reasonable investor would see as important.

THE COURT:  All right.  I'll keep that in mind.  Thank you.  All right.  Nothing further, I guess we are adjourned.  Thank you again.

COURTROOM SECURITY OFFICER:  All rise.  Court stands

adjourned.

(Whereupon, the proceedings were adjourned at 11:20 a.m.)

- - -

REPORTERS CERTIFICATE

I, Wynette C. Blathers, Official Court Reporter for the United States District Court for the Northern District of Georgia, with offices at Atlanta, do hereby certify:

That I reported on the Stenograph machine the proceedings held in open court on January 18, 2024, in the matter of CITY OF SOUTHFIELD GENERAL EMPLOYEES' RETIREMENT SYSTEM v. NATIONAL VISION HOLDINGS, INC. et al., Case No. 1:23-CV-00425-VMC; that said proceedings in connection with the hearing were reduced to typewritten form by me; and that the foregoing transcript (Pages 1 through 39) is a true and accurate record of the proceedings.

This the 10th day of May, 2024.

_____
/s/ Wynette C. Blathers, RMR, CRR
    Official Court Reporter